# EXHIBIT C

# LYNN PINKER COX HURST

JEREMY A. FIELDING, PLLC
*Partner*

D 214 981 3803
F 214 981 3839
jfielding@lynnllp.com

*Lynn Pinker Cox & Hurst, LLP*
*2100 Ross Avenue*
*Suite 2700*
*Dallas, Texas 75201*
**lynnllp.com**

May 20, 2019

<u>**Via Electronic Mail: jryan@rbdllp.net**</u>
Mr. John Ryan
East Rockaway Village Attorney
131 Tulip Avenue
Floral Park, New York 11001

Re:     Village of East Rockaway's Unconstitutional Solicitation Curfew and Licensing
Process

Dear Mr. Ryan:

My firm represents Aptive Environmental, LLC ("Aptive"), a nationwide pest control
company providing regular pest control services to thousands of satisfied customers in dozens of
New York cities and towns. Aptive's initial sales are made almost exclusively through door-to-
door solicitation. Because most residents have work, school, or other obligations keeping them
away from their homes during typical working hours, most of Aptive's sales occur between the
hours of 5:30 p.m. and 9:00 p.m.

Aptive understands and appreciates East Rockaway's desire to create and maintain rules
governing door-to-door solicitation. Aptive believes such regulations – when reasonably drawn –
provide important assurances that solicitation efforts in the Village will be safe and free from
abusive practices.  As such, Aptive places the highest priority on its compliance with such rules.
That said, when these regulations cross a constitutional line – by, for instance, imposing an
unconstitutional curfew or overly broad restrictions on solicitation activities – Aptive must insist
that these improper regulations be repealed. Not only are such regulations unconstitutional – both
facially and as applied – but they also have a direct and substantial impact on Aptive's business
viability and profits. To protect Aptive's First Amendment freedoms, and to remedy the harm
caused by the Village's unconstitutional solicitation curfew and restrictions, Aptive has retained
my firm.

## A.     Unconstitutional Solicitation Curfew

The Village of East Rockaway's solicitation curfew, found at § 171-18 of the Village Code,
restricting solicitation to the hours between 9:00 am and 5:00 pm violates the First and Fourteenth
Amendments of the United States Constitution.

Last year Aptive secured a temporary restraining order in New Jersey federal court against
Woodcliff Lake, New Jersey's enforcement of a less restrictive 6:00 p.m. curfew.  *See Aptive
Environmental, LLC v. Borough of Woodcliff Lake, New Jersey*, No. 2:18-cv-10891-SDW-LDW
(D.N.J. June 22, 2018).  *See also* Order to Show Cause, attached hereto.  The Court granted the

John Ryan
May 20, 2019
Page 2

TRO because the Supreme Court has unequivocally held that the loss of First Amendment freedoms, for any amount of time, constitutes *per se* irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Aptive will not hesitate to seek the same relief against the Village's enforcement of its curfew, which is currently inflicting the same irreparable harm upon Aptive's First Amendment freedoms.

It has been Aptive's desire to resolve these constitutional issues amicably and without litigation, and it has done so with nearly every municipality having a solicitation curfew. Nevertheless, some municipalities have chosen to take this issue to trial. Just last year, in the lawsuit captioned *Aptive Environmental, LLC v. Town of Castle Rock, Colorado*, the United States District Court for the District of Colorado invalidated the Town of Castle Rock, Colorado's 7:00 p.m. solicitation curfew—*a curfew less restrictive than that of East Rockaway*—holding that the curfew was an unconstitutional restriction on commercial speech. *See* Court's Judgment, attached hereto. Our firm initiated, prosecuted, and tried this case on behalf of Aptive, and as the prevailing party, Aptive recovered more than half a million dollars in attorneys' fees.

The Court struck this curfew despite Castle Rock's purported justifications of protecting residents' privacy and safety. *See also City of Watseka v. Illinois Public Action Counsel*, 796 F.2d 1547, 1556-57 (7th Cir. 1986) (invalidating 5:00 p.m. solicitation curfew despite the city's objective of protecting privacy and preventing crime). To give you a more complete overview of the case law a municipality defending a pre-9:00 p.m. curfew must contend with, I have attached the summary judgment briefing in the *Castle Rock* case.

The District of Colorado's decision in the *Castle Rock* case is consistent with what the U.S. Supreme Court and five federal circuit courts have uniformly held: that municipal ordinances prohibiting door-to-door solicitation before 9:00 p.m. are unconstitutional. *See Project 80's Inc. v. City of Pocatello*, 942 F. 2d 635 (9th Cir. 1991) (rejecting total ban on commercial solicitation); *City of Watseka v. Illinois Public Action Council*, 479 U.S. 1048 (1987) (affirming that 5:00 p.m. curfew was unconstitutional); *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564 (6th Cir. 2012) (invalidating 6:00 p.m. curfew); *City of Watseka v. Illinois Public Action Counsel*, 796 F.2d 1547 (7th Cir. 1986) (invalidating 5:00 p.m. curfew); *New Jersey Citizen Action v. Edison Township*, 797 F.2d 1250 (3d Cir. 1986) (invalidating 5:00 p.m., 6:00 p.m. and sunset curfews); *Wisconsin Action Coalition v. City of Kenosha*, 767 F.2d 1248 (7th Cir. 1985) (invalidating 8:00 p.m. curfew); and *Association of Community Organizations for Reform v. City of Frontenac*, 714 F.2d 813 (8th Cir. 1983) (invalidating 6:00 p.m. curfew).

The holdings of these cases clearly indicate that the Village's 5:00 p.m. solicitation curfew is unconstitutional. The solicitation curfew further violates the right of citizens of the Village to receive information, which is another protected First Amendment freedom. *Bd. Of Educ., Island Trees Union Free Sch. Dist. Number 26 v. Pisco,* 457 U.S. 853, 867 (1982).

John Ryan
May 20, 2019
Page 3

**B.      Unconstitutional Licensing Process**

The Village's solicitation ordinance violates the First and Fourteenth Amendments of the United States Constitution because it contains no express standards or time frames for investigating license applications and issuing licenses. As a result, the ordinance vests unbridled discretion in the hands of Village officials and prohibitively restricts the granting of solicitation licenses.

Just last year, the U.S. District Court for the District of New Jersey enjoined the entirety of Woodcliff Lake's solicitation licensing restrictions, in addition to enjoining its solicitation curfew. *See Aptive Environmental, LLC v. Borough of Woodcliff Lake, New Jersey*, No. 2:18-cv-10891-SDW-LDW (D.N.J. June 22, 2018). The Court granted the TRO because Aptive showed irreparable harm to its constitutional freedoms caused by unbridled discretion in the hands of licensing officials to grant licenses *as they saw fit, when they saw fit*.

The East Rockaway Village Solicitation Ordinance includes no express standards regulating the investigation of applicants for licenses. Additionally, the Village insists on processing license applications without any prescribed time limits for issuing decisions. The Solicitation Ordinance thus vests unbridled discretion in Village officials to grant licenses whenever they see fit. The U.S. Supreme Court has repeatedly invalidated ordinances that leave the timetable up to the official's discretion. *See Riley* v. *National Federation of Blind of N. C., Inc*., 487 U.S. 781 (1988); *Freedman* v. *Maryland*, 380 U.S. 51 (1965). Indeed, "One 'species of unbridled discretion' that renders a prior restraint unconstitutional is a lack of time limits on processing applications: '[A] prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible.'" *Nittany Outdoor Advert., LLC v. Coll. Twp.*, 22 F. Supp. 3d 392, 411 (M.D. Pa. 2014) (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223 (1990)).

**C.      Unconstitutional Licensing Bond Requirement**

The Village of East Rockaway's bond requirement for solicitation, found at § 171-16 of the Village's Code (the "Solicitation Bond"), violates the First and Fourteenth Amendments of the United States Constitution. Section 171-16 imposes an onerous $2,500 surety bond for *each* applicant for a solicitor's license. This restriction will not survive constitutional scrutiny.

The Village's Solicitation Bond constitutes an unconstitutional restraint on speech for at least three reasons: *First*, the Bond is not narrowly tailored and does not advance a substantial government interest, but rather it is arbitrary and operates to prevent free speech from taking place. *Second*, the Bond functions as a *de facto* ban on solicitation for any company with a national presence. *Third*, the Bond violates citizens' constitutional right to receive information.

*1.      The Bond is Not Narrowly Tailored*

Numerous federal courts have held that a fee cannot be charged if the fee is arbitrary or is a method of preventing free speech from taking place. *See, e.g., Forsyth County, Georgia v.*

John Ryan
May 20, 2019
Page 4

*Nationalist Movement*, 505 U.S. 123 (1992); *Big Hat Books v. Prosecutors*, 565 F.Supp.2d 981 (S.D. Ind. 2008) (finding $250 fee – even if only paid once – to be an unconstitutional restriction on free speech); *Ohio Citizen Action v. City of Mentor-on-the-Lake*, 272 F. Supp.2d 671 (N.D. Ohio 2003); *American Target Advertising, Inc. v. Giani*, 199 F.3d 1241 (10th Cir. 2000); *Collin v. Smith*, 447 F.Supp. 676 (N.D. Ill. 1978). Generally, the government may not tax the exercise of a constitutionally protected right. *Ne. Ohio Coalition for the Homeless v. City of Cleveland*, 105 F.3d 1107, 1109 (6th Cir. 1997). East Rockaway's Bond constitutes precisely such a tax.

Further, for a license fee to be permissible under the First Amendment, a municipality may charge *no more* than the amount necessary to cover administrative costs. *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941) (no constitutional infirmity in license fee limited to expense incident to administration of statute and maintenance of public order in the matter licensed); *Baldwin v. Redwood City*, 540 F.2d 1360, 1371–72 (9th Cir. 1976), *Jacobsen v. Harris*, 869 F.2d 1172, 1174 (8th Cir. 1989). But nowhere does East Rockaway justify the $2,500 fee, and East Rockaway cannot show that each door-to-door solicitor imposes a $2,500 administrative burden to the Village.

Under the U.S. Supreme Court's commercial speech jurisprudence, it is East Rockaway's burden to show that the regulation is narrowly tailored and advances substantial governmental interests. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980). Courts have invalidated ordinances where the government failed to set forth "objective evidence" demonstrating that the restrictions were narrowly tailored to serve the interests asserted. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52 (1986) (evidence relied upon by city in enacting ordinance abridging First Amendment rights must be "reasonably believed to be relevant to the problem that the city addresses"); *White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163, 171–72 (2d Cir. 2007) (town relied on insufficient evidence of secondary effects of nude dancing when enacting public indecency ordinance); *Klein v. City of San Clemente*, 584 F.3d 1196, 1201–04 (9th Cir. 2009) (city enacting leafleting ordinance failed to provide any evidence that placing leaflets on cars resulted in litter, much less more-than-minimal amount of litter); *Krantz v. City of Fort Smith*, 160 F.3d 1214, 1221–22 (8th Cir. 1999) (no factual basis existed for concluding cause-and-effect relationship between placement of leaflets on parked cars and litter that impacted health, safety, or aesthetic well-being of City).

Even if the Village were to prove some justifiable interest necessitating a Bond, the requirement would fail the First Amendment requirement of narrow tailoring. The Village will be unable to show that state and federal criminal laws—and the proper enforcement thereof—are inadequate to the task of deterring fraud or theft. And state tort law provides an additional and independent remedy for any resident who claims property loss from solicitation, a claim which, based on the evidence from other cases, is highly unlikely. Moreover, other less-restrictive means exist for those Village residents who desire privacy: the Village has the option of allowing any resident freely to opt out of door-to-door solicitation by adopting a "No Knock List." The Bond Requirement is therefore unnecessary.

John Ryan
May 20, 2019
Page 5

    2.    *The Bond Constitutes a De Facto Ban on Solicitation*

    The fact that the $2,500 requirement imposed by the Solicitation Bond is prohibitively high – so high that it is simply not cost-effective for Aptive to pay the fee for each of its representatives – reveals the underlying purpose of the Bond: ***to impose a de facto ban on solicitation***.

    In a series of decisions, the Supreme Court and five federal circuit courts have uniformly held that municipal ordinances prohibiting door-to-door solicitation are unconstitutional. *See Project 80's Inc. v. City of Pocatello*, 942 F. 2d 635 (9th Cir. 1991) (rejecting total ban on commercial solicitation); *City of Watseka v. Illinois Public Action Council*, 479 U.S. 1048 (1987) (affirming that 5:00 p.m. curfew was unconstitutional); *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564 (6th Cir. 2012) (invalidating 6:00 p.m. curfew); *City of Watseka v. Illinois Public Action Counsel*, 796 F.2d 1547 (7th Cir. 1986) (invalidating 5:00 p.m. curfew); *New Jersey Citizen Action v. Edison Township*, 797 F.2d 1250 (3d Cir. 1986) (invalidating 5:00 p.m., 6:00 p.m. and sunset curfews); *Wisconsin Action Coalition v. City of Kenosha*, 767 F.2d 1248 (7th Cir. 1985) (invalidating 8:00 p.m. curfew); and *Association of Community Organizations for Reform v. City of Frontenac*, 714 F.2d 813 (8th Cir. 1983) (invalidating 6:00 p.m. curfew). The holdings of these cases clearly indicate that the *de facto* prohibition imposed by East Rockaway is unconstitutional.

    3.    *The Bond Violates Citizens' Constitutional Right to Receive Information*

    The Solicitation Bond also violates the right of citizens of East Rockaway to receive information, which is another protected First Amendment freedom. *Bd. Of Educ., Island Trees Union Free Sch. Dist. Number 26 v. Pisco,* 457 U.S. 853, 867 (1982). Indeed, this right is corollary of the right to free speech and is explicitly guaranteed by the Constitution. *Id. See also Lamont v. Postmaster General*, 381 U.S. 301, 308, 85 S.Ct. 1493, 1497 (1965) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers."). By ensuring that the Bond functions as a *de facto* ban on solicitation, East Rockaway is unconstitutionally depriving its citizens of their right to receive information.

    Aptive's damages from the unconstitutional solicitation curfew and licensing process are significant. In 2018, Aptive generated millions of dollars in door-to-door sales in New York, with most of this sales activity occurring after 5:00 p.m. Aptive is thus losing thousands of dollars in sales every day it is prohibited by the unconstitutional curfew and licensing process from soliciting in East Rockaway. Federal law entitles Aptive to recover damages incurred due to the Village's enforcement of the unconstitutional solicitation ordinance. Federal law also entitles Aptive to recover attorneys' fees and costs in any suit brought to remedy the Village's constitutional violations pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988. For your information, my billing rate is $625.00 per hour.

    If Aptive is forced to litigate this matter with the Village of East Rockaway, it will seek recovery of the full extent of its damages, including its lost profits and attorneys' fees – just as it did against Woodcliff Lake, New Jersey and Castle Rock, Colorado. Aptive sincerely hopes,

John Ryan
May 20, 2019
Page 6

however, that this outcome can be avoided. Aptive is accordingly willing to forgo its rights to seek the recovery of its lost profits, provided the Village agrees to immediately cease and desist enforcement of its solicitation curfew and Solicitation Bond, found at §§ 171-16 and 171-18 of the Village Code, and repeal or amend these sections of the Code to extend the curfew to 30 minutes after sunset, suspend the bond requirement, as well as provide objective and narrowly tailored criteria for background investigations, and implement a specific and reasonable time limit for decisions regarding license applications. To this end, we request that you provide us with the Village's written assurances, as soon as possible, but by no means later than ***one week from the date of this letter***, that the Village has complied, or is taking immediate steps to fully comply, with our request. Each day that these unconstitutional restrictions are enforced costs Aptive thousands of dollars in lost revenue and profits.  Accordingly, should the Village elect to maintain its present curfew and other unconstitutional restrictions, Aptive will have no choice but to bring suit in federal court and seek immediate injunctive and compensatory relief.

As noted above, Aptive's sincere desire is to resolve this matter without the need for litigation. If, however, the Village of East Rockaway refuses to suspend and repeal its curfew and other unconstitutional restrictions, and suit becomes necessary, be advised that any subsequent settlement of this matter must include payment of Aptive's lost profits, as well as Aptive's attorneys' fees in connection with filing suit – to which Aptive is entitled pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

We sincerely hope that you will understand Aptive's need and determination to vigilantly protect its valuable First Amendment freedoms.  We are willing, and hopeful, that we will be able to resolve this dispute in an amicable manner.  Accordingly, if you believe it would be productive to discuss a mutually agreeable compromise that adequately protects Aptive's First Amendment rights, please do not hesitate to contact me and we would be happy to arrange such a conversation at a mutually convenient time.  This letter is written without prejudice to Aptive's rights and remedies, all of which are hereby expressly reserved.  Please direct all future correspondence related to the issues in this letter to me and my colleagues, Jon Kelley, Clint Cowan, or Rebecca Adams.

Sincerely,

Jeremy A. Fielding, PLLC

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**NEWARK DIVISION**

| | | |
|---|---|---|
| APTIVE ENVIRONMENTAL, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| BOROUGH OF WOODCLIFF LAKE, | § | Civil Action No. _18-10891_ |
| NEW JERSEY, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

---

**ORDER TO SHOW CAUSE FOR A TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

**THIS MATTER** having been opened to the Court by Plaintiff, Aptive Environmental,

LLC ("Aptive" or "Plaintiff") on Plaintiff's Motion for Temporary Restraining Order against the

Borough of Woodcliff Lake, New Jersey (the "Motion"), and the Court having considered this

Motion, the arguments of counsel, the pleadings on file, and all other matters properly before the

Court, with Plaintiff alleging that it will be irreparably injured because Chapter 255-3 – 255-7,

255-14 of the Woodcliff Lake, New Jersey Code (the "Code") violate Plaintiff's First Amendment

right to commercial speech if the Court does not issue the requested Temporary Restraining Order,

and it appearing from the facts set forth in Plaintiff's Memorandum in support of its Verified

Application for Temporary Restraining Order, which is supported by affidavit that, without this

Order, Plaintiff will suffer immediate and irreparable harm for which there is no adequate remedy

due to the Borough's enforcement of the Code against Aptive, and for other good cause shown:

**IT IS** on this _22nd_ day of _June_, 2018, at _2_ a.m./p.m.,

**ORDERED**, that Defendant, Borough of Woodcliff Lake, New Jersey appear and show cause on the 10ᵗʰ day of _July_, 2018, before the United States District Court for the District of New Jersey, Hon. _SDW_, at the _MLK, JR_ U.S. Courthouse, located at _____, New Jersey _____, at 3⁰⁰ o'clock in the _afternoon_, or as soon thereafter as counsel can be heard, why an Order should not be entered;

1. Preliminarily enjoining and restraining Defendant from enforcement of Chapter 255-3 – 255-7, 255-14 of the Woodcliff Lake Code; and

2. Granting Plaintiff such other and further relief as the Court deems equitable and just.

It is **FURTHER ORDERED** that,

1. Pending further hearing on this Order to Show Cause, Defendant the Borough of Woodcliff Lake, New Jersey and its agents, servants, employees, and entities acting in concert and participation with it, are temporarily enjoined and restrained from enforcement of Chapter 255-3 – 255-7, 255-14 of the Woodcliff Lake Code.

2. A copy of this Order to Show Cause, Complaint, supporting affidavits, declarations or certifications, and Memorandum of Law submitted in support of this application, together with a summons, shall be served upon the Defendant within _3_ days of the date hereof, in accordance with FRCP 4.

3. The Plaintiff must file with the Court its proof of service of the pleadings on the Defendants no later than three (3) days before the return date.

4. Defendant shall file and serve a written response to this Order to Show Cause and proof of service by _Fri., June 29_, 2018. You must send a courtesy copy of your
_at 4 PM_

opposition papers directly to Judge _Wigenton_, whose address is: _____, New Jersey _____.

5.     The Plaintiff must file and serve any written reply to the Defendant's opposition to the Order to Show Cause by _Fri., July 6_, 2018. A courtesy copy of the reply papers must be sent directly to the chambers of Judge _at 4PM_ _SDW_.

6.     If the Defendant does not file and serve an opposition to this Order to Show Cause, the application will be decided on the papers on the return date and relief may be granted by default, provided that the Plaintiff files a proof of service and a proposed form of Order at least three days prior to the return date.

7.     If the Plaintiff has not already done so, a proposed form of Order addressing the relief sought on the return date (along with a self-addressed return envelope with return address and postage) must be submitted to the Court no later than three (3) days before the return date.

8.     The Court will notify the parties whether it will entertain argument on the return date of the Order to Show Cause in accordance with Local Civil Rule 78.1.

_Oral argument shall be heard_

_____
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Chief Judge Marcia S. Krieger

Civil Action No. 17-cv-01545-MSK-MJW

**APTIVE ENVIRONMENTAL, LLC,**

      **Plaintiff,**

**v.**

**TOWN OF CASTLE ROCK, COLORADO,**

      **Defendant.**

---

## JUDGMENT

---

**PURSUANT TO** the Court's oral findings of fact and conclusions of law issued on

March 22, 2018, judgment is hereby entered in favor of the Plaintiff, Aptive Environmental,

LLC, and against the Defendant, Town of Castle Rock, Colorado, on the claims in this action.

The Town of Castle Rock is permanently enjoined from enforcing Chapter 5.04.080(A)(4) of the

Castle Rock Municipal Code, known as the "curfew" on solicitation activities.  Costs are

awarded to the Plaintiff pursuant to Fed. R. Civ. P. 54(d)(1).

    Dated this 22d day of March, 2018.

                        **BY THE COURT:**

                        _____

                        Marcia S. Krieger
                        Chief United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| **APTIVE ENVIRONMENTAL, LLC** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CA NO. 1:17-cv-015445-MSK-MJW** |
| | § | |
| **TOWN OF CASTLE ROCK, COLORADO** | § | |
| | § | |
| **Defendant.** | § | |

---

### APTIVE ENVIRONMENTAL, LLC'S MOTION FOR SUMMARY JUDGMENT

---

DATE:  January 11, 2018

Respectfully submitted,

*/s/ Jeremy A. Fielding*
Jeremy A. Fielding
Texas Bar No. 24040895
jfielding@lynnllp.com
Jonathan D. Kelley
Texas Bar No. 24090202
jkelly@lynnllp.com,
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
214-981-3800 - Telephone
214-981-3839 – Facsimile

Steven J. Perfrement
Colorado Bar No. 27442
steven.perfrement@bryancave.com
Bryan Cave
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203

**ATTORNEYS FOR PLAINTIFF**
**APTIVE ENVIRONMENTAL, LLC**

## TABLE OF AUTHORITIES

**CASES**

*Ass'n of Cmty. Organizations for Reform Now, (ACORN) v. Municipality of Golden, Colo.*,
744 F.2d 739 (10th Cir. 1984 ........................................................................... 1, 4
*Bates v. State Bar of Arizona*, 433 U.S. 350 (1977) ...................................................... 26
*Bd. Of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469 (1989) .................... 11
*Browne v. City of Grand Junction*, 136 F. Supp. 3d 1276 (D. Colo. 2015) ..................... 1
*Carey v. Population Servs., Int'l*, 431 U.S. 678 (1977) ............................................... 26
*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
447 U.S. 557 (1980) ........................................................................................ passim
*Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993) ....................................... 10
*Citizens Action Coal. of Indiana, Inc. v. Town of Yorktown, Ind.*,
58 F. Supp. 3d 899 (S.D. Ind. 2014) ................................................................ passim
*Citizens for a Better Env't v. Vill. of Olympia Fields*,
511 F. Supp. 104 (N.D. Ill. 1980 .......................................................... 4, 18, 21, 24
*Ass'n of Cmty. Organizations for Reform Now v. City of Dearborn*,
696 F. Supp. 268 (E.D. Mich. 1988) ......................................................... 21, 24
*Ass'n of Cmty. Organizations for Reform v. City of Frontenac*, 714 F.2d 13 (8th Cir. 1983) ...... 24
*City of Idaho Falls, Idaho v. Project 80's, Inc.*, 493 U.S. 1013 (1990) ....................... 14
*City of Mentor-On-The-Lake*, 272 F. Supp. 2d at 685 ......................................... 16, 24
*City of Watseka v. Illinois Pub. Action Council*,
796 F.2d 1547 (7th Cir. 1986), aff'd, 479 U.S. 1048, 107 S. Ct. 919, 93 L. Ed. 2d 972 (1987)
........................................................................................................................ passim
*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
657 F.3d 936 (9th Cir. 2011) ............................................................................. 11
*Connecticut Citizens Action Group (CCAG) v. Town of Southington*,
508 F. Supp. 43 (D. Conn. 1980) ................................................................ 4, 20, 24
*Edenfield v. Fane*, 507 U.S. 761 (1993) ....................................................................... passim
*New Jersey Citizen Action v. Edison Tp.*, 797 F.2d 1250 (3d Cir. 1986) .......... 4, 24, 28
*Educ. Media Co. at Virginia Tech, Inc. v. Swecker*, 602 F.3d 583 (4th Cir. 2010) ......... 9, 17
*Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) .................................................... 9
*In re Express—News Corp.*, 695 F.2d 807 n. 2 (5th Cir. 1982) .................................. 25
*Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85 (1977) ................. 26
*Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 116 S.Ct. 1495 L.Ed.2d 711 (1996) ......... 11
*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) ................................................ 25
*Mason v. Florida Bar*, 208 F.3d 952 (11th Cir. 2000) ............................................... 7, 9
*Massachusetts Fair Share, Inc. v. Town of Rockland*,
610 F. Supp. 682, 686 (D. Mass. 1985) .......................................................... 4, 29
*New Jersey Envtl. Fed'n v. Wayne Tp.*, 310 F. Supp. 2d 681 (D.N.J. 2004) ......... passim
*New York Cmty. Action Network, Inc. v. Town of Hempstead*,
601 F. Supp. 1066, 1069 (E.D.N.Y. 1984) .......................................... 4, 17, 21, 24
*New York Youth Club v. Town of Harrison*, 150 F. Supp. 3d 264 (S.D.N.Y. 2015) ......... 9
*Ohio Citizen Action v. City of Englewood*, 671 F.3d 564 (6th Cir. 2012 ............. passim
*Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221 (10th Cir. 2005) ............... passim
*Pennsylvania Pub. Interest Coal. v. York Tp.*, 569 F. Supp. 1398 (M.D. Pa. 1983) ......... 4

*Project 80's, Inc. v. City of Pocatello*, 942 F.2d 635 (9th Cir. 1991) .................................... passim

*Thompson v. W. States Med. Ctr.,* 535 U.S. 35 (2002) ........................................................ passim

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994) ........................................................ 10

*U.S. Mission Corp. v. City of Mercer Island*,
      C14-1844RSM, 2015 WL 540182 (W.D. Wash. Feb. 10, 2015) ................................ 3, 21, 24

*U.S. W., Inc. v. F.C.C.*, 182 F.3d 1224 (10th Cir. 1999) ........................................................ 10, 11

*Utah Licensed Beverage Ass'n v. Leavitt,* 256 F.3d 1061 (10th Cir. 2001) ..................... 2, 8, 9, 11

*Virginia Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 US. 748 (1976).. 26, 27

*Watchtower Bible and Tract Soc'y of N.Y. v. Village of Stratton*, 536 U.S. 150 (2002) ........ 12, 16

*Wisconsin Action Coal. v. City of Kenosha*, 767 F.2d 1248 (7th Cir. 1985 ............. 4, 16,18, 20, 24

*Working Am., Inc. v. City of Bloomington*, 142 F. Supp. 3d 823 (D. Minn. 201 ..................... 3, 17

# I.     <u>INTRODUCTION</u>

The Town of Castle Rock, Colorado, ("Defendant" or the "Town") maintains an ordinance banning all "for-profit" door-to-door solicitation after 7:00p.m (the "Curfew"). During the summer, the Curfew bars solicitation during a substantial amount of daylight hours.[1] The Town claims this curfew is necessary to protect the privacy of its residents and prevent crime.  But the Town already has several laws on its books which "assure adequately citizens' privacy and provide law enforcement with the means of identifying potential criminals and deterring crime" involving solicitors, including two different ways that any resident of the Town wishing to avoid uninvited solicitation may "opt-out."[2]  As such, the only real effect of Town's attempt to "roll up the front sidewalks of all its citizens at a very early hour" is to "substitute its own judgment for that of its citizens" and "deprive willing listeners [in the Town] of the [solicitors'] message."[3]  As Judge Arguello recently observed in invalidating Grand Junction's sunset panhandling curfew, Castle Rock has "taken a sledgehammer to a problem that can and should be solved with a scalpel."[4] This, the constitution does not allow.  Indeed, "[i]f the First Amendment means anything, it means that regulating [commercial] speech must be a last—not first—resort."[5]

This is why regulations of "door-to-door canvassing and soliciting" are "presumptively unconstitutional and the state bears the burden of justification."[6] Here, this means satisfying the *Central Hudson* test, which requires the Town to prove that the Curfew "addresses what is in fact

---

[1] Aptive challenges the Curfew only as applied to daylight hours *i.e.* until dusk – defined as 30 minutes after sunset.
[2] *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1234 (10th Cir. 2005)
[3] *City of Watseka v. Illinois Pub. Action Council*, 796 F.2d 1547, 1556–57 (7th Cir. 1986), aff'd, 479 U.S. 1048, 107 S. Ct. 919, 93 L. Ed. 2d 972 (1987).
[4] *Browne v. City of Grand Junction*, 136 F. Supp. 3d 1276, 1294 (D. Colo. 2015)
[5] *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002)
[6] *Ass'n of Cmty. Organizations for Reform Now, (ACORN) v. Municipality of Golden, Colo.*, 744 F.2d 739, 746 (10th Cir. 1984)

a serious problem," will "contribute in a material way to solving that problem,"[7] and that the Town "carefully calculated the costs and benefits associated with burdens on Speech,"[8] validly concluding that the problems could not be solved just as well "by a more limited restriction on commercial speech."[9] For three independent reasons, the undisputed evidence shows the Town cannot carry its burden under *Central Hudson*.

**First**, the Town – both before and after passage of the Curfew – has **never** had a "problem" with licensed for-profit, commercial solicitors invading residents' privacy or committing crimes after 7:00p.m., let alone a "serious" problem that demanded the Curfew as a solution. To the contrary, as the Town's own Chief of Police frankly conceded, the Curfew was (and continues to be) an unneeded hammer in search of a non-existent nail.

**Second**, the Curfew does not "directly and materially advance" its ostensible privacy and crime protection purposes. The Town "has already provided unwilling listeners with a mechanism to ban all solicitors from their property at any time the listeners desire:"[10] signing up for the Town's "No-Knock" List or posting a "No-Soliciting" sign on their door. Moreover, the Curfew doesn't apply to broad categories of door-to-door solicitors, including anyone selling goods or services for a "non-profit" purpose or engaging in religious or political "canvassing." Accordingly, "someone with an illegitimate [criminal] intent has options besides posing as a [for-profit] solicitor"[11] – an especially appealing option since solicitors and "canvassers" exempt from the Curfew are also exempt from the Town's exacting registration and background check requirements. In other words, "an individual who [is] intent on perpetrating a crime or fraud

---

[7] *Edenfield v. Fane*, 507 U.S. 761, 765–66 (1993)
[8] *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1075 (10th Cir. 2001)
[9] *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564 (1980)
[10] *City of Watseka*, 796 F.2d at 1556–57.
[11] *Id*. at 1555-56.

against a [Town] resident is unlikely to be deterred by the [Curfew]."[12]   As such, the Curfew "provides only ineffective or remote support for the government's purpose" and must be invalidated.[13]

**Finally**, the Curfew is not "narrowly tailored." As the 10th Circuit recently held, a regulation of door-to-door commercial solicitation "is unconstitutional if the governmental interest could be served as well by a more limited restriction on commercial speech."[14] And here, the Town has numerous alternative means that "could advance the Government's asserted interest[s] in a manner less intrusive to First Amendment rights."[15] "Privacy is easily served by prohibiting solicitation at households that have posted a sign or listed themselves in a registry"[16] – something the Town's existing solicitation ordinance already does.  And "crime can be regulated by licensing, registration, and normal enforcement."[17]

The court should invalidate the Curfew for one additional reason as well: it is an unconstitutional restriction on the free speech rights of the Town's residents who are willing to receive uninvited commercial solicitors after 7:00p.m.  As such, it amounts to little more than an "attempts by [the Town] to substitute its judgement for that of its citizens."[18]   This, too, is unconstitutional.

What Aptive asks this Court to do here is hardly novel.  At least 17 other federal courts – including the Third Circuit, the Sixth Circuit, the Seventh Circuit (twice) and the Eighth Circuit – have invalidated similar solicitation curfews, ranging from 5pm to a half hour after sunset

---

[12] *New Jersey Envtl. Fed'n v. Wayne Tp.,* 310 F. Supp. 2d 681, 697 (D.N.J. 2004).
[13] *Pleasant Grove City,* 414 F.3d at 1231.
[14] *Id.* at 1234 (citing to *Cent. Hudson,* 447 U.S. at 564).
[15] *Thompson v. W. States Med. Ctr.,* 535 U.S. 357, 371 (2002)
[16] *Project 80's, Inc. v. City of Pocatello*, 942 F.2d 635, 638 (9th Cir. 1991)
[17] *Id.*
[18] *City of Watseka,* 796 F.2d at 1556–57.

including three 7:00p.m. curfews like the one at issue here.[19]  This Court should join these other

courts, invalidate this Curfew as unconstitutional on its face, permanently enjoin its enforcement,

and award Aptive's its reasonable attorneys' fees and costs as a prevailing party.

## II.          FACTS

### A.     Aptive's Business is Based on Door-to-Door Solicitation.

Aptive is a large pest control services company with regional offices throughout the

country, including a permanent office in Denver, Colorado that is currently staffed with 10

permanent employees[20]. Aptive's business is primarily focused on selling residential customers

annual pest control service agreements, in which Aptive provides pest control services (including

extermination of insects and rodents) for a period of at least one year[21]. Crucially, while Aptive

maintains a website and utilizes social media to communicate with customers and prospective

customers, Aptive markets its services ***almost exclusively*** through door-to-door solicitation.[22]

---

[19] *U.S. Mission Corp. v. City of Mercer Island*, C14-1844RSM, 2015 WL 540182, at *1 (W.D. Wash. Feb. 10, 2015) (invalidating an 7:00p.m. curfew); *Working Am., Inc. v. City of Bloomington*, 142 F. Supp. 3d 823 (D. Minn. 2015) (invalidating an 8:00p.m. curfew); *Citizens Action Coal. of Indiana, Inc. v. Town of Yorktown, Ind.*, 58 F. Supp. 3d 899, 908 (S.D. Ind. 2014) (invalidating a sunset curfew); *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 573–74 (6th Cir. 2012) (invalidating a 6:00p.m. curfew); *New Jersey Envtl. Fed'n v. Wayne Tp.*, 310 F. Supp. 2d 681 (D.N.J. 2004) (invalidating a half-hour before sunset curfew); *Ohio Citizen Action v. City of Mentor-On-The-Lake*, 272 F. Supp. 2d 671, 685 (N.D. Ohio 2003) (invalidating an 8:00p.m curfew); *Ohio Citizen Action v. City of Seven Hills*, 35 F. Supp. 2d 575 (N.D. Ohio 1999) (invalidating a 5:00p.m. curfew); *Ass'n of Cmty. Organizations for Reform Now v. City of Dearborn*, 696 F. Supp. 268, 270 (E.D. Mich. 1988) (invalidating a 7:00p.m. curfew); *New Jersey Citizen Action v. Edison Tp.*, 797 F.2d 1250, 1252 (3d Cir. 1986) (invalidating a sunset curfew); *City of Watseka*, 796 F.2d at 1552 (invalidating a 5:00p.m. curfew); *Wisconsin Action Coal. v. City of Kenosha*, 767 F.2d 1248 (7th Cir. 1985) (invalidating an 8:00p.m. curfew); *Massachusetts Fair Share, Inc. v. Town of Rocklbloand*, 610 F. Supp. 682, 686 (D. Mass. 1985) (invalidating an 8:30pm curfew (among others)); *New York Cmty. Action Network, Inc. v. Town of Hempstead*, 601 F. Supp. 1066, 1069 (E.D.N.Y. 1984) (invalidating an 7:00p.m. curfew); *Ass'n of Community Organizations for Reform v. City of Frontenac*, 714 F.2d 813 (8th Cir. 1983) (invalidating 6pm curfew); *Pennsylvania Pub. Interest Coal. v. York Tp.*, 569 F. Supp. 1398, 1403 (M.D. Pa. 1983) (invalidating a 6pm curfew); *Citizens for a Better Env't v. Vill. of Olympia Fields*, 511 F. Supp. 104, 106 (N.D. Ill. 1980) (invalidating a sunset curfew); *City of Watseka*, 796 F.2d at 1552 (invalidating an 5pm curfew); *Connecticut Citizens Action Group (CCAG) v. Town of Southington*, 508 F. Supp. 43, 45 (D. Conn. 1980) (invalidating a 6:00p.m. curfew).
[20] Joint Stipulation as to Facts at ¶¶5 and 6
[21] Joint Stipulation as to Facts at ¶8
[22] Joint Stipulation as to Facts at ¶14

---

Aptive has achieved tremendous success utilizing this business model: in 2017 alone, through door-to-door solicitation, Aptive sold over 200,000 customers annual pest services agreements.[23]

Given the fact that paying thousands of door-to-door solicitors to solicit in cities across the United States is an enormously expensive proposition, Aptive has every incentive to discover and utilize alternate means of marketing that are less expensive and equally (if not more) effective. Yet Aptive chooses to market its services through door-to-door solicitation because it has identified no other form of marketing that produces the same efficacy, customer satisfaction and retention levels, and cost-per-sales benefits as door-to-door solicitation.[24] Indeed, Aptive's success is largely attributable to the unique interaction with customers that door-to-door solicitation provides, which is why, in Aptive's experience, other forms of less personal marketing – including phone solicitation, email campaigns, and web advertisements – are simply not an effective means for establishing or maintaining the necessary personal relationship with customers.[25]

Another key component of Aptive's business is establishing long-term customers. Indeed, the success of Aptive's business model depends not just upon selling customer accounts, but upon those customers electing to **_continue_** Aptive's service beyond the expiration of the initial annual service period.[26] The reason for this is simple: the longer a customer remains on regular Aptive service, the more profitable that customer is for Aptive.[27] Aptive has found that establishing a customer relationship through door-to-door solicitation provides a more effective means to **_maintain_** the personal customer relationships that form the backbone of Aptive's

---

[23] Joint Stipulation as to Facts at ¶ 14.
[24] Joint Stipulation as to Facts at ¶ 13.
[25] Joint Stipulation as to Facts at ¶ 11.
[26] Joint Stipulation as to Facts at ¶ 12
[27] Joint Stipulation as to Facts at ¶ 12.

business.  Accordingly, Aptive has determined that door-to-door solicitation is the only way to market that is consistent with its business model.[28]

**B.      Aptive's Salespeople, and Solicitation in Castle Rock.**

Aptive contracts with third-party contractors ("Salespeople," or individually, a "Salesperson") who engage in door-to-door sales of contracts for its pest control services.[29] Prior to hiring a Salesperson, Aptive requires that the Salesperson take and pass a background check and drug test.[30]   Upon passing this background check, each of Aptive's Colorado Salespeople are trained by a team leader in Colorado, and are required to sign Aptive's "Behavior Expectations" agreement, which states that Salespeople may be fined $500.00 or terminated by "being rude, overly aggressive, or threatening to either homeowners or reps from other companies (e.g. shouting/yelling, swearing, putting foot in the door, refusing to leave after being asked, physical altercations, damaging consumer's physical property, etc)." Any Aptive Salesperson who violates these expectations may be subject to disciplinary action, including fining them and/or firing them, depending upon the severity of the offense.[31]   Further emphasizing the importance of appropriate behavior on behalf of its Salespeople, as part of its training, Aptive instructs its Salespeople to be polite, courteous, respectful, and to follow the law.[32]

Aptive takes just as seriously its compliance with the laws of the city, village, or town in which it is soliciting.  Each Aptive branch manager has the responsibility to determine the

---

[28] Joint Stipulation as to Facts at ¶ 13.
[29] Joint Stipulation as to Facts at ¶ 19.
[30] Joint Stipulaiton as to Facts at ¶ 33.
[31] Joint Stipulation as to Facts at ¶ 37.
[32] Joint Stipulation as to Facts at ¶ 166.

permitting requirements and other restrictions that apply to particular towns.[33]  The manager then instructs each Sales Representative regarding each town's regulations and the importance of complying with these regulations.[34]  The Town of Castle Rock is no exception.  Prior to entering Castle Rock, Aptive registered its Salespeople with the Town and was provided with a copy of the Town's "No Knock List."[35]  Because the list was digital, Aptive's branch manager, Robert Hansen, checked the list as frequently as possible for updates.[36]  Aptive received permits for some of its Salespeople to conduct door-to-door solicitation activities in Castle Rock on August 4, 2017[37], and solicited in Castle Rock for eight days, until August 12th.[38]

### C.    Engaging in Door-to-Door Solicitation After 7:00p.m. is Critically Important to Aptive.

While Aptive's Salespeople accept calls from prospective customers on their phones and can make sales by phone, every sale made by a Salesperson originates from door-to-door interaction with a resident.[39]  The Salespeople each set their own daily schedule and Aptive does not require the Salespeople to engage in solicitation during any particular time of the day, but it encourages its Salespeople to work between 10:00a.m. and 11:00a.m., take a lunch break between 2:30p.m. and 4:00p.m., and complete work at dark each day that they worked, except that the Sales Teams generally complete work at 4:00p.m. on Saturdays.[40]  On weekdays, Aptive also encourages its Salespeople to knock the doors of an area the first time through in the hours before lunch, then return and re-knock the area after 4pm through dusk so as to contact people

---

[33] Joint Stipulation as to Facts at ¶ 42.
[34] *Id.*
[35] Joint Stipulation as to Facts at ¶ 46.
[36] Joint Stipulation as to Facts at ¶ 47.
[37] Joint Stipulation as to Facts at ¶53.
[38] Joint Stipulation as to Facts at ¶ 54.
[39] Joint Stipulation as to Facts at ¶ 14.
[40] Joint Stipulation as to Facts at ¶ 31.

who weren't home during the first pass through.  Returning to re-knock an area from 4:00p.m.

through dusk is paramount to Aptive's door-to-door sales strategy because, as Castle Rock's

Chief of Police testified to, less people in a town like Castle Rock are home during the working

hours of 9:00a.m. and 7:00p.m.[41] This is often the case because Castle Rock residents may work

in Denver, and make a daily hour-long commute between the two cities.[42]

The fact that many residents do not return home from work before 7:00p.m. is borne out

in Aptive's own internal data, which shows that the percentage of decisionmakers who are home

is by far the highest between 7:00p.m. and 9:00p.m.[43]  Notably, of the doors knocked on during

the day, Aptive only finds roughly a third have a decisionmaker home, compared to almost *half*

of the homes knocked later in the evening.[44]  Because decisionmakers are those who ultimately

make the decision to subscribe to Aptive's services, the 7:00 to 9:00p.m. timeframe also reflects

the highest conversion rate of any time period, proving that Aptive is most effective in selling

after 7:00p.m.[45]  It is unsurprising, then, that over the course of the last summer, Aptive's sales

after 7:00p.m. were substantial, with approximately 14% of all sales nationwide and 11% of all

sales made in Colorado made after 7:00p.m.[46]  Indeed, even looking at these sales in a non-linear

fashion, the hard numbers reflect that Aptive made 24,937 sales nationwide and 537 sales in

Colorado after 7:00p.m. in 2017, which, at an average contract value of $548,[47] amounts to

---

[41] Joint Stipulation as to Facts at ¶ 129
[42] *Id.*
[43] Joint Stipulation as to Facts at ¶ 51.
[44] *Id.*
[45] *Id.*
[46] Joint Stipulation as to Facts at ¶ 50.
[47] Joint Stipulation as to Facts at ¶ 9.

$13,665,476 in revenue nationally and $241,650 in revenue in Colorado over the course of a single summer.[48]

Because Aptive is most effective in its door-to-door sales after 7:00p.m., the impact of Castle Rock's 7:00p.m. curfew is significant, and functions to effectively ban Aptive from soliciting to an entire group of residents: those who are gone from their homes on weekdays. The best evidence of the devastating impact on Aptive's business caused by a 7:00p.m. curfew are the results of its own sales in Castle Rock. [49]   Aptive sold for eight days in Castle Rock, ceasing its soliciting at 7:00p.m.  The effect was dramatic.  Without the ability to solicit after 7:00p.m., and without the ability to return and re-knock from 4:00p.m. to dusk, Aptive averaged **less than half** the number of sales per hour that it did for the rest of the Denver metro area.[50]  Put another way, when Aptive Salespeople are able to return to re-knock an area from 4:00p.m. through dusk – which is the routine practice of Aptive's Salespeople – Aptive is **twice** as effective.  Accordingly, the eight days that Aptive solicited in the Town provides a paradigmatic example of the harm that a 7:00p.m. solicitation curfew causes to Aptive, when its Salespeople are prevented from soliciting during their most effective hours of the day.

### D.   The Evolution of Castle Rock's Ordinance

#### a.   *The Town's Pre-2008 Ordinance Requires Licensing, but Imposes No Curfew*

Before 2008, the Town regulated door-to-door solicitation through Chapter 5.04 of the Town Code, which was enacted on April 28, 2003 (the "**Original Ordinance**").[51]  The purpose

---

[48] ¶50. Note, also, that AE000096 understates the percentage of Aptive's sales made after 7:00p.m., because it includes Saturdays, when Aptive stops soliciting at 4:00 p.m. Parties' Stipulated Facts at ¶ 31.
[49] Joint Stipulation as to Facts at ¶ 56.
[50] Joint Stipulation as to Facts at ¶ 55.
[51] Joint Stipulation as to Facts at ¶ 57.

of the Original Ordinance was to assist the Town in enforcing self-collection of sales taxes,[52] and required door-to-door solicitors (called "Peddlers" and defined as "any person . . . who goes from house to house, from place to place, or from street to street, conveying or transporting goods, wares or merchandise or offering to exposing the same for sale, or making sales and delivering articles to purchaser") to obtain a license to solicit in Castle Rock.[53]  The Original Ordinance did not impose a curfew.[54]

> **b.**     *The Passage of the 2008 Ordinance*

In 2007, the Town began receiving complaints from residents who did not want uninvited solicitors knocking on their doors, as well as individuals who wanted the Town to filter out any unscrupulous or nefarious persons who might go door to door as solicitors.[55]  In response to this Town feedback, in August 2007 a member of Town Council expressed an interest in discussing possible amendments to the Code in order to regulate door-to-door solicitation, and a Town Council study session was recommended for the purpose of studying a door-to-door solicitation policy and possible amendments to the Code.[56]  In advance of that August 2007 study session, Town staff prepared an Agenda Memorandum pertaining to door-to-door solicitation, with several attachments, including (a) an email from then Chief of Police Tony Lane and (b) a memorandum from the Assistant Town Attorney regarding legal issues surrounding door-to-door solicitation.[57]  The email from Chief Lane discusses the solicitor complaints received from residents of the Town, generally, and the fact that the complaints received were mostly anecdotal.  *Id.* Notably absent from the Agenda Memorandum, the email

---

[52] Joint Stipulation as to Facts at ¶ 59.
[53] *See* Exhibit 1 to Parties' Stipulated Facts.
[54] *Id.*
[55] Joint Stipulation as to Facts at ¶ 60.
[56] Joint Stipulation as to Facts at ¶ 60.
[57] Joint Stipulation as to Facts at ¶ 61.

from Chief Lane, and the memorandum from the Assistant Town Attorney is any mention crime in Castle Rock, or concerns about crime.[58]   During the August 2007 meeting the Town Council requested that the Town staff research the issue and develop recommendations that would address concerns expressed by Town residents.[59]

Between this initial Council meeting and its next meeting in October of 2007, the Council received a third complaint from a Town resident.  This complaint specified that in September of that year, a solicitor had knocked on the resident's door at 9:45p.m.[60]  Notably, in September, the sun generally sets in Castle Rock around 7:00p.m. (according to the Town's website).  Thus, at 9:45p.m. it had already been dark in Town for almost three hours.   This is reflected in the Agenda Memorandum that the Town Council received and reviewed prior to their October 2007 meeting, which contained recommendations addressing not only the two concerns originally identified by the Town Council in August, but also the concern raised by a single resident in September, related to solicitation after dark.[61]   The recommendations included the implementation of a "No Knock" list, use of "no solicitation" signs, and adding "reasonable hours" within which to prohibit solicitation.   *Id.* The memo also recommends that, because "most of the complaints received by the Town are from solicitors that are not licensed," the Town should require solicitors to supply a picture for an ID badge, and that solicitors be required to wear the badge be required at all times.[62]

During the October 2007 meeting, the Town Council embraced the recommendations detailed in the October Agenda Memorandum and requested that the Town staff conduct more

---

[58]  *See* Exhibit 1 to Parties' Stipulated Facts.
[59]  Joint Stipulation as to Facts at ¶ 61.
[60]  Joint Stipulation as to Facts at ¶ 83.
[61]  Joint Stipulation as to Facts at ¶¶ 64, 65.
[62]  Joint Stipulation as to Facts at ¶ 65. (CR00004).

research on what might constitute "reasonable hours" for a solicitation curfew.[63]   The Town Council also requested that the Town's legal department conduct an "unbiased review of this issue, and not approach analysis from [the] point of trying to justify [an] ordinance that was potentially unconstitutional."[64]

Between October of 2007 and February of 2008, the Town staff and Town's legal department did just as the Council had requested, and presented their findings to the Council in advance of the Council's February 2008 meeting in an Agenda Memorandum.[65]   This Memorandum was written by Cynthia Harvey, the Town's Assistant Attorney, and describes various ways that the Town might constitutionally regulate solicitation.[66]   The Memorandum does not specifically discuss what hours might be considered reasonable for a solicitation curfew, but instead refers to an attached research memorandum prepared by the Colorado Municipal League (the "**CML Article**"), and endorses that Memorandum as a "thorough and in depth analysis of the feasibility of various methods of regulation."[67]   The CML Article itself discusses various legal issues inherent in developing a solicitation regulation regime, and notes that the imposition of permitting requirements is considered constitutional, as are "do-not-solicit" lists like the "No Knock" list recommended in the Town's October 2007 Agenda Memorandum.[68]   Importantly, the CML Article also addresses time restrictions, noting specifically that "limiting solicitation to the hours of 9:00a.m. to 5:00p.m. has been held to be too restrictive," and that "an ordinance limiting door-to-door activity to between 10:00a.m. and one-half hour after dusk has been held unconstitutional." The CML Article also cites to cases holding content-based curfews

---

[63] Joint Stipulation as to Facts at ¶ 66.
[64] Joint Stipulation as to Facts at ¶ 66. (CR 000025).
[65] Joint Stipulation as to Facts at ¶ 68.
[66] Joint Stipulation as to Facts at ¶ 68.
[67] Joint Stipulation as to Facts at ¶ 68. (CR 000028).
[68] *Id.*

---

unconstitutional, as well as an ordinance prohibiting door-to-door soliciting between sunset and sunrise. *Id.* The Town Council reviewed this information as part of the Agenda Memorandum prior to its February 2008 meeting.[69]

During the February 2008 meeting, the Town Council discussed the recommendations made in the February 2008 Agenda Memorandum, and the Council specifically asked the Town's Assistant Attorney "what hours were considered acceptable" for a solicitation curfew of the type recommended by Town staff.[70]  The Town's lawyer responded that typically solicitation curfews between 8:00p.m. and 9:00p.m. were considered acceptable.[71]  Councilmember Lehnen then expressed concern that allowing solicitation until 8:00p.m. was too late, particularly in the winter when it gets dark as early as 4:30p.m., and recommended a 7:00p.m. curfew.  *Id.* Notwithstanding the advice given by the Town's own legal counsel, and based on nothing more than a single comment from Councilmember Lehnen about the time it gets dark during the winter months, the Town Council directed its staff to prepare an ordinance with a solicitation curfew of 7:00p.m.  *Id.* After the ordinance was prepared, the Town Council met in March 2008 and on April 8, 2008 for a first and second reading, at which point Castle Rock passed an amended version of the Original Ordinance (the "2008 Ordinance").[72]

The Town stipulates that its purposes in enacting the 2008 Ordinance were "protecting citizens' right to privacy in their own homes, preserving the peace and public order, and protecting public safety and welfare," yet remarkably, the Town simultaneously admits that prior to passing the 2008 Ordinance, the Town Council did not discuss or analyze ***any one of these***

---

[69] Joint Stipulation as to Facts at ¶ 68.
[70] Joint Stipulation as to Facts at ¶ 69.
[71] Joint Stipulation as to Facts at ¶ 69 (CR 000051).
[72] Joint Stipulation as to Facts at ¶¶ 89, 90.

*purported interests*.[73]  Indeed, the Town stipulates that prior to passage of the 2008 Ordinance, the Town Council did not discuss or analyze any of the following issues: a) crime in Castle Rock; b) solicitation-related crime in Castle Rock; c) crime committed by commercial solicitors in Castle Rock; d) crime committed by commercial solicitors in Castle Rock after 7:00p.m.; or d) how a 7:00p.m. curfew would protect public safety and privacy.[74]  Indeed, the Town's Mayor at the time – Randy Reed – freely admits that not a single document produced by the Town contains any indication whatsoever that the Town Council discussed *why* 7:00p.m. in particular was a necessary curfew to protect or safeguard the public.[75]  Despite possessing ample time and resources, the Town acknowledges that it did not review or consult any studies or data related to crime rates among commercial solicitors versus noncommercial solicitors, or between permitted commercial solicitors versus noncommercial solicitors.  Nor did the Council discuss whether or how a 7:00p.m. Curfew would protect public safety and privacy.[76]  Indeed, despite the fact that the Council passed an ordinance completely eliminating the ability of for-profit solicitors to solicit in Castle Rock after 7:00p.m., the *only* time specific complaint considered by the Town Council was a single complaint of solicitation occurring at 9:45p.m., and the Town does not know whether the complaint concerned a commercial, non-commercial, for-profit solicitor.[77]

Town residents had originally complained of three things: a) solicitors knocking on their doors, b) a lack of a means to filter-out unscrupulous solicitors, and c) a solicitor who knocked on a residence after dark.  In response, the 2008 Ordinance implemented three measures that were clearly appropriate and addressed the concerns as stated: a) a "No Knock" list; b) a "no

---

[73] Joint Stipulation as to Facts at ¶ 76.
[74] Joint Stipulation as to Facts at ¶ 80.
[75] Joint Stipulation as to Facts at ¶ 84.
[76] Joint Stipulation as to Facts at ¶ 82.
[77] Joint Stipulation as to Facts at ¶ 83.

solicitation" sign policy; and c) a series of permitting requirements designed to filter out unscrupulous solicitors.  But the Town Council went a step further, and – against the advice of the Town's own attorney – implemented a 7:00p.m. solicitation curfew that was neither tailored to address or advance any particular concern, nor was it supported by any data, analysis, or study.  In short, in passing the Curfew, the Town Council unilaterally addressed complaints by Town residents in a manner wholly divorced from the problem that had originally been complained of.  From its outset, the Curfew was a square peg the Town opportunistically tried to jam into a round hole.

### i.        The Substance of the 2008 Ordinance

The 2008 Ordinance Castle Rock defined three categories of door-to-door solicitors. First, "Canvassers" were defined as "person who attempts to make personal contact with a resident and his or her residence without prior specific invitation or appointment from the resident for the primary purpose of (1) attempting enlist support for or against a particular religion, philosophy, ideology, political party, issue or candidate, even if incidental to such purpose the canvasser accepts the donation or money for or against such cause" or (2) "distributing non-commercial flyers."[78] Second, "Hawkers or Peddlers" were defined as a "person who attempts to make personal contact with a resident and his or her residence without prior specific invitation or appointment from the resident for the primary purpose of attempting to sell a good or service."[79]  Third, "Solicitors" were defined a "person who attempts to make personal contact with a resident and his or her residence without prior specific invitation or appointment from the resident for the primary purpose of (1) attempting to obtain a donation to a

---

[78] Joint Stipulation as to Facts ¶71.
[79] Joint Stipulation as to Facts ¶71.

particular patriotic, philanthropic, social service, welfare, benevolent, educational, civic, fraternal, charitable, political or religious purpose, even if incidental to such purpose there is the sale of some good or service; or (2) distributing a commercial flyer."[80]

The 2008 Ordinance also implemented stringent registration requirements, requiring all "Hawkers," "Peddlers" and "Solicitors" to register with the Town by providing the Town with the following information: (1) their name, physical description, and photograph; (2) the permanent and local address or the organization they represented; (3) their permanent and local address; (4) a "brief description of the proposed activity related to this registration," and (5) "the motor vehicle make, model, year, vehicle identification number, and state license plate of any vehicle which will be used by each person."  In addition, "Hawkers and Peddlers" were required to provide (1) the name and permanent address of the business offering the good or service, (2) a copy of the business' state sales tax license; (3) the web address for the business "where residents having subsequent questions can go for more information; (4) two identical photos of the applicant; and (5) "a statement as to whether or not the applicant has been convicted of any felony or has been institutionalized for mental illness which caused acts of violence against the person or property or another within the five (5) years preceding the date of the application or is required to be registered as a sex offender or as a sexual predator and the nature of the offense or the punishment or penalty assessed therefore, in this or any other state."[81]

Importantly, not only were applicants required to provide extensive information prior to registering with the Town, but the 2008 Ordinance also granted the Town Clerk the right to deny an applicant's registration for the following five reasons: (1) Any misrepresentation, fraud, deception, breach of warranty, or breach of contract in the Town or elsewhere; (2) failure to

---

[80] Joint Stipulation as to Facts ¶71.
[81] Joint Stipulation as to Facts ¶71.

comply with the ordinance or any other city ordinance; (3) failure to obtain a sale tax license or remit sales tax due to the Town; (4) "felony convictions for crimes against the person or property of another, or institutionalization for mental illness which caused acts of violence against the person or property of another" within five year prior to the date of registration.[82]

Finally, the 2008 Ordinance created for the first time three protections that were each designed to protect residents from solicitation during all hours of the day: ***First***, the Ordinance implemented a "no visit list," which made it unlawful for any Peddler, Hawker, or Solicitor to "enter or remain" on any property that was on the "no visit list." ***Second***, the Ordinance allowed residents to post a sign containing the words "'no soliciting' or 'no solicitors.'" ***Third***, the 2008 Ordinance made it unlawful to "enter upon any private property in the Town" between the hours of 7:00p.m. and 9:00a.m. (the "Curfew").[83]

Notably, the 2008 Ordinance exempted Canvassers from the requirement to register with the Town, from the restrictions about entering or remaining on property on the "no visit list," or which features a no-solicitation notice, and from the Curfew.[84]

      c.     ***The 2013 Amendment to the Ordinance***

In 2013, the Town staff suggested to the Town Council that certain changes be made to the 2008 Ordinance to improve its efficacy, namely, that a) the definition of "Canvassers" be expanded; and b) that the Ordinance's permitting requirements for registered-solicitors be enhanced. In January of 2014, the 2013 Ordinance was passed by the Town Council (the "2013 Ordinance"), implementing these changes.[85]

---

[82] Joint Stipulation as to Facts ¶71.
[83] Joint Stipulation as to Facts ¶71.
[84] Joint Stipulation as to Facts ¶71.
[85] Joint Stipulation as to Facts ¶¶ 98, 99.

## ii.   The Amendment Exempted a Larger Group of Solicitors from Compliance with the Ordinance

The 2013 Ordinance maintained the Town's 7:00p.m. Curfew, as well as the restrictions on "entering or remaining" on property on the "No Knock" list, or that otherwise post a "no solicitation" sign on their property, charging all Solicitors with the "responsibility for verification of addresses contained on the 'no knock list' prior to engaging in solicitation within the Town."[86] The Town kept in place the same criminal penalties for violations of the Ordinance, also allowing the Town Clerk to revoke a Solicitor's registration for any "ordinance violation." *Id.*

While the 2013 Ordinance maintained these elements of the 2008 Ordinance, it dramatically expanded the group of individuals who are exempt from the Ordinance's regulation. The Town broadened the definition of "Canvassers" to include a "person who attempts to make personal contact with a resident and his or her residence without prior specific invitation or appointment from the resident for the primary purpose of attempting to obtain a donation to a particular patriotic, philanthropic, social service, welfare, benevolent, educational, civic, fraternal, charitable, political or religious purpose, even if incidental to such purpose there is the sale of some good or service."[87]   The 2013 Ordinance also abolished the terms "Hawkers and Peddlers" from the 2008 Ordinance, defining "Solicitors" as a "person who attempts to make personal contact with a resident and his or her residence without prior specific invitation or appointment from the resident for the primary purpose of attempting to sell a good or service." *Id.*   Thus, while the 2008 Ordinance required that any for-profit solicitor selling ***anything*** was classified as a "Solicitor" or "Peddler" and was therefore subject to the Ordinance's regulation,

---

[86] Joint Stipulation as to Facts ¶93.
[87] Joint Stipulation as to Facts ¶93.

the 2013 Ordinance exempted an entire class of individuals – those attempting to obtain a donation to a particular patriotic, philanthropic, social service, welfare, benevolent, educational, civic, fraternal, charitable, political or religious purpose – who were formerly subject to the Ordinance.

Expanding the definition of Canvasser significantly impacted the Town of Castle Rock's regulatory scheme, because the 2013 Ordinance exempted Canvassers from compliance with several of the Ordinance's core regulations, including (1) the Ordinance's registration process, (2) the restrictions on soliciting residences on the "No Knock List" or with posted "no soliciting" signs, and (3) the Curfew. *Id.* Through expanding the definition of Canvasser in the 2013 Ordinance, the Town increased the numbers of door-to-door solicitors no longer subject to the Curfew, the "No Knock List," and the registration requirements.

### iii.     The Amendment Added Significant Additional Permit Requirements

As the 2013 Ordinance reduced the number of solicitors required to register with the Town, it simultaneously ***increased*** its already robust registration requirements through adding several new categories of information that "Solicitor" would need to provide as part of the registration process.  These included (1) "the names and addresses of any former places of employment of the applicant during the previous two years;" (2) all "licenses held or previously held by the applicant within five years preceding the application relating to solicitation or a similar business endeavor, noting any non-renewal, suspension, or revocation by the issuing authority, and the pertinent details thereof;" (3) a statement as to whether a civil judgment has ever been entered against the applicant or, to the applicant's knowledge, the company, for fraud, deceit, or misrepresentation and, if so, the full details thereof;" and (4) authorization for the

Town to run a criminal background check "to verify information disclosed on the application."[88]

The 2013 Ordinance also provided the Town Clerk with the additional right to deny registration

to any applicant "whose character and record are such as to not warrant the Town Clerk's

confidence that he or she will conduct the business of soliciting lawfully, honestly, and fairly or

without resorting to duress, coercion, intimidation, or harassment of any person being solicited

for business." *Id.* Finally, once a solicitor's application has been approved, the 2013 Ordinance

requires that any registered Solicitor must be issued an identification badge, and that it be "worn

so as to be plainly visible at all times." *Id.*

### E.     The Present Status of Castle Rock's Ordinance

As testified to by the Town's own corporate representatives and as verified by the

Town's own data, the "No Knock" list, the "no solicitation" sign policy, and the registration

requirements implemented by the 2013 Ordinance have proven to be an unmitigated success, and

serve as more than adequate protection of residents' privacy and safety.

### a.     *The "No Knock" List, the "No Solicitation" Sign Policy, and the Ordinance's Registration Requirements Have Worked Exactly as the Town Hoped*

The Town's "No Knock" list, "no solicitation" sign policy, and registration requirements

provide precisely the kind of effective protection against commercial Solicitors that some

residents originally asked for in 2007.  Generally, Town residents who do not want solicitors

knocking on their doors are opposed to solicitation at any hour – not just after 7:00p.m.[89]  Under

the 2013 Ordinance, any resident who wishes to opt-out of uninvited commercial solicitation has

no less than two mechanisms by which they may do so, either one of which effectively solves the

---

[88] Joint Stipulation as to Facts ¶ 93.
[89] Joint Stipulation as to Facts ¶ 112.

resident's privacy concerns.  The efficacy of these methods was testified to by the Town's own

current Mayor, Jennifer Green, as well as its former Mayor, Randy Reed, and other witnesses

including Kellie Helm, Linda Omar, Robbie Schonher, Mitch Dulleck, and Karla McCrimmon,

each of whom testified that they do not want solicitors entering their property at **_any_** hour, and so

each had registered with the Town's No-Knock list.[90]  Each of these individuals testified that

after registering with the No Knock list, they have not identified a single registered, commercial

Solicitor who has knocked on their door.[91] This anecdotal evidence is borne out in the data

provided by the Town, which shows that, of all solicitation-related complaints made to the Town

of Castle Rock's Police Dispatch Center, only **_one complaint_** involved a registered Solicitor, and

that complaint was before 7:00p.m.[92]  Indeed, the only individuals knocking on doors are those

who are **_exempt from the Ordinance_**, as demonstrated by the complaints the Town itself keeps

record of.[93]  The efficacy of these regulations is the very reason that the Town's policy is to

direct its residents to sign up with the No-Knock list when they wish to avoid solicitation.[94]

      For Town residents who were concerned about unscrupulous Solicitors knocking on their

doors, the Town has implemented a rigorous set of requirements to filter-out bad actors, and has

given itself the authority to make a fair determination and deny any solicitation application if

necessary.  It was for these reasons that Chief Cauley testified that one of the most significant

components of the 2013 Ordinance is its requirement that for-profit Solicitors register with the

Town, which he testified has a deterrent effect on crime in Castle Rock.[95]

---

[90] Joint Stipulation as to Facts at ¶ 112.
[91] *Id.*
[92] Joint Stipulation as to Facts at ¶ 143.
[93] Joint Stipulation as to Facts at Exhibit 4 (noting that the Town has record of **_16 resident complaints_** about Canvassers, **_22 resident complaints about unregistered solicitors_**, but **_only one complaint about a registered solicitor_**).
[94] Joint Stipulation as to Facts at ¶ 186.
[95] Joint Stipulation as to Facts at ¶¶ 132, 133.

      **b.**     *Crime by Permitted Commercial Solicitors is Not (and Never has been)*
              *an Issue in Castle Rock*

Crime caused by door-to-door solicitors has never been a problem in Castle Rock, and it is not a problem, today.  Nothing illustrates this fact more poignantly than the fact that in the history of the Town of Castle Rock, only one for-profit solicitor has ever been charged with a crime.[96]  Similarly, the Town can point to only two complaints, ever, received by the Town – which currently has a population of ***58,000 people*** – about for-profit solicitors, and neither of these complaints took place after 7:00p.m.[97]  It is therefore little wonder that Chief Cauley, the Town's chief law enforcement officer, readily testified that moving the Town's 7:00p.m. solicitation curfew from 7:00p.m. to dusk would not materially hamper the Castle Rock Police Department's ability to protect its residents from crime.[98]

In contrast to the Town's claims that the Curfew was necessary to protect its residents from crime, the Town all but admits to knowing virtually nothing about crime within its borders, generally – let alone solicitation related crime – prior to passing the 2008 and 2013 Ordinances. For example, Castle Rock is unaware whether there were fewer for-profit commercial solicitors charged with a solicitation-related crime than non-profit solicitors prior to the Ordinance's passage and/or between the hours of 7:00p.m. and dusk.[99]  The Town's chief law enforcement officer – Chief Cauley – testified that he is not aware of a single instance from 2012 to present where any person was convicted of a crime to persons or property arising out of door-to-door solicitation in Castle Rock, nor was he aware of a single time in Castle Rock, before or after the passage of the 2008 Ordinance, that any for-profit, registered commercial solicitor was accused,

---

[96] Joint Stipulation as to Facts at ¶ 160.
[97] Joint Stipulation at Exhibit 4; ¶ 157.
[98] Parties' Stipulated Facts at ¶ 126.  Dep. of Jack Cauley at 161:14-25
[99] Joint Stipulation as to Facts at ¶ 135.

charged, or convicted of a crime related to property. [100]  Similarly, the Town lacks any evidence

of solicitation-related crime after 7:00p.m.  This is due in no small part to the fact that fewer

Castle Rock residents are home during the working hours of 9:00a.m. and 7:00p.m., and – as

Chief Cauley testified - most residential burglaries happen during the daytime hours, because

"it's more likely for someone to commit a residential burglary when somebody's not home."[101]

This lack of crime-related evidence is corroborated by each of the Town's witnesses, none of

whom could identify any specific document, data, study, or other information considered by the

Town Counsel related to crime, resident privacy concerns, or the need for a 7:00p.m. Curfew.[102]

The Town's former-Mayor, Randy Reed, perhaps best summarized the conclusory speculation

and conjecture upon which the Town's defense of the Curfew is based.  During his deposition,

when asked about the basis of the Town's assertion that the Curfew protects residents from

crime, he testified that "there probably was some thoughts" that "reasonable people would think

that people walking around their neighborhood or up to their home could potentially be

somebody that might create a crime in the town."[103]

### III.  ARGUMENT

#### A.  The 7:00pm Curfew is an Unconstitutional Restriction on the Speech of Commercial Solicitors

##### 1.  The First Amendment protects the rights of persons to engage in door-to-door commercial solicitation.

---

[100] Joint Stipulation as to Facts at ¶ 123.

[101] Joint Stipulation as to Facts at ¶¶ 129, 131.

[102] *See, e.g.*, testimony of former Mayor Randy Reed, noting that the Council did not consider or analyze "a) crime in Castle Rock; b) solicitation-related crime in Castle Rock; c) crime committed by commercial solicitors in Castle Rock; d) crime committed by commercial solicitors in Castle Rock after 7:00 p.m.; or d) how a 7:00 p.m. curfew would protect public safety and privacy." Parties Stipulated Facts at ¶ 80.

[103] Joint Stipulation as to Facts at ¶ 116.

"In a line of cases running [back to 1960], the Supreme Court has granted substantial First Amendment protection to door-to-door canvassing and soliciting activities." *Wisconsin Action Coal. v. City of Kenosha*, 767 F.2d 1248, 1251 (7th Cir. 1985; *see also Edenfield,* 507 U.S. at 765–66 ("Solicitation is a recognized form of speech protected by the First Amendment"). In so doing, "the Supreme Court has implicitly recognized that door-to-door communication has a special significance not duplicated by less personal forms of contact." *City of Watseka*, 796 F.2d at 1556–57. Moreover, the Court has made clear that these hard-to-duplicate benefits associated with personal solicitation are hardly confined to non-commercial speech. "In the commercial context, solicitation may have considerable value." *Edenfield,* 507 U.S. at 765.

Part of the "considerable value" of commercial solicitation flows from the "indispensable value" of commercial speech generally. "It is a matter of public interest that economic decisions, in the aggregate, be intelligent and well-informed. To this end, the free flow of commercial information is indispensable." *Thompson v. W. States Med. Ctr.,* 535 U.S. 357, 366–67 (2002). Indeed, as the Court has observed, a "particular consumer's interest in the free flow of commercial information may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Id.*   For this reason, "even a communication that does no more than propose a commercial transaction is entitled to the coverage of the First Amendment." *Edenfield*, 507 U.S. at 767.

But the "considerable value" of personal solicitation is not limited to the intrinsic value of the information itself.  As the Supreme Court has noted, personal solicitation offers unique and conspicuous benefits to both buyers and sellers over "other forms of commercial expression:"

> Unlike many other forms of commercial expression, solicitation allows direct and spontaneous communication between buyer and seller. A seller has a strong financial incentive to educate the market and stimulate demand for his product or service, so solicitation produces more personal interchange between buyer and seller than would occur if only buyers were permitted to initiate contact. Personal interchange enables a potential buyer to meet and evaluate the person offering the product or service and allows both parties to discuss and negotiate the desired form for the transaction or professional relation. . . . For the buyer, it provides an opportunity to explore in detail the way in which a particular product or service compares to its alternatives in the market.

*Edenfield,* 507 U.S. at 766. Laws that "deny" buyers and sellers the unique "advantages" of commercial solicitation "threaten[] societal interests in broad access to complete and accurate commercial information that First Amendment coverage of commercial speech is designed to safeguard." *Id.* This is why a regulation of commercial solicitation (like the Curfew) is presumptively unconstitutional, and can only survive challenge if the municipality can meet the test set forth by the Supreme Court in *Central Hudson. Pleasant Grove City,* 414 F.3d at 1231.

### 2. To Survive a Constitutional Challenge, the Town Must Prove the Curfew Meets Each of the Four Elements of the Central Hudson Test

The *Central Hudson* test has four prongs. As a threshold matter, a court first "asks whether commercial speech concerns unlawful activity or is misleading." *Thompson v. W. States Med. Ctr.,* 535 U.S. 357, 366–67 (2002). Assuming the speech concerns lawful activity and is not misleading, the Town must prove that that (1) "the state's interests in proscribing [the Curfew] are substantial," (2) "the [Curfew] advances these interests in a direct and materially way," and (3) the Curfew is "narrowly tailored" *i.e.* not "more extensive than necessary to serve [those] interest[s]." *Edenfield,* 507 U.S. at 779 (1993). If each of these requirements is not satisfied, the "regulation is unconstitutional." *Pleasant Grove City,* 414 F.3d at 1231.

Here, the Curfew does not claim to target untruthful or deceptive speech. Instead, it prohibits all commercial solicitation speech after 7:00pm, regardless of its truthfulness or

untruthfulness.  In addition, Castle Rock's satisfaction of the first *Central Hudson* element is not in dispute here.  Castle Rock has identified two "substantial" interests the Curfew allegedly advances – protecting the privacy of its residents who do not want to be visited by uninvited solicitors and preventing crime.  And Aptive acknowledges that these twin goals are valid objectives for the Town to pursue.  Instead, the Curfew is unconstitutional because it does not meet either the third or fourth *Central Hudson* prong.

> a.  **The Town Must Provide "Concrete Evidence" the Curfew "Directly and Materially Advances" Residents' Privacy and Protection from Crime**

To meet the third prong of Central Hudson, the Town must show that banning all for profit solicitation after 7:00p.m. "directly and materially advance[s] the asserted government interest." *Greater New Orleans Broadcasting Assoc., Inc. v. U.S.,* 527 U.S. 173, 188 (1999). This showing has two component parts.

First, the Town must show that it implemented its total ban on post-7:00p.m. for profit-solicitation to "address what in fact is a serious problem." *Edenfield*, 507 U.S. at 771; *see also Pleasant Grove City*, 414 F.3d at 1235 (holding that a regulation of commercial solicitation "comport[s] with the First Amendment's strictures, so long as a city shows that it faces ***real harms***.") (emphasis added). This is true even though the Town permits solicitation at other hours of the day, as "[e]ven partial restrictions on commercial speech must be supported by a showing of some ***identifiable harm***." *Mason v. Florida Bar,* 208 F.3d 952, 958 (11th Cir. 2000) (holding that the state was not "relieved of its burden to identify a ***genuine threat of danger***" even though the ordinance was not a "complete ban on [all] commercial speech.") (emphasis added).

Second, assuming the town can show the Curfew is directed at what is a "serious problem" and "real harm," the Town must show that the Curfew "contributes in a material way

to solving that [serious] problem." *Edenfield*, 507 U.S. at 771; *see also Pleasant Grove City*, 414 F.3d at 1235 (holding that a regulation of commercial solicitation is constitutional only if the "real harms" the town faces are "materially palliated" by the regulation"). Put differently, "[i]f the [Curfew] provides only ineffective or remote support for the government's purpose, it will not be upheld." *Pleasant Grove City*, 414 F.3d at 1235.

Importantly, in proving that a "serious harm" actually exists that the Curfew specifically is "solving in a material way," the Town may not rely upon "mere speculation or conjecture." *Edenfield,* 507 U.S. at 771.  Accordingly, evidence of "unsubstantiated fears and worries" are "not sufficient." *Citizens Action Coal. of Indiana, Inc. v. Town of Yorktown, Ind*, 58 F. Supp. 3d 899, 909 (S.D. Ind. 2014) (invalidating a 9:00p.m. curfew where the evidence submitted by the Town consisted of "several affidavits from residents stating they are concerned about the *possibility* of crime in their neighborhoods" but "without referencing any specific events, evidence, or statistics").

 Nor may the Town carry its evidentiary burden on this element by relying upon "conclusory assertion[s] by an interested party, particularly when unsupported by any statistics or firsthand knowledge". *City of Watseka*, 796 F.2d at 1556; *see also Edenfield,* 507 U.S. at 771 (holding that the state did not carry its Central Hudson burden by relying upon "a series of conclusory statements that add little, if anything, to the board's original statement of its justification"); *Utah Licensed Beverage Ass'n,* 256 F.3d at 1071 (holding that the state "conclusory assertions" that the commercial speech restriction "reduced harms to a material degree" was "insufficient to meet [its Central Hudson] burden"). As the Seventh Circuit explained in *City of Watseka*, "[w]hen a city like Watseka wants to pass an ordinance that will substantially limit First Amendment rights, the city must produce more than a few conclusory

affidavits of city leaders which primarily contain unsubstantiated opinions and allegations. 796 F.2d at 1555.

Instead, the Town must "produce concrete evidence" that demonstrates this element is met. *Mason v. Florida Bar*, 208 F.3d at 958 (11th Cir. 2000); *see also New York Youth Club v. Town of Harrison*, 150 F. Supp. 3d 264, 273–74 (S.D.N.Y. 2015) (finding a Town had not carried its burden under Central Hudson where it "failed to set forth sufficient documentary or testimonial evidence to show that its interests in crime-prevention and/or the tranquility of private property are actually served by or justify the [solicitation regulation]."). This evidentiary burden is "critical, for otherwise, a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression." *Utah Licensed Beverage Ass'n*, 256 F.3d at 1071 (quoting *Edenfield*, 507 U.S. at 771).

This "concrete evidence" can be "anecdotal" in nature, provided such anecdotal evidence is sufficiently robust, persuasive, and not "irrational" or "contrary to specific data." *See, e.g., Educ. Media Co. at Virginia Tech, Inc. v. Swecker*, 602 F.3d 583, 589 (4th Cir. 2010) ("[T]he [evidentiary] link is insufficient if it is irrational, contrary to specific data, or rooted in speculation or conjecture."); *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1074 (10th Cir. 2001) (invalidating a restriction on the labeling of certain alcoholic beverages because the ordinance "irrationally. . . distinguish[ed] among the indistinct, permitting a variety of speech . . . that poses the same risks the Government purports to fear while banning messages unlikely to cause any harm at all."); *Pleasant Grove City*, 414 F.3d at 1235 (contrasting the copious "anecdotal evidence" the Supreme Court deemed sufficient in *Florida Bar v. Went-for-It, Inc* – which included a "two-year study of the impact lawyer advertising and solicitation and a 106-

page summary of its findings" – with the "conjecture" of conclusory statements by interested witnesses).

Where a party cannot make such a showing with "concrete evidence," the Curfew must be invalidated.  *See, e.g., Pleasant Grove City*, 414 F.3d at 1231; *Edenfield*, 507 U.S. at 771.

> **b.    The Town Must Prove that its Privacy and Crime Protection Goals Cannot be "Served as Well by a More Limited Restriction on Commercial Speech.**

To meet the final prong of Central Hudson, the Town must show that the Curfew is "narrowly tailored" i.e. not "more extensive than necessary to serve [its] interest[s]" of privacy and protection from crime. *Edenfield,* 507 U.S. at 779 (1993); *see also Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 571 (6th Cir. 2012) ("A content-neutral regulation is deemed narrowly tailored to a significant governmental interest if 'the incidental restriction on alleged First Amendment freedoms is no greater than is essential") (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994)). Put differently, "if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, ***the Government must do so***". Thompson, 535 U.S. at 371 (emphasis added).  Or as the 10th Circuit put it in *Pleasant Grove City*, "a regulation is unconstitutional if the governmental issue would be served as well by a more limited restriction on commercial speech." *Pleasant Grove City*, 414 F.3d at 1231-32.[104]

"Narrow tailoring means that the government's speech restriction must signify a careful calculation of the costs and benefits associated with the burden on speech imposed by its

---

[104] As the 10th Circuit explained elsewhere, "while this pronouncement, in effect, imposes a burden on the government to consider certain less restrictive means—those that are obvious and restrict substantially less speech—it does not amount to a least restrictive means test. We do not require the government to consider every conceivable means that may restrict less speech and strike down regulations when any less restrictive means would sufficiently serve the state interest. We merely recognize the reality that the existence of an obvious and substantially less restrictive means for advancing the desired government objective indicates a lack of narrow tailoring." U.S. W., 182 F.3d at 1238 (10th Cir. 1999).

prohibition." *U.S. W., Inc. v. F.C.C.*, 182 F.3d 1224, 1238 (10th Cir. 1999) (quoting *Cincinnati v. Discovery Network, Inc*., 507 U.S. 410, 417 (1993).  And while the Supreme Court has "rejected the 'least-restrictive-means' test for judging restrictions on commercial speech," the "existence of an obvious and substantially less restrictive means for advancing the desired government objective indicates a lack of narrow tailoring."  *U.S. W.,* 182 F.3d at 1238; *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 529, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (O'Connor, J., concurring) ("The availability of less burdensome alternatives to reach the stated goal signals that the fit between the legislature's ends and the means chosen to accomplish those ends may be too imprecise to withstand First Amendment scrutiny."); *Project 80's, Inc. v. City of Pocatello*, 942 F.2d 635, 638 (9th Cir. 1991)("By pointing out the alternatives available to the cities to advance their interests, we do not impose a least restrictive means requirement. Rather, we conclude, as did the Supreme Court in Fox, that restrictions which disregard far less restrictive and more precise means are not narrowly tailored.")

"This is particularly true when such alternatives are obvious and restrict substantially less speech." *Id*.  The fact that there are "all of these alternatives that could advance the Government's asserted interest in a manner less intrusive to First Amendment rights indicated that the law was more extensive than necessary." *Id*. (quoting *Thompson*, 535 U.S. at 371); *see also U.S. W.,* 182 F.3d at 1238 ("[T]he FCC's failure to adequately consider an obvious and substantially less restrictive alternative, an opt-out strategy, indicates that it did not narrowly tailor the CPNI regulations regarding customer approval.").  Indeed, "almost all of the restrictions disallowed under Central Hudson's [narrow-tailoring requirement] have been substantially excessive, disregarding far less restrictive and more precise means." *Bd. Of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 479 (1989); (emphasis added); *see,*

*e.g.*, *Utah Licensed Beverage Ass'n,*, 256 F.3d at 1071 (invalidating a commercial regulation where "alternative forms of regulation that would not involve any restriction on speech would be more likely to achieve the State's goal."); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011) (striking a commercial speech regulation where "the City has various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech."); *Project 80's*, 942 F.2d at 639 (invalidating a ban on door-to-door commercial solicitation where the city had "disregarded far less restrictive and more precisely means").

This pattern is particularly true in cases involving challenges to solicitation regulations and curfews.  In these cases, like here, the cities invariably argue the restrictions advance the twin goals of protecting residents from unwanted solicitation and preventing crime. But in virtually every instance, courts invalidate restrictions that go beyond reasonable permitting requirements and enforcement of an unwilling listener's right to "opt-out," concluding that these two measures alone are sufficient to protect privacy and prevent crime, while being far less restrictive of speech.

The Supreme Court has invalidated several door-to-door solicitation restrictions on precisely this basis. In *Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton,* the Supreme Court invalidated a provision requiring solicitors to obtain a permit. *Id*. The city had argued (among other things) that the permit requirement was "narrowly tailored" to the city's interests in "protecting the privacy of the resident". *Id.* 536 U.S. 150, 168 (2002).  The Supreme Court expressly rejected this claim, observing that:

> [I]it seems clear that § 107 of the ordinance, which provides for the posting of
> "No Solicitation" signs and which is not challenged in this case, coupled with the

resident's unquestioned right to refuse to engage in conversation with unwelcome visitors, provides ample protection for the unwilling listener.

*Id.*

The Supreme Court reached the same conclusion in *Vill. of Schaumburg v. Citizens for a Better Env't*, holding that the solicitation restriction was not narrowly tailored where "other provisions of the ordinance, which are not challenged here, such as the provision permitting homeowners to bar solicitors from their property by posting signs reading 'No Solicitors or Peddlers Invited,' suggest the availability of less intrusive and more effective measures to protect privacy." 444 U.S. 620, 638 (1980).

The 10th Circuit reached the same conclusion in *Pleasant Grove City*. 414 F.3d at 1227. In invalidating the city's fingerprinting requirement, the court found that there were other, less restrictive means of protecting residents from unwanted solicitation and crime. *Id*. at 1234. For instance, "Pleasant Grove enforces compliance with posted "No Soliciting" signs, and requires proof of age, address, and identification, two photographs, and a background check of all applicants." *Id*. Because these measures alone "assure adequately citizens' privacy and provide law enforcement with the means of identifying potential criminals and deterring crime," the court concluded the fingerprinting requirement was not narrowly tailored." *Id.*

Numerous other courts have relied upon the same logic to invalid a solicitation curfew. In each of these cases, the court struck the curfew, observing that it was not narrowly tailored in light of the "less restrictive and more precise" method for avoiding unwelcome solicitation offered by posting a sign. For instance, in *Edison Tp*., the Seventh Circuit invalidated a 5pm solicitation curfew after observing that:

> [I]t is evident that a 'precisely tailored' regulation can readily be drafted. Municipalities seeking to protect the privacy rights of their residents who strongly

object to solicitation at any time may enact ordinances that require canvassers to observe the individual resident's signs indicating that solicitors are not welcome.

797 F.2d at 1252.

This is the same logic numerous federal courts have applied in invalidating at least 17 other solicitation curfews.[105]   The same logic applies here and requires the invalidation of this Curfew.

> 3.    The Curfew Does Not "Directly and Materially Advance" the Town's Ostensible Goals of Protecting Residents from Unwanted Solicitation and Preventing Crime.

As discussed above, to satisfy Central Hudson's third prong, the Town has "the obligation to demonstrate that it is regulating speech in order to address what is in fact a serious problem and that the preventative measure it proposes will contribute in a material way to solving that problem." *Edenfield*, 507 U.S. at 777.   In light of the Town's asserted goals and the scope of the Curfew, this means that the Town must prove – through "concrete," non-conclusory evidence – that (1) it has a "serious problem" with registered for-profit solicitors interrupting the privacy of unwilling residents and committing crimes and (2) the 7:00p.m. Curfew will "materially" solve that problem.   The Town cannot carry this burden.

> a.    The is not (and never has been) a "serious problem" in the Town with permitted commercial solicitors knocking the doors of residents unwilling to receive their speech.

"Privacy is inherently an individual matter; it is difficult to violate a person's privacy unless that person wishes to be let alone."   *Project 80's, Inc. v. City of Pocatello*, 876 F.2d 711, 714 (9th Cir. 1988), cert. granted, judgment vacated on other grounds *City of Idaho Falls, Idaho v. Project 80's, Inc.*, 493 U.S. 1013 (1990).   Some residents of the Town clearly wish not to be disturbed after 7:00p.m.; others don't.   For the residents disturbed by post-7:00p.m. commercial

---

[105] *See* n. 17, *supra*.

solicitation, the Curfew "directly protect[s] their privacy." *Id*.  But those residents already have a means to avoid commercial solicitation after 7:00p.m. – they can either sign up on the Town's "no-knock" list or place a "no-soliciting" sign on their door after 7:00p.m.[106]

In other words, **every single resident** of Castle Rock who wishes to avoid commercial solicitation after 7:00p.m. is already able to do in at least two different ways.   And the undisputed evidence shows both that residents of Castle Rock avail themselves of this option – over 6300 residents have signed up for the "no-knock" list[107] – and that it works.  Since adopting this "opt-out" option in 2008, the Town can point to only one single instance of a registered commercial solicitor knocking on the door of an individual that had signed up for the "no-knock" list.[108]  There is thus no "problem" in Castle Rock with commercial solicitors knocking on the doors of the unwilling after 7:00p.m., let alone the "serious problem" required to justify a blanket ban on all commercial solicitation thereafter.

And because there is no problem, there is nothing for the Curfew to "materially" solve. As the Seventh Circuit explained in *City of Watseka*, "Watseka has already provided unwilling listeners with a mechanism to ban all solicitors from their property at any time the listeners desire." 796 F.2d at 1556–57. Accordingly, "a resident who does not want to be disturbed during dinner but is willing to talk to canvassers thereafter can post the sign during dinner and take it down once the table is cleared". *Id*.  And "Watseka can prosecute any solicitor who disturbs a resident posting a no solicitation sign". *Id*.  Accordingly, the Court concluded the 6pm curfew there was "not sufficiently related to Watseka's legitimate objective of protecting its citizens' peace and quiet enjoyment of their homes". *Id*.

---

[106] Stip. Ex. 1, CR000240-53
[107] Stip. Ex. 1, CR000261-398
[108] Joint Stipulation as to Facts ¶157.

In fact, instead of the Curfew being protective of residents' rights, its actual effect is pernicious: "depriving willing listeners of the [solicitor's] message." *Id.* Indeed, "[t]o support the [curfew] on this ground [of privacy] is to derogate the First Amendment rights of plaintiffs and those of defendants' residents who would be willing recipients of plaintiffs' message during the evening hours to the nuisance concerns of those of their residents who would not be willing listeners during those hours, when the wishes of both groups can be easily accommodated." *Id.*

But this is not the only defect in the Town's claim that the 7:00p.m. Curfew materially "solves the problem" of persons knocking on the doors of unwilling residents. Just as problematic is the irrationality of the Town's overall regulatory scheme. The Town has carved out cavernous categories of door-to-door solicitors and canvassers that are exempt from the Curfew and the applicability of the "opt-out" provisions of the Town's solicitation ordinance.[109] This includes anyone selling a good or a service for a "non-profit" purpose.[110] It also includes anyone engaging in religious, political, charitable, or philanthropic solicitation.[111] "Yet the level of intrusion into a resident's privacy is the same whether the person ringing the doorbell is selling food, dropping off religious pamphlets or soliciting donations for an educational organization." *City of Mentor-On-The-Lake*, 272 F. Supp. 2d at 685. Other than conclusory assertions unsubstantiated by any concrete evidence, the Town as put forth no evidence "as to why visits from those [unregistered] door-to-door canvassers are in any way less annoying or less of an invasion of privacy than those by [registered commercial solicitors]." *Wayne Tp.,* 310 F. Supp. 2d at 696–97; *see also Watchtower Bible*, 536 U.S. at 168 (observing that "[t]he annoyance caused by an uninvited knock on the front door is the same whether or not the visitor is armed

---

[109] Stip. Ex. 1, CR000240-53.
[110] *Id.*
[111] Stip. Ex. 1, CR000240-53.

with a [registration] permit"); *City of Kenosha*, 767 F.2d at 1257 (invalidating a curfew where "the City has presented no evidence that solicitation constitutes some exacerbated threat to privacy not posed by the door-to-door activities which are exempt from the curfew.")

In fact, the undisputed evidence supports the conclusion that these broad exemptions to the Curfew and registration requirements ***make things worse***. While Castle Rock's records reflect a single complaint to the Town's non-emergency line about a registered commercial solicitor during the period October 8, 2016 through August 2017, there were no less than 16 complaints about exempt "canvassers."[112]

This data is not surprising. Because "there is no requirement that those canvassers exempt from [the Curfew] be notified of households participating to the no-solicitations list . . . political campaigners and non-profit and charitable canvassers . . . are ***more likely*** to go to the homes of Wayne residents who have specifically voiced their opposition to these visits by signing up for the non-solicitations list." *Wayne Tp.*, 310 F. Supp. 2d at 697. "In light of the[se] extensive exemptions, it is difficult to determine how this ordinance substantially furthers the interest of ensuring privacy, avoiding crime or otherwise protecting town residents from annoyance." *Town of Hempstead*, 601 F. Supp. at 1071; *Educ. Media Co. at Virginia Tech, Inc. v. Swecker*, 602 F.3d 583, 589 (4th Cir. 2010) (holding that the requisite evidentiary "link" between the challenged commercial regulation and problem ostensibly being solved "is insufficient if it is irrational [or] contrary to specific data").

There is one final reason the Curfew fails this third prong of *Central Hudson*: the Town has offered no evidence of why or how the daylight **7:00p.m.** Curfew "materially" solves the alleged "problem" of commercial solicitors knocking on the doors of unwilling listeners as

---

[112] Joint Stipulation as to Facts ¶178.

opposed to – for instance – a nighttime curfew beginning at dusk.   The Town "has no tangible evidence that demonstrates solicitation occurring before [7]:00p.m. is more invasive than solicitation occurring after [7]:00p.m." *City of Bloomington*, 142 F. Supp. 3d at 834.   And, "although it is true that as the evening proceeds toward bedtime, a doorbell ring becomes more invasive, the [Town] provides no evidence that [7]pm is when privacy interests need to be protected."   *Id.*   To the contrary, as in *City of Englewood*, Castle Rock residents "appear generally averse to door-to-door advocacy, at any time of the day."[113] 671 F.3d at 573.   This reality, too, is fatal to the Town's claims that the 7:00p.m. Curfew "materially" protects the privacy of residents who wish to avoid solicitation.  *See City of Englewood,* 671 F.3d at 573 (affirming the district court's ruling that "Englewood's interest in protecting the privacy rights of its citizens [does not] support the [6:00p.m.] curfew."); *City of Kenosha*, 767 F.2d at 1257 (invalidating an 8:00p.m. curfew where the city failed to demonstrate "why privacy must be specially protected—by the [curfew]—at 8:00p.m., even though trespassing laws, signs and door-slamming are sufficient at 7:45p.m.").

### b. There is not (and never has been) a "serious problem" in the Town with permitted commercial solicitors committing crimes after 7:00p.m.

As noted previously, to carry its burden under Central Hudson, "it is incumbent upon [the Town]" to put on actual evidence "establishing that their time restrictions prevent crime."  *Vill. of Olympia Fields,* 511 F. Supp. at 106.   "[C]onclusory assertion[s] by an interested party, particularly when unsupported by any statistics or firsthand knowledge of any actual crimes" won't do.  *City of Watseka v. Illinois Pub. Action Council*, 796 F.2d 1547, 1556 (7th Cir. 1986), aff'd, 479 U.S. 1048, 107 S. Ct. 919, 93 L. Ed. 2d 972 (1987).  Instead, the Town must "establish

---

[113] Joint Stipulation as to Facts ¶112.  Seven of the cities witnesses each testified they do not want solicitors visiting their property "at any hour."

a factual basis" for the assertion that "a problem with criminal [commercial] solicitors existed in the past." *Town of Harrison*, 150 F. Supp. 3d at 274.  And it must present actual "evidence of the preventive effect of [the] curfew on crimes by door-to-door [commercial] canvassers." *City of Englewood*, 671 F.3d at 574.  Absent such an evidentiary showing, the Curfew cannot stand. *Town of Yorktown,* 58 F. Supp. 3d at 909 (invalidating a 9:00p.m. curfew where the town had submitted several "affidavits" discussing "the possibility of crime" but that did not reference any "specific events, evidence, or statistics" that would "establish an increase in the crime rate due to door-to-door solicitation").

The Supreme Court's decision in *Edenfield* is instructive in this regard.  That case involved Florida's ban on "personal solicitation" of potential clients by accountants.  Florida asserted that that the ban "directly and materially" protected these potential clients from "fraud." *Edenfield*, 507 U.S. at 770. Florida argued that this "prophylactic rule" was necessary since personal solicitation "most often occurs in private offices and is difficult to regulate or monitor." *Id*. at 773.  But Florida provided "no studies that suggest personal solicitation of prospective business clients by CPA's creates the dangers of fraud." *Id*. at 771.  Nor did it provide "any anecdotal evidence, either from Florida or another State, that validates the Board's suppositions." *Id*.  Instead, "[t]he only suggestion that a ban on solicitation might help prevent fraud" was is the affidavit of Louis Dooner, the former chairman of the board that adopted the restriction, which "contains nothing more than a series of conclusory statements that add little if anything to the Board's original statement of its justifications."  *Id*.  Concluding that Florida had thus failed to show that the restriction addressed what was "in fact a serious problem and that the preventative measure it proposes will contribute in a material way to solving that problem," the Supreme Court invalidated the personal solicitation ban.  *Id*. at 776.

The Tenth Circuit's recent decision in *Pleasant Grove City* is also instructive. *Pleasant Grove City*, 414 F.3d at 1227.  There, a company selling Kirby vacuum cleaners door-to-door challenged Pleasant Grove, Utah's requirement that commercial solicitors provide their fingerprints and put up a bond as part of the licensing and registration process. *Id*.  There, like here, the city argued that these requirements "directly and materially" protected its residents against crime, supporting that contention with conclusory testimony from the city's chief of police and the councilmember that was the author of the ordinance that the requirements "deterred solicitors from committing crime." *Id*.  But the data actually showed that the amount of crime committed by for-profit solicitors in Pleasant Grove was "minimal." *Id*.  And what crime there was involved "those posing as solicitors who did not apply for a license" and provide their fingerprints. *Id*. at 1234-35.  Further, other than the conclusory assertions of its interested witnesses, the city put on no evidence that the requirement "had any [actual] impact on crime committed by [for-profit] solicitors." *Id*. at 1235.  Given the absence of such actual evidence, the 10th Circuit observed that the conclusory testimony of the city's witnesses about the alleged "deterrent" effect of the restriction on for-profit solicitors was mere "speculation" and "conjecture." *Id*.  Accordingly, the court concluded that the city had "failed to show that its restriction will in fact alleviate [the alleged harms] to a material degree" and invalidated the restrictions.

The Town faces the same evidentiary burden with respect to the Curfew.  Moreover, it is not enough for Castle Rock merely to put on evidence that a curfew ***generally*** "prevents crime;" it must demonstrate why its 7:00p.m. for-profit solicitor Curfew ***in particular*** does.  Otherwise, its "defense of its ordinance . . .  would, if accepted, justify almost any arbitrary time limitation on door-to-door solicitation short of a total ban." *Connecticut Citizens Action Group (CCAG) v.*

*Town of Southington*, 508 F. Supp. 43, 45 (D. Conn. 1980). Put differently, Castle Rock must show why "privacy [and safety] must be specially protected—by the [Curfew]—at [7]:00 p.m., even though trespassing laws, signs and door-slamming are sufficient at [6]:45 p.m." *Wisconsin Action Coal. v. City of Kenosha*, 767 F.2d 1248, 1257 (7th Cir. 1985).

What would such evidence consist of here? As other courts have observed, it would be evidence linking the material advancement of privacy protection and crime prevention ***to the specific time (7:00p.m.) and scope (only applies to for-profit solicitors) of the challenged Curfew itself***. Thus, at minimum, it would involve evidence establishing the following three facts:

***First***, that "a problem with [for-profit] criminal-solicitors [committing crimes after 7:00p.m.] existed in the past" or exists in the present.[114]

***Second***, that for-profit solicitors commit crimes at higher rates between 7 pm and dusk than other times of the day.[115]

***Finally***, that the 7:00p.m. Curfew has had a measurable impact on crime rates in Castle Rock.[116]

---

[114] *Town of Harrison,* 150 F. Supp. 3d at 274; *see also City of Mercer Island,* 2015 WL 540182, at *6 (enjoining a curfew where the city "offer[ed] no evidence of criminality by canvassers or solicitors with the exception of one incident in the last ten years"); *Town of Yorktown,* 58 F. Supp. 3d at 909 ("Without any substantive evidence establishing an increase in the crime rate due to door-to-door solicitation, the Town fails to show how canvassing after [the curfew] poses any greater threat to its citizens than any other person who may come to a resident's door after [the curfew]."); *City of Englewood,* 671 F.3d at 573–74 (6th Cir. 2012) (invalidating a curfew where "the city offered no evidence of criminality by solicitors in Englewood.")

[115] *See, e.g., City of Watseka,* 796 F.2d at 1555–56 (invalidating a 6pm curfew where the city "failed to in any way link the evidence on nighttime crime to [daylight] solicitation"); *City of Dearborn,* 696 F. Supp. at 274 (enjoining a 7:00p.m. curfew where there was no evidence that preventing solicitation after 7:00p.m. "will significantly increase the incidence of burglary or other evening crime."); *Vill. of Olympia Fields,* 511 F. Supp. at 106–07 (invalidating a sunset curfew where "defendants have not shown, and the Court doubts, that many of those types of crimes most commonly associated with door-to-door solicitation, e. g., consumer fraud, are more commonly committed after sunset.")

[116] *See, e.g., City of Englewood,* 671 F.3d at 573–74 (invalidating a curfew where the city failed to "present evidence of the preventive effect of curfews on crimes by door-to-door canvassers."); *City of Watseka,* 796 F.2d at 1555–56 (invalidating an ordinance where the city failed to offer any evidence showing that its "crime rate went down during

---

Here, the undisputed evidence show that none of these three facts are true.

***First***, it is undisputed that the Town has never had a problem with commercial solicitors committing crimes, after 7pm, or at any other time of the day. Indeed, in the entire history of Castle Rock of the Town of Castle Rock, only one for-profit solicitor has ever been charged with a crime.[117] And the Town's Chief of Police testified as its corporate representative that "he could not point to a single time in Castle Rock, before or after the passage of the [Curfew], that any for-profit, registered commercial solicitor was accused, charged, or convicted of a crime related to property."[118]  Similarly, the Town can point to only two complaints, ever, received by the Town – which currently has a population of ***58,000 people*** – about for-profit solicitors, and neither of these complaints took place after 7:00 p.m.

***Second***, it is undisputed that for-profit solicitors in Castle Rock **<u>do not</u>** commit crimes at higher rates between 7pm and dusk than at other times of the day.  For one thing, as noted above, for-profit solicitors almost never commit ***any crimes at all*** in Castle Rock.[119]  And, in any event, Chief Cauley conceded that a person generally is "probably not more likely to commit a crime arising out of door-to-door solicitation after 7:00 p.m. than before 7:00 p.m."[120]  Indeed, Chief Cauley admitted that most residential burglaries happen during the daytime hours because less people are home.[121]

---

the three years the [curfew] was in effect"); *City of Mercer Island*, 2015 WL 540182, at *6 (W.D. Wash. Feb. 10, 2015) (enjoining a curfew where the city "offer[ed] no evidence of criminality by canvassers or solicitors [nor] . . . present[ed] evidence of the preventive effect of curfews on crimes by door-to-door canvassers."); *Town of Hempstead*, 601 F. Supp. at 1071(invalidating a 7:00p.m. curfew where the town failed to provide evidence "showing of a crime wave" pre-dating the curfew" or of any positive effect on diminishing crime which the [curfew] has had")

[117] Parties' Stipulated Facts at ¶ 160.
[118] Parties' Stipulated Facts at ¶ 125.
[119] Parties' Stipulated Facts at ¶ 160.
[120] Parties' Stipulated Facts at ¶ 124.
[121] Parties' Stipulated Facts at ¶ 131.

---

**Finally**, it is undisputed that the Curfew has not had a measurable impact on crime rates in Castle Rock.  As noted above, Castle Rock has only once in its entire history charged a for-profit solicitor with a crime.[122]  When the Town passed the Curfew in 2008, it was not because of concerns about crime, anyway.  Indeed, the Town's corporate representative has testified that prior to passage of the 2008 Ordinance, the Town Council did not even discuss or analyze solicitation-related crime in Castle Rock or crime committed by commercial solicitors in Castle Rock, including crime committed by commercial solicitors in Castle Rock after 7:00 p.m.[123]  It is thus no surprise that Chief Cauley, as Town's corporate representative, conceded that moving the Town's 7:00 p.m. solicitation curfew from 7:00 p.m. to dusk "would not materially hamper the Castle Rock Police Department's ability to protect its residents from crime."[124]  This admission – by the Town's chief law enforcement officer – that abolishing the Curfew wouldn't materially affect crime in Castle Rock is fatal to the constitutionality of the Curfew under Central Hudson's "material advancement" prong.

The Town's Curfew fails this prong for one additional reason: the irrationality of the Town's overall regulatory scheme.  As noted above, large categories of persons engaging in solicitation activities are exempt from the Curfew and the Town's robust registration process and background check requirements.[125]  As the Supreme Court noted in Stratton, these exceptions deal a fatal blow to the efficacy of the Curfew in deterring crime, since it "seems unlikely that the absence of a permit would preclude criminals from knocking on doors and engaging in conversations covered by the ordinance." *Stratton,* 536 U.S. at 169.  "In other words, an individual who was intent on perpetrating a crime or fraud against a [Town] resident is unlikely

---

[122] Parties' Stipulated Facts at ¶ 160.
[123] Joint Stipulation as to Facts at ¶ 80.
[124] Parties' Stipulated Facts at ¶ 126.  Dep. of Jack Cauley at 161:14-25
[125] Stip. Ex. 1, CR000240-53.

to be deterred by the [Curfew]." *Wayne Tp.,* 310 F. Supp. 2d at 697.   Someone seeking to commit a crime after 7:00p.m. "has options besides posing as a [commercial] solicitor" that is subject to the Curfew and registration/background check process.   *City of Watseka*, 796 F.2d at 1555–56.   "Common ones, for example, are the pretense of looking for someone at the wrong address, the need for emergency use of the telephone, or a claim that entrance is needed to check for gas leaks, and so forth."   *Id.*   Or – perhaps most likely – such a person would pose as a non-profit canvasser exempt from the Curfew and the registration requirements.   "Unfortunately, for the devious there is no shortage of opportunities."   *Id.*   Given the broad categories of persons exempt from Curfew and registration requirements, such opportunities "for the devious" are particularly plentiful in Castle Rock.

### 4.        The Curfew Is Not Narrowly Tailored

As the Tenth Circuit held in *Pleasant Grove City*, "a [commercial solicitation] regulation is unconstitutional if the governmental issue would be served as well by a more limited restriction on commercial speech." 414 F.3d at 1231-32.   The problem for the Town here is that – as the Supreme Court observed in *Stratton*, "it seems clear that [the "opt-out" provisions] of the [Town's] ordinance, which provides for the posting of "No Solicitation" signs and which is not challenged in this case, coupled with the resident's unquestioned right to refuse to engage in conversation with unwelcome visitors, provides ample protection for the unwilling listener." 536 U.S. 150, 168 (2002).

And the Supreme Court's holding in *Stratton* is by no means confined to non-commercial speech cases.   Indeed, in *Pleasant Grove City*, the Tenth Circuit quoted and applied ***precisely*** this language from Stratton to invalidate the commercial solicitation regulations at issue there. *Pleasant Grove City*, 414 F.3d at 1234.   There, like here, the city argued that the regulation was

necessary to protect the privacy of its residents and prevent crime. *Id*. There, like here, the city's existing solicitation regulations "enforce[d] compliance with posted "No Soliciting" signs, and require[d] proof of age, address, and identification, two photographs, and a background check of all [commercial solicitor] applicants." *Id*. The court held because these two options would "assure adequately citizens' privacy and provide law enforcement with the means of identifying potential criminals and deterring crime," the city goals could be "served as well by more limited restriction[s] on commercial speech." *Id*. Accordingly, the court held that the commercial speech regulation was unconstitutional. *Id*.

The 9th Circuit applied the same test in *Project 80's* to invalidate a city's outright ban on commercial solicitation. 942 F.2d at 638. There, like here, the city argued that its ban protected the privacy of residents who wished to avoid commercial solicitation and deterred crime. *Id*. But the court concluded that both of these goals could be advanced "through less restrictive means." *Id*. Specifically, the court held that "[p]rivacy is easily served by prohibiting solicitation at households that have posted a sign or listed themselves in a registry." *Id*. And "crime can be regulated by licensing, registration, and normal enforcement." *Id*. Accordingly, the court invalidated the commercial solicitation ban, "conclude[ing], as did the Supreme Court in *Fox*, that restrictions which disregard far less restrictive and more precise means are not narrowly tailored." *Id*.

Federal courts regularly invalidate solicitation curfews for the very same reason, concluding that "opt-out" provisions, reasonable registration requirements, and enforcement of existing penal laws constitute "less restrictive alternatives that will satisfactorily accomplish the same objectives" of preserving residents' privacy and protecting them from crime. *City of Frontenac*, 714 F.2d, 818; *see also City of Watseka*, 796 F.2d at 1556–57 ("The 5 p.m. [curfew]

fails to pass constitutional muster, in light of the less restrictive alternatives Watseka has

available to it, many of which Watseka has in fact already incorporated into the ordinance.");

*Olympia Fields*, 511 F. Supp. at 107 ("To the extent defendants wish to prevent the commission

of those categories of crimes more frequently committed at night by persons posing as door-to-

door solicitors, defendants can employ an array of legislative weapons which are much less

intrusive of plaintiffs' and their residents' First Amendment rights than a blanket ban on

solicitation after sunset or some earlier hour. For example, defendants could enact appropriate

registration and identification procedures.")[126]

Here, the Town existing ordinance has "opt-out" provision and a rigorous registration and

background check requirement to which all commercial solicitors must submit. "These less

restrictive alternatives show the Town can effectively combat the interest of protecting their

---

[126] At least ten other federal courts have invalidated curfews on the same grounds. *See, e.g., City of Mentor-On-The-Lake*, 272 F. Supp. 2d at 685 ("[E]ach resident has an unqualified right to exclude solicitors from their property by posting a no solicitation sign. . . .These methods are much less restrictive means of preventing unwarranted and unwanted intrusions into the privacy of their home life."); *Edison Tp.*, 797 F.2d at 1252 ("Municipalities seeking to protect the privacy rights of their residents who strongly object to solicitation at any time may enact ordinances that require canvassers to observe the individual resident's signs indicating that solicitors are not welcome."); *City of Mercer Island*, 2015 WL 540182, at *8 (invalidating a curfew where "the ordinance allows residents to avoid being inconvenienced by door-to-door canvassers at dinnertime by simply posting a "No Soliciting" sign on their property."); *City of Kenosha*, 767 F.2d at 1257 ("The City might enforce its trespass laws against solicitors who enter or remain on private property after the owner has indicated the solicitor is not welcome. Any resident wishing to avoid solicitation could post a sign to that effect."); *Wayne Tp.*, 310 F. Supp. 2d at 696 ("However, the No–Solicitation List Ordinance, which allows Wayne residents to place their address on the do-not-solicit list, provides an adequate means to address the privacy problem."); *City of Dearborn*, 696 F. Supp. at 275 ("Other, less restrictive means will adequately protect Dearborn's interest in crime prevention and tranquility. [For instance,] homeowners can protect their tranquility through the use of a simple and inexpensive "No Solicitors" sign."); *Town of Rockland*, 610 F. Supp. at 690 ("[T]he defendants' public annoyance justification will not support a first amendment challenge when the defendants have an ample supply of legislative weapons which are much less intrusive of plaintiffs and their residents' first amendment rights than a blanket ban on solicitation after sunset."); *Town of Southington*, 508 F. Supp. at 46 (rejecting the Town's argument that an 8:30p.m. protected residents privacy since towns could protect their citizens from annoyance by punishing "those who call at a home in defiance of the previously expressed will of the occupant."); *Town of Hempstead*, 601 F. Supp. at 1071 ("[P]reventing annoyance and ensuring the privacy of Hempstead residents can be accomplished by means that are less intrusive on constitutional freedoms. The town's trespassing laws are a starting point . . . [and] the resident can foreclose all soliciting by a sign at the door which so states."); *City of Frontenac*, 714 F.2d at 819 ("Frontenac may not, in the interest of achieving its legitimate objectives, broadly prohibit the plaintiffs' activities when less restrictive alternatives will satisfactorily accomplish the same objectives.")

---

residents' privacy [and deterring crime] without a broad prohibition on [soliciting] after 7:00p.m." *Town of Yorktown, Ind.*, 58 F. Supp. 3d at 908.   And the Town "may not, in the interest of achieving its legitimate objectives, broadly prohibit [solicitors'] activities [with a curfew] when less restrictive alternatives will satisfactorily accomplish the same objectives. *City of Frontenac*, 714 F.2d at 818.  The Curfew is unconstitutional.

**B.**      **The 7:00p.m. Curfew is An Unconstitutional Restriction on the Rights of the Town's Residents who Would Welcome Solicitors After 7:00p.m.**

The Curfew is not simply an affront to the protected speech rights of commercial solicitors who work in Castle Rock.  The Curfew also substantially restricts the free speech rights of the many residents of Castle Rock who do not object to solicitation after 7:00p.m.   The freedom of expression protected by the First Amendment encompasses the rights of both speakers ***and*** listeners. *See Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 565 (2001) ("[A] speech regulation cannot unduly impinge on the speaker's ability to propose a commercial transaction and the adult listener's opportunity to obtain information about products."); *Virginia Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 US. 748, 756-57 (1976) ("Freedom of speech presupposes a willing speaker. But where a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both"). The Supreme Court has repeatedly recognized "a First Amendment right to 'receive information and ideas,'" and that freedom of speech necessarily protects the right to receive." *Id.; see also In re Express—News Corp.,* 695 F.2d 807, 809 n. 2 (5th Cir. 1982) (observing that "[t]he public right to receive information has been repeatedly recognized and applied to a vast variety of information").

The right to receive speech applies to commercial speech-including door-to-door commercial solicitation. *See, e.g., Project 80's Inc.,* 942 F.2d at 639 (right to receive door-to-door commercial solicitation); *Lorillard Tobacco,* 533 U.S. at 564 (2001) (right of adult tobacco consumers to receive advertising about tobacco products); *Virginia Board of Pharmacy,* 425 U.S. at 757 (right to receive advertising about prescription drug prices); *Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85, 96-97 (1977) (right to receive information about property for sale through "For Sale" or "Sold" signs on residential property); *Carey v. Population Servs., Int'l,* 431 U.S. 678, 700 (1977) (right to receive advertising about contraceptives); *Bates v. State Bar of Arizona,* 433 U.S. 350, 384 (1977) (right to receive information about availability and tem1s of legal services). As the Supreme Court reasoned, "[i]f there is a right to advertise, there is a reciprocal right to receive the advertising." *Virginia Board of Pharmacy,* 425 U.S. at 757. Accordingly, the Court has held that listeners suffer a cognizable First Amendment injury when the government restricts speech for which they were the intended audience. *See Id.* at 756-57.

The Curfew is an unconstitutional regulation of Castle Rock residents' right to receive door-to-door commercial solicitation. The Ordinance allows residents who do not wish to receive door-to-door solicitation to avoid it altogether by posting a "No Soliciting" sign, or by registering with the Town's "no knock" list. But by restricting solicitation of residents who have elected *not* to post such signs, or who have elected *not* to register with the "no knock" list, the Town is violating the First Amendment rights of these residents to receive Aptive's (and other affected solicitors') speech. As evidenced by the hundreds of residents in the Denver area who

just this past year welcomed Aptive into their homes and purchased its services after 7:00p.m., there are many residents in the Town who would, in fact, welcome door-to-door solicitors.[127]

Yet, with the Curfew in effect, the only way these willing Castle Rock residents would be allowed to meet with solicitors is if they contact solicitors directly and affirmatively schedule their own appointment.[128]   The Town, however, cannot burden would-be listeners of speech by forcing them to affirmatively "opt-in," particularly where an "opt-out" option (a "No Soliciting" sign or registration with the "no knock" list) is readily available. *See, e.g., Bolger,* 463 U.S. at 70 n. 18 (rejecting government's argument that restriction on speech was valid because individuals could still request the restricted speech). As the Supreme Court made clear, "[w]e arc aware of no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means, such as seeking him out and asking him what it is. Nor have we recognized any such limitation on the independent tight of the listener to receive the information sought to be communicated." *Virginia Board of Pharmacy,* 425 U.S at 757 n. 15.

In *Project 80's,* the Ninth Circuit expressly rejected just such an opt-in scheme – persons that wanted to receive uninvited door-to-door solicitors had to post a "Solicitors Welcome" sign – holding that "[t]he government's imposition of affirmative obligations on the residents' first amendment rights to receive speech is not permissible." *Project 80's Inc.,* 942 F.2d at 639.   The same holding applies here.   The Town cannot impose an affirmative "opt-in" burden on its residents' right to receive door-to-door commercial speech.   Yet this is precisely what the Curfew does. As the Seventh Circuit recognized in *City of Watseka,* solicitation curfews amount

---

[127] Stip. Ex. 2, AE00096
[128] Stip. Ex. 1, CR000240-53 § 5.04.080(C) ("It shall he an affirmative defense to any violation of this Chapter that the solicitor has an express invitation from the resident or occupant of a dwelling allowing him or her to enter upon any posted property.").

to little more than "attempts by [a city] to substitute its judgement for that of its citizens." *City of Watseka,* 796 F.2d at 1556.

For all these reasons, the Town's Curfew is facially unconstitutional because it violates Castle Rock's residents' right to receive door-to-door commercial solicitation after 7:00p.m.


## IV.        <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant Aptive's motion, invalidate the Curfew as unconstitutional, enjoin its further enforcement, and aware Aptive its attorney fees as a prevailing party in this action.

Dated: January 11, 2018                        Respectfully submitted,

                                               /s/ Jonathan D. Kelley
                                               Jonathan D. Kelley
                                               Texas Bar No. 24090202
                                               jkelly@lynnllp.com
                                               Jeremy A. Fielding
                                               Texas Bar No. 24040895
                                               jfielding@lynnllp.com
                                               ,LYNN PINKER COX & HURST, LLP
                                               2100 Ross Avenue, Suite 2700
                                               Dallas, Texas 75201
                                               214-981-3800 - Telephone
                                               214-981-3839 – Facsimile

                                               Steven J. Perfrement
                                               Colorado Bar No. 27442
                                               steven.perfrement@bryancave.com
                                               Bryan Cave
                                               1700 Lincoln Street, Suite 4100
                                               Denver, Colorado 80203

                                               ATTORNEYS FOR PLAINTIFF
                                               APTIVE ENVIRONMENTAL, LLC

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of APTIVE ENVIRONMENTAL LLC'S MOTION FOR SUMMARY JUDGMENT was served electronically filed with the Clerk of the Court using CM/ECF system, which will send notification of such filing to the following email addresses on January 10, 2018 :

Brian James Connolly
**bconnolly@ottenjohnson.com**
J. Thomas Macdonald
**mac@ottenjohnson.com**
OTTEN JOHNSON ROBINSON NEFF & RAGONETTI, P.C.
950 Seventeenth Street, Suite 1600
Denver, Colorado 80202

ATTORNEYS FOR DEFENDANT
TOWN OF CASTLE ROCK, COLORADO

                                               /s/ Jonathan D Kelley
                                               Jonathan D. Kelley

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action Number: 1:17-cv-001545-MSK-MJW

APTIVE ENVIRONMENTAL, LLC,

      Plaintiff,

v.

TOWN OF CASTLE ROCK, COLORADO,

      Defendant.

---

**APTIVE ENVIRONMENTAL, LLC'S REPLY IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

---

      Plaintiff Aptive Environmental, LLC ("Aptive") files this Reply in Support of its Motion for Summary Judgment, and states as follows:[1]

## **INTRODUCTION**

      In its Motion, Aptive cites to literally dozens of cases in which courts invalidated solicitation regulations – including seventeen separate daylight curfews –because the town failed to carry its evidentiary burden, failed to demonstrate the restriction was narrowly tailored, or – in most cases – for both reasons.  In its Response, the Town insists the Court ignore **each** of these decisions – which, of course, it must if the Town is to prevail.  The Town premises this assertion on the argument that each of these cases involved regulation of non-commercial solicitation and that the "rigorous evidentiary burden" applied under the time, place, manner test in these non-commercial cases "has been rejected in the context of commercial speech cases."[2]  As the centerpiece of its

---

[1] Aptive also incorporates herein all arguments made and evidence cited in its Brief in Support of its Motion for Summary Judgment [Doc. 93].

[2] Def.'s Resp. to Pl.'s Mot. for Summ. J. 8 [Doc. 96].

argument, the Town cites to the Supreme Court's decision in *Stratton*, whose holding (the Town claims) expressly applies only to non-commercial solicitation regulations.

The Town is wrong.  At least as applied to the Town's evidentiary burden and a court's narrow tailoring analysis under *Central Hudson*, the non-commercial/commercial nature of the restriction is a distinction without a difference.  Indeed, as the Supreme Court expressly observed in *Fox* — also a commercial speech case – the time, place and manner test applied to non-commercial speech restrictions is "materially similar" to the *Central Hudson* test.  And nowhere is this point made more clearly than by the Tenth Circuit in *Pleasant Grove*.  In that case involving a challenge to a restriction on **commercial** solicitation, the Tenth Circuit explicitly applied the Supreme Court's holding in *Stratton*, both to analyze whether the town carried its evidentiary burden under *Central Hudson* and to determine whether the commercial restriction was "narrowly-tailored." Concluding that Pleasant Grove had "not met its burden" set forth in *Stratton* **and** that the town's licensing scheme coupled with the enforcement of its "no-solicitation" ordinance would "assure adequately" residents' privacy and safety, the Tenth Circuit invalidated the commercial speech restriction. *Pleasant Grove* controls here and requires this Court to reach the same conclusions.

## ARGUMENT

A. **As the Tenth Circuit Expressly Held In *Pleasant Grove*, the Supreme Court's holding in *Stratton* Applies with Equal Force to Regulations of Commercial Solicitation.**

In its Motion for Summary Judgment,[3] Aptive pointed to the Supreme Court's holding in *Watchtower Bible & Trust Soc'y of N.Y., Inc. v. Vill. Of Stratton*[4] that "the posting of 'No Solicitation' signs . . . coupled with the resident's unquestioned right to refuse to engage in conversation with unwelcome visitors, provides ample protection for the unwilling listener."[5]  Concluding this meant

---

[3] Pl.'s Mot. for Summ. J. 31 [Doc. 93].
[4] 536 U.S. 150 (2002).
[5] *Id.* at 168.

the solicitation restriction was not narrowly-tailored, the Supreme Court invalidated it. The Town's only response to this dispositive holding is to claim that the Supreme Court explicitly limited *Stratton's* holding to non-commercial solicitation regulations.[6] The Tenth Circuit, however, **directly** **rejected** this same argument in *Pleasant Grove*, explicitly holding that *Stratton* **does** apply to commercial solicitation regulations.[7] And did so under circumstances virtually identical to those here.

There, Pleasant Grove's council adopted an ordinance requiring commercial solicitors to be fingerprinted and post a bond as part of the licensing process – a far less onerous restriction than Castle Rock's complete ban on all daylight commercial solicitation after 7 p.m. There, like here, Pleasant Grove argued that the restriction "directly advanced" the "city's legitimate interests in assuring peaceful use of private property and in protecting its citizens against crime."[8] And there, like the Town here, Pleasant Grove argued that *Stratton's* holding didn't apply because "Stratton involved religious speech, and the [Supreme] Court explicitly acknowledged [in *Stratton*] that the village's arguments might justify a regulation of commercial speech."[9]

Acknowledging both distinctions, the Tenth Circuit nevertheless concluded that "the [Supreme] Court's analysis persuades us that Pleasant Grove has not met its burden in this case." Specifically, the Tenth Circuit held that Pleasant Grove had failed (like the Town has here) to produce evidence that "it faces real harms, which are materially palliated by the [restrictions]."[10] In addition, the Tenth Circuit (again citing to *Stratton*) held that town's enforcement of its "no-solicitation" sign ordinance coupled with its existing registration process would "assure adequately citizens' privacy and provide law enforcement with the means of identifying potential criminals and

---

[6] Def.'s Resp. to Pl.'s Mot. for Summ. J. 1-2 [Doc. 96].
[7] *Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1233-34 (2005).
[8] *Pleasant Grove*, at 1233.
[9] *Id.* at 1234 (emphasis added).
[10] *Pac. Frontier* at 1235.

deterring crime."[11]  Accordingly, the Tenth Circuit concluded Pleasant Grove had not met its burden under *Central Hudson* and invalidated the commercial speech restriction.[12]

The holding in *Pleasant Grove* is fatal to the Town's case, and perfectly illustrative of the standard Aptive has articulated throughout its briefing.  Indeed, it invalidates **both** of the Town's arguments against Aptive's articulation of the *Central Hudson* standard, each of which hinged entirely on an allegedly materially distinction between the evidentiary and legal standard applied to commercial versus non-commercial solicitation restrictions.[13]  The Tenth Circuit could not have been more definite:  the "clear lines drawn by the Court in *Watchtower [Stratton]*"[14] apply in force to commercial speech cases.  Indeed, far from "apparently ignor[ing]"[15] the *Stratton* case's application, the Tenth Circuit's holding in *Pleasant Grove* **necessitates** the application of *Stratton* holding to this case.

B. **As the Supreme Court has observed, the Time Place Manner Test is "Materially Similar" to *Central Hudson*.**

In its Motion, Aptive cites to no less than seventeen federal courts that have invalidated solicitation curfews.[16]  The respective courts in each of these cases invalidated these curfews under a time, place, manner test[17] because the town had failed to meet its burden of showing the curfew advanced a government interest, because the curfew was not narrowly tailored in light of less restrictive means available to the town, or – in many cases – for both reasons.  Castle Rock's **only**

---

[11] *Id.*

[12] *Id.*

[13] *See, e.g.,* Def.'s Resp. 8 (arguing that "Aptive's Motion makes two significant errors: (1) it wrongly equates the standard of review for commercial speech regulations under *Central Hudson* with the standard applied to noncommercial speech regulations, and (2) it argues in favor of a rigorous evidentiary burden that has been rejected in the context of commercial speech cases").

[14] Resp. at 2.

[15] *Id.* at 18.

[16] Pl.'s Mot. 3-4.

[17] Under the time, place, manner, test, the government may impose reasonable, content-neutral restrictions on the time, place, or manner of protected speech, provided that such restrictions are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication.  *Thomas v. Chicago Park Dist.,* 534 U.S. 316 & n. 3, 323 (2002).

response is to urge the Court to ignore all of these cases because they involved restrictions on noncommercial solicitation.[18]  But since both the time, place, manner and *Central Hudson* tests share common elements – advancement of an interest and narrow tailoring -- this is a distinction without significance.   This reality is precisely why the Supreme Court observed in *Fox* that the *Central Hudson* and time, place, manner tests are "**substantially similar**."[19]  This, no doubt, is also why the Tenth Circuit applied *Stratton's* holding to commercial solicitation regulations in *Pleasant Grove*.[20]  And why federal courts have invalidated solicitation restrictions using the time, place, manner test,[21] while others have invalidated solicitation restrictions under *Central Hudson's* commercial speech test.[22]

With the failure of its sole basis for ignoring these other cases, the Town is left with no other argument why the holdings in these seventeen cases should not control.  They should.  And for the same reasons as each of these courts, this Court should invalidate the Curfew here.

C.  **Aptive Does not Claim that Castle Rock's Burden is Any Greater than what *Central Hudson* Requires.**

In its effort to dilute its evidentiary burden under *Central Hudson*, Castle Rock presents the Court with a false dichotomy, suggesting that the choice of burden is between the Town's "reasonably believed" standard and an impossible one requiring the town to do such things as "maintain multiple decades worth of records" and perform complicated "empirical data analysis of crime."[23]   But the Town's parade of ostensible horribles is simply a red herring.  The true standard is simply that articulated by the Supreme Court which – whether the Town likes it or not – requires the Town to put on "real evidence"[24] that "demonstrate[s] that it is regulating speech in order to

---

[18] Def.'s Resp. 3 (noting that, of the 17 cases that have overturned curfews on door-to-door solicitation, "every one of these cases involved regulations of noncommercial speech").

[19] *Fox*, 492 U.S. at 477.

[20] *See* § A, *supra*.

[21] *See Watseka*, 796 F.2d at 1552-58; *Ohio Citizen Action* 671 F.3d at 571-80; *New Jersey Citizen Action,* 797 F.2d at 1254-62; *Wisconsin Action Coal.* 767 F.2d at 1251-59; *ACORN*, 714 F.2d at 816-20.

[22] *See Project 80's,* 942 F. 2d at 637.

[23] Town Response at p. 10.

[24] *Adolph Coors*, 944 F.2d at 1550.

address what is in fact a serious problem and that the preventative measure it proposes will contribute in a material way to solving that problem."[25]

The problem for the Town here is not that it lacks "multiple decades worth of data," or an "empirical analysis of crime."  The problem is that the Town has offered **no** competent evidence that the Curfew addresses – let alone solves – a commercial solicitation privacy or crime problem. Instead, the Town's "evidence" consists solely of the kind of self-serving, conclusory, conjectural and speculative testimony from interested witnesses that court after court – including the Tenth Circuit in *Coors I* and *Coors II* – found to constitute "no evidence" at all.[26]  Worse, that conjectural testimony is directly contradicted by record evidence to the contrary – including the testimony of its own Chief of Police that repealing the daytime Curfew would not "materially hamper" crime prevention efforts in the Town and the fact that its "no-soliciting" sign and "no-knock" list ordinance more than adequately protects the privacy of every resident of the Town who wishes to avoid commercial solicitation.

D. **There Are No Material Facts Disputed Between the Parties.**

Castle Rock complains that Aptive "mischaracterizes" the facts stipulated to between the Parties, while it, in contrast, simply "filed its Motion, which contained a short paragraph referring the Court to the Joint Stipulation as its statement of undisputed facts.[27]  As a reading of the Town's own cross-motion demonstrates, this claim is untrue.  The Town employed the same approach as Aptive, citing to the Joint Stipulation of Undisputed Facts, characterizing those undisputed facts as it wished.  And though Aptive disputes the manner in which the Town has characterized those undisputed facts, it does not dispute those facts themselves.

---

[25] *Edenfield*, 507 U.S. at 776.
[26] *Adolph Coors*, 2 F.3d 357.
[27] Resp. at 4.

Nor does the Town.  Though complaining about "mischaracterizations," the Town does not identify any dispute regarding the undisputed facts that underlie the "mischaracterization" – let alone any material disputed facts that would preclude summary judgment.  Nor could it, since the parties explicitly agreed that "the relevant facts of this case are as set forth in the Joint Stipulation of Facts."[28]

E. __Aptive has Complied with Civ. Practice Standard 7.6.2 in All Material Respects__.

The Town is incorrect in alleging that Aptive has not complied with Civ. Practice Standard 7.6.2.  This standard provides that in a motion for summary judgment, a party must identify each element of a cause of action or affirmative defense and then identify the material, undisputed or admitted facts that prove the existence or absence of such element.  Aptive's Motion for Summary Judgment contains each of these required elements.  What is more, the Town's Motion for Summary Judgment is nearly identical in format to Aptive's, but for the headings.

In accordance with Standard 7.6.2(b), Aptive filed its Motion for Summary Judgment based on the Stipulated Facts agreed to and filed by the Parties.  In accordance with Standard 7.6.2(c), on the first page of its Motion for Summary Judgment,[29] Aptive states that the Town of Castle Rock bears the burden of meeting each element of the *Central Hudson* test.[30]  The Motion also lists each element of the *Central Hudson* test that the Town is required to prove,[31] detailing that these elements include (1) that "the state's interests in proscribing [the Curfew] are substantial;"[32] (2) that "the

---

[28] *Id.*

[29] Pl.'s Mot. 1 (noting that "the state bears the burden" and that "the Town [must] prove that the Curfew" meets each prong of the *Central Hudson* test).

[30] *Edenfield v. Fane*, 507 U.S. 761, 768 (1993) (describing the three elements of Central Hudson and holding that "it is well established that the party seeking to uphold a restriction on commercial speech carries the burden of justifying it.").

[31] *See* Pl.'s Mot. 25 (listing and describing each element of the Central Hudson test: "As a threshold matter, a court first asks whether commercial speech concerns unlawful activity or is misleading. Assuming the speech concerns lawful activity and is not misleading, the Town must prove that that (1) the state's interests in proscribing the Curfew are substantial, (2) the Curfew advances these interests in a direct and materially way, and (3) the Curfew is narrowly tailored *i.e.* not more extensive than necessary to serve those interests") (internal citations omitted).

[32] *Edenfield*, at 768.

[Curfew] advances these interests in a direct and material way;"[33] and (3) that the Curfew is "not more extensive than necessary to serve [those] interest[s]."[34]  The Motion next engages in a thorough analysis of each element, and includes numerous citations to undisputed facts that support each element of the test.[35]  Indeed, just as the Town does in its own Motion, Aptive engages in a discussion of the *Central Hudson* elements and cites to the stipulated facts for support throughout.[36]  For these reasons, Aptive believes that its Motion complies in all material respects with the standard as set forth in Civil Practice Standard 7.6.2.

Aptive's Response to the Town's Motion for Summary Judgment likewise complies in all material respects with this standard.  Indeed, in its Response, Aptive makes clear that it "disputes the movant's statement of the burden of proof,"[37] then, because there are no disputed material facts between the Parties, Aptive argues that the Town lacks sufficient proof for two of the *Central Hudson* elements.[38]

Notwithstanding the fact that Aptive believes it has complied in all material respects with Standard 7.6.2, Aptive includes below the only material facts that substantively impact the Court's decision under each element of the *Central Hudson* test:

> ### i.  First Element: The Town's Interests in Proscribing the Curfew are Substantial;

As noted in its Motion, Aptive does not challenge that the Town's purported interests of

---

[33] *Id.*

[34] *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371 (2002).

[35] Pl.'s Mot. 33-46.

[36] *See* Pl.'s Mot. 26 (noting that Aptive "acknowledges that" the Town's interests are substantial); 33-43 (citing to the Parties Stipulated Facts **seventeen times** in support of its contention that the Town does not meet *Central Hudson's* third element because "the Curfew does not directly and materially advance the Town's ostensible goals of protecting residents from unwanted solicitation and preventing crime"); 43-46 (arguing that the fourth element of *Central Hudson* is not met by the Town, and referencing various Stipulated Facts).

[37] Civ. Prac. Stand. 7.6.2(c)(2)(B); *see* Pl.'s Resp. 1-9 (arguing that the Town asks this Court to adopt the wrong legal standard).

[38] Pl.'s Resp. § II.B (arguing that the facts cited by the Town are insufficient to prove that the third element of *Central Hudson* is met); § II.C (arguing that the facts cited by the Town are insufficient to prove that the fourth element of *Central Hudson* is met).

crime prevention and the protection of privacy are substantial.[39]

> **ii. Second Element: The Curfew advances these interests in a direct and material way;**

As Aptive asserts in its Motion, the below stipulated facts support the fact that the Town

fails to meet this element of *Central Hudson*:

- Town residents can either sign up on the Town's "no-knock" list or place a "no-soliciting" sign on their door after 7:00p.m. *See* Joint Stip. Ex. 1, CR000240-53,[40] CR000261-398;[41] ¶57.[42]

- The Town has carved out cavernous categories of door-to-door solicitors and canvassers that are exempt from the Curfew and the applicability of the "opt-out" provisions of the Town's solicitation ordinance. *See* Joint Stip. Ex. 1, CR000240-53.[43]

- While Castle Rock's records reflect a single complaint to the Town's non-emergency line about a registered commercial solicitor during the period October 8, 2016 through August 2017, there were no less than 16 complaints about exempt "canvassers." Joint Stip. ¶ 178.[44]

- Castle Rock residents "appear generally averse to door-to-door advocacy, at any time of the day." Joint Stip. ¶ 112.[45]

- In the entire history of the Town of Castle Rock, only one for-profit solicitor has ever been charged with a crime. Joint Stip. ¶ 160.[46]

- The Town's Chief of Police testified as its corporate representative that "he could not point to a single time in Castle Rock, before or after the passage of the [Curfew], that any for-profit, registered commercial solicitor was accused, charged, or convicted of a crime related to property." Joint Stip. ¶ 125.[47]

- The Town can point to only two complaints, ever, received by the Town – which currently has a population of 58,000 people – about for-profit solicitors, and neither of these complaints took place after 7:00 p.m. Joint Stip. ¶¶ 3, 157, 178.[48]

- The Town's Police Chief conceded that a person generally is "probably not more likely to commit a crime arising out of door-to-door solicitation after 7:00 p.m. than before 7:00 p.m." Joint Stip. ¶ 124.[49]

- The Town's Police Chief admitted that most residential burglaries happen during the

---

[39] Pl.'s Mot. 26 ("Aptive acknowledges that these twin goals are valid objectives for the Town to pursue.").
[40] *Id.* at 35, 42.
[41] *Id.* at 34.
[42] *Id.*
[43] Pl.'s Mot. 35.
[44] *Id.* at 36.
[45] *Id.* at 37.
[46] *Id.* at 41.
[47] *Id.*
[48] *Id.*
[49] *Id.*

daytime hours because less people are home. Joint Stip. ¶ 131.[50]

- Prior to passage of the 2008 Ordinance, the Town Council did not even discuss or analyze solicitation-related crime in Castle Rock or crime committed by commercial solicitors in Castle Rock, including crime committed by commercial solicitors in Castle Rock after 7:00 p.m. Joint Stip. ¶ 80.[51]

- Chief Cauley, as Town's corporate representative, conceded that moving the Town's 7:00 p.m. solicitation curfew from 7:00 p.m. to dusk "would not materially hamper the Castle Rock Police Department's ability to protect its residents from crime." Joint Stip. ¶ 126.[52]

### iii. Third Element: The Curfew is narrowly tailored and is not more extensive than necessary to serve those interests.

Aptive asserts that the below stipulated facts support the fact that the Town fails to meet

this element of *Central Hudson*:

- The Town's Ordinance includes that residents my post "No Solicitation" signs and join the Town's "No Knock" list if they wish to avoid solicitation.  Joint Stip. ¶ 99; Ex. 1 CR000243-51.[53]

- The Town directs residents to sign up with the No-Knock List when they wish to avoid solicitation. Joint Stip. ¶ 186.[54]

- Every solicitor must fill out a solicitation application with the Town, and is required to pass a background check and provide various other information to eventually receive a solicitation license.  Joint Stip. ¶¶ 99, 102; CR 000243-51.[55]

- The Town's current Mayor, Jennifer Green, as well as its former Mayor, Randy Reed, and other Town witnesses including Kellie Helm, Linda Omar, Robbie Schonher, Mitch Dulleck, and Karla McCrimmon each testified that they do not want solicitors entering their property at any hour, and so had each registered with the Town's No-Knock list. Joint Stip. ¶ 112.[56]

- Mayor Green, Former Mayor Reed, and Karla McCrimmon each testified that after registering with the No Knock list, they have not identified a single registered, commercial Solicitor who has knocked on their door. Joint Stip. ¶ 109.[57]

- The Town can point to only two complaints it has received about for-profit solicitors, and neither of these complaints took place after 7:00 p.m. Joint Stip. ¶¶ 157, 178.[58]

---

[50] *Id.*
[51] *Id.* at 42.
[52] *Id.*
[53] Pl.'s Mot. 43, 44.
[54] *Id.* at 21.
[55] *Id.* at 45 (noting that "the Town existing ordinance has "opt-out" provision and a rigorous registration and background check requirement to which all commercial solicitors must submit").
[56] *Id.* at 21.
[57] *Id.*
[58] *Id.*

- The Town Code contains three provisions containing regulations with enforcement tied to "dusk," "dawn," "sunrise," "sunset" and "daylight hours." Joint Stip. ¶ 193.

Aptive also alleges that the Curfew is an unconstitutional regulation of Castle Rock residents' right to receive door-to-door commercial solicitation.[59] Here, the burden is again on the Town to prove that the elements of Central Hudson are met, and, again, it fails to do so. Aptive makes this point and cites to the following facts, which are the only facts material to the Court's determination:

- The Town's Ordinance includes that residents may post "No Solicitation" signs and join the Town's "No Knock" list if they wish to avoid solicitation. Joint Stip. ¶ 99; Ex. 1 CR000243-51.[60]

- Hundreds of residents in other cities in the Denver area purchased Aptive's services after 7:00 p.m. Joint Stip. Ex. 2, AE_000096.

- The only way Castle Rock residents are able to meet with solicitors after 7:00 p.m. is if they contact solicitors directly and schedule an appointment. Joint Stip. Ex. 1, CR000240-53 § 5.04.080(C) ("It shall he an affirmative defense to any violation of this Chapter that the solicitor has an express invitation from the resident or occupant of a dwelling allowing him or her to enter upon any posted property.").[61]

Accordingly, Aptive believes that it has substantially complied with the standard set out in Standard 7.6.2.[62]

---

[59] *Id.* at 47.

[60] *Id.*

[61] *Id.* at 48.

[62] Alternatively, if the Court were to find that Aptive's Motion for Summary Judgment and/or Response did not meet Standard 7.6.2, the resulting consequence is set forth in subsection (f) of the Standard itself: "Failure to follow these procedures will likely delay the resolution of the motion." Accordingly, the Town's suggestion that Aptive's Motion should be denied is inapposite. Indeed, the guidance offered by subsection (f) is perfectly in line with the decisions of multiple district courts and the Tenth Circuit, and if this Court to require Aptive to file a corrected Motion and/or Response, it would gladly do so in an expeditious manner. *See, e.g., Lacy v. Old Standard Life Ins., Inc.,* 2007 WL 1576353, at *2 (D. Colo. May 31, 2007) (Nottingham) (striking motion for summary judgment for failure to comply with practice standards and setting deadline for corrected motion); *Muhic v. Pueblo Cmty. Coll.,* 2007 WL 2688859, at *1 (D. Colo. Sept. 11, 2007) (Nottingham) (striking response motion for summary judgment for failure to comply with practice standards and allowing 10 days from order to file a compliant brief); *Bondarenko v. Potter,* 2008 WL 707380, at *1 (D. Colo. Mar. 14, 2008) (Nottingham) (same); *Lacy v. Old Standard Life Ins., Inc.,* 2007 WL 1576353, at *2 (D. Colo. May 31, 2007) (Nottingham) (striking motion for summary judgment for failure to comply with practice standards and setting deadline for corrected motion); *Sewell v. Safeco Ins. Co. of Am.,* 2007 WL 2684465, at *3 (D. Colo. Sept. 6, 2007) (Nottingham) (on motion for reconsideration, failure to comply with practice standard in motion for summary judgment was not "proper ground for reconsideration, much less to grant Defendant summary judgment"); *Smith v. E. New Mexico Med. Ctr.,* 153 F.3d 728 (10th Cir. 1998) ("As our affirmance of the district court's grant of summary judgment was based on the Smiths' failure to follow the local rules and because procedural decisions cannot be the basis of a law of the case ruling, we vacate and remand[.]").

F. **Aptive Has Demonstrated that the Curfew Affects Commercial Speech.**

The Town argues that Aptive has failed to demonstrate that it is in fact engaged in speech, and that that speech is protected.  But this is untrue.  Among other things, Aptive cited to no less than seventeen cases explicitly or implicitly holding that curfews constitute restrictions on speech that implicate the First Amendment.[63]  In contrast, the Town cannot point to a single court that has evaluated a solicitation regulation and found that the regulation involved conduct instead of speech: not the Third Circuit, not the Sixth Circuit, not the Seventh Circuit, not the Eighth Circuit, not the Tenth Circuit,[64] and not even the United States Supreme Court in *Stratton*, which the Town itself *admits* is factually nearly identical to the case at bar.[65]  Indeed, the Town's argument that the Curfew regulates conduct is belied by its own argument that *Stratton* is materially indistinguishable from this case, when *Stratton* indisputably involved the regulation of speech.  Accordingly, Aptive has sufficiently argued and proven what federal courts have **uniformly** held:  that curfews regulating door-to-door solicitation are protected by the First Amendment.

## CONCLUSION

For the foregoing reasons, this Court should grant Aptive's motion, invalidate the Curfew was unconstitutional, enjoin its further enforcement, and award Aptive its attorney fees as a prevailing party in this action.

---

[63] Pl.'s Mot. 3-4.  Aptive incorporates herein all arguments made and evidence cited in § II.D of its Response to the Town's Motion for Summary Judgment.

[64] *U.S. W., Inc. v. F.C.C.*, 182 F.3d 1224, 1232 (10th Cir. 1999) ("Effective speech has two components: a speaker and an audience. A restriction on either of these components is a restriction on speech").

[65] Def.'s Resp. 9.

Respectfully submitted, this 29th day of January, 2018.

/s/   *Jonathan D. Kelley*
Jonathan D. Kelley
Texas Bar No. 24090202
jkelley@lynnllp.com
Jeremy A. Fielding
Texas Bar No. 24040895
jfielding@lynnllp.com
Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile (214) 981-3839


Steven J. Perfrement, # 27442
1700 Lincoln Street, Suite 4100
Denver, CO 80203
Email: steven.perfrement@bryancave.com
Tel.: (303) 861-7000
Fax: (303) 866-0200

**Counsel for Plaintiff**
**Aptive Environmental, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 29, 2018, a true and correct copy of the above and foregoing **PLAINTIFF APTIVE ENVIRONMENTAL, LLC'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of the court using the CM/ECF system, which will send notification of the filing to the following email addresses:

Brian James Connolly
Thomas Macdonald
Otten Johnson Robinson Neff &
Ragonetti, P.C.
950 Seventeenth Street
Suite 1600
Denver, CO 80202
Email: bconnolly@ottenjohnson.com
*Attorney for Defendant*

/*s*/  *Jonathan D. Kelley*
Jonathan D. Kelley

14