# EXHIBIT I

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Civil Action No. 17-cv-01545-MSK-MJW

**APTIVE ENVIRONMENTAL, LLC,**

     **Plaintiff,**

**v.**

**TOWN OF CASTLE ROCK, COLORADO,**

     **Defendant.**

---

## JUDGMENT

---

**PURSUANT TO** the Court's oral findings of fact and conclusions of law issued on March 22, 2018, judgment is hereby entered in favor of the Plaintiff, Aptive Environmental, LLC, and against the Defendant, Town of Castle Rock, Colorado, on the claims in this action. The Town of Castle Rock is permanently enjoined from enforcing Chapter 5.04.080(A)(4) of the Castle Rock Municipal Code, known as the "curfew" on solicitation activities. Costs are awarded to the Plaintiff pursuant to Fed. R. Civ. P. 54(d)(1).

    Dated this 22d day of March, 2018.

               **BY THE COURT:**

               _Marcia S. Krieger_
               _____

               Marcia S. Krieger
               Chief United States District Judge

1               IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2

Civil Action No. 17-cv-01545-MSK-MJW
3

APTIVE ENVIRONMENTAL, LLC,
4

    Plaintiff,
5

vs.
6

TOWN OF CASTLE ROCK, COLORADO,
7

    Defendant.
8  _____

9
                **REPORTER'S TRANSCRIPT**
10                    ORAL RULING

11 _____

12        Proceedings before the HONORABLE MARCIA S. KRIEGER,

13 Judge, United States District Court for the District of

14 Colorado, commencing at 10:00 a.m., on the 22nd day of March,

15 2018, in Courtroom A901, United States Courthouse, Denver,

16 Colorado.

17

18

19

20

21

22

23         THERESE LINDBLOM, Official Reporter
        901 19th Street, Denver, Colorado 80294
24     Proceedings Reported by Mechanical Stenography
       Transcription Produced via Computer
25

1          **A P P E A R A N C E S**

2               JEREMY ALAN FIELDING and JONATHAN DAVID KELLEY,

3     Attorneys at Law, Lynn Pinker Cox & Hurst, LLP, 2100 Ross

4     Avenue, Suite 2700, Dallas, Texas 75201, appearing for the

5     Plaintiff.

6               STEVEN JAMES PERFREMENT, Attorney at Law, Bryan Cave,

7     1700 Lincoln Street, Suite 4100, Denver, Colorado 80203 ,

8     appearing for the Plaintiff.

9               BRIAN JAMES CONNOLLY and J. THOMAS MACDONALD,

10    Attorneys at Law, Otten, Johnson, Robinson, Neff & Ragonetti,

11    P.C., 950 Seventeenth Street,  Suite 1600, Denver, Colorado,

12    80202, appearing for the Defendant.

13                         *   *   *   *   *

14          **P R O C E E D I N G S**

15          (In open court at 10:00 a.m.)

16          *THE COURT:*  We're convened today in

17    Case No. 17-cv-1545.  This is encaptioned Aptive Environmental,

18    LLC v. The Town of Castle Rock.  We're convened for purposes of

19    an oral ruling on a combined merits and motion for preliminary

20    injunction.

21               Could I have entries of appearance, please.

22          *MR. PERFREMENT:*  Good morning, Your Honor.  Steve

23    Perfrement for the plaintiff, Aptive Environmental.  I also

24    have my co-counsel on the phone, Jeremy Fielding and Jonathan

25    Kelley.

1          *THE COURT:*  Good morning.

2          *MR. CONNOLLY:*  Good morning, Your Honor.  Brian

3   Connolly for the Town of Castle Rock.  With me at counsel table

4   is Heidi Hugdahl, Deputy Town Attorney, and Sally Misare, as

5   well.

6          *THE COURT:*  Good morning.

7          I thank you all for coming in today for purposes of my

8   ruling and also for your presentation at the time of trial.

9          As you know, I'm doing an oral ruling in deference to

10  the parties, because the issues impact the solicitation season,

11  which comes with warm weather.  And while we can't always

12  predict in Colorado when the warm weather is going to come,

13  there is the possibility it might be here.  And, therefore, I

14  think you, as parties, deserve a definitive ruling so you know

15  what you're doing in the solicitation season of 2018.

16         I've had the opportunity to review all that was

17  submitted in conjunction with the trial, including the

18  arguments that were made both orally and in writing, and I

19  thank you for those.

20         The matter is before the Court following the bench

21  trial pertinent to the issue of whether Castle Rock's town

22  ordinance, 5.04.080(A)(4), that imposes a 7:00 p.m. curfew on

23  commercial solicitation constitutes a constitutionally

24  impermissible restriction of commercial speech.  That is the

25  issue presented.

1      I'm going to refer to the plaintiff here as Aptive and

2   the defendant as the Town, even though, technically, its name

3   is Castle Rock.

4      Aptive contends that the curfew or ordinance is

5   unconstitutional, violating the First and the Fourteenth

6   Amendments of the United States Constitution, both facially and

7   as applied.

8      Now, the procedural posture of this determination

9   incorporates the plaintiff's motion for preliminary injunction

10  and the merits of the action which was consolidated for

11  purposes of trial by my order on October 10, 2017.  Thereafter,

12  the parties conducted expedited discovery.  The plaintiff

13  withdrew its claim for a monetary award and for a jury trial.

14  They filed cross motions for summary judgment, which were both

15  denied based on the existence of a genuine dispute of a

16  material fact requiring a trial.

17     As I said, I've had the opportunity to consider your

18  briefing; stipulated facts; those matters contained in the

19  approved Final Pretrial Order, Docket No. 105; briefing on the

20  standing issue; the testimony presented; the exhibits admitted,

21  to the extent that the parties have referred to them either in

22  argument or in examination of witnesses; and as I said, the

23  ruling is made orally in deference to the scheduling of the

24  solicitation season.

25     Aptive's claim is brought pursuant to 42 U.S.C.

1    Section 1983.  And the parties agree that the Court's

2    jurisdiction to resolve issues under that section arises under

3    28 U.S.C. Section 1331.  However, after the trial was

4    completed, the Town challenged Aptive's standing, stating that

5    it was not a solicitor subject to the curfew ordinance.  The

6    Town's position was stated in a responsive brief to Aptive's

7    trial brief on the issue of standing.  The Court treated the

8    Town's brief as a motion to dismiss brought under Rule 12(b)(1)

9    of the Federal Rules of Civil Procedure.  And after allowing

10   Aptive the opportunity to respond, the Court denied the motion

11   by a text order.  Now I take the opportunity to further

12   explicate my reasoning.

13        Standing is a jurisdictional issue.  To have standing

14   to bring a constitutional challenge, a plaintiff must

15   demonstrate that it has or will suffer an injury in fact; that

16   there is a causal connection between the injury and the conduct

17   complained of; and it's likely that the injury will be

18   redressed by a favorable decision.  Those three requirements

19   are set out in *Lujan v. Defenders of Wildlife*, at 504 U.S. 555,

20   a 1992 Supreme Court decision.  These are all factual showings.

21        The Town's solicitation curfew that is at the heart of

22   this dispute prohibits solicitors from entering upon private

23   property between 7 o'clock p.m. and 9 o'clock a.m. unless

24   invited.  Whether Aptive is a solicitor is a question of fact,

25   which the Town resolved in its stipulated facts in the parties'

1    scheduling order.  They are found at paragraphs 4 and 5 of the

2    scheduling order.

3            Paragraph 4 states, "Plaintiff engages in activities

4    regulated by the Town of Castle Rock Ordinance No. 2013-43."

5    And Paragraph 5 states, "Aptive is a solicitor as defined by

6    Section 5.04.010 of the Town of Castle Rock Ordinance 2013-43."

7            These factual statements have never been withdrawn.

8    And although the Town has made legal arguments as to standing,

9    it has, consistent with these statements, repeatedly

10   acknowledged the Court's jurisdiction without reservation in

11   the pretrial order, in the motion for summary judgment, and in

12   arguments made at the time of trial.

13           Notwithstanding the late-made legal arguments to the

14   contrary, the Town's factual admission that Aptive is a

15   solicitor subject to the curfew ordinance establishes Aptive's

16   standing to challenge it.  I therefore find that this court can

17   exercise its jurisdiction pursuant to 28 U.S.C. Section 1331.

18           Turning to the factual findings.  The town is a

19   suburban residential community characterized by largely

20   single-family residential neighborhoods; it's a home-rule

21   municipality governed by a town council with seven members; its

22   laws are codified in the municipal code; and in 2017, it had a

23   population of approximately 58,000.

24           In 2008, the Town Council adopted Ordinance 2008-15,

25   which repealed and reenacted Chapter 5.04 of the municipal code

1    entitled "Canvassers, Hawkers, Peddlers, and Solicitors."  This

2    chapter comprehensively addressed residential door-to-door

3    solicitation.  And "solicitors" were defined to include those

4    that had both commercial and noncommercial purposes.

5          The ordinance required a number of things:  It

6    required registration of all persons engaging in door-to-door

7    commercial activity with the City; it required a background

8    check prior to being authorized to solicit; it prohibited

9    commercial solicitors from entering property or remaining on

10   property that displayed a sign containing words such as "no

11   soliciting" or "no solicitors"; it prohibited registered

12   commercial solicitors from entering any private property that

13   was listed by the occupant on the Town's no-visit or no-knock

14   list; and, finally, it prohibited a registered solicitor from

15   entering private property after 7:00 o'clock p.m. and before 9

16   o'clock a.m.

17         All of these acts were punishable by imposition of a

18   fine of up to $1,000, but subject to an affirmative defense

19   that the resident or occupant had expressly invited the

20   registered solicitor to enter his or her property.

21         The enactment history with regard to this ordinance is

22   limited, and particularly so with regard to the curfew

23   provision found at 5.04.080(A)(6).

24         The Town Council first addressed the question of its

25   policies with regard to door-to-door solicitation at its

1    August 21, 2007, meeting at the request of Councilman Ed

2    Rausch.  Councilman Rausch had had an unexpected encounter with

3    a solicitor in his garage during daylight hours.  Councilman

4    Rausch requested that the Town Clerk prepare a memorandum that

5    described the existing ordinance and the process used by the

6    police if its department received calls from town residents.

7         From Chief of Police Tony Lane and Sally Misare

8    received an e-mail with the information requested.  The

9    e-mail, dated August 15, 2007, reported that during the year

10   2007, there were 13 reports or complaints about solicitors.  Of

11   the thirteen, eight were door-to-door solicitors, and nine

12   involved summons for failure to have a license -- in other

13   words, no registration.  One warning was issued.

14        The memorandum also stated that there could have been

15   20 to 30 other solicitor complaints, but not all door-to-door,

16   where no report or contact was made.  It states "Unfortunately,

17   these calls do not make it into the system, so we have no way

18   of identifying the exact number."  And then it follows with a

19   statement that, "Most citizens who call report feeling

20   uncomfortable, they think solicitors are suspicious.  Several

21   citizens report they have been harassed or intimidated by

22   solicitors.  And on occasion, citizens report that they fear

23   that the solicitor may be using a sale of products or goods in

24   order to case the area for future burglaries."

25        The memo also explains what the City's policy was with

1    regard to solicitor complaints.  Its enforcement mechanism was

2    described by the chief of police, who states, "If an officer

3    contacts a solicitor, either by complaint or officer initiative

4    activity, the subject is checked for a license and then checked

5    for warrants through NCIC and CCIC.  If they have" -- "if they

6    have a warrant, they go directly to jail.  If the solicitor

7    does not have a license in his or her possession, they're

8    advised to immediately stop soliciting, issued a summons or

9    warning, and advised to contact the Town Clerk's office."

10         The Town Council also received a memo from assistant

11   Town counsel identifying the factors that courts have

12   considered in determining the constitutionality of solicitation

13   restrictions.  But it was brief and ultimately supported by a

14   much more detailed memo, which I will refer to in a moment.

15         The Town Council in response formed a working group --

16   or directed formation of a working group; directed that group,

17   comprised of representatives from the Town Attorney's Office,

18   the Town Manager, the police department, the Town Clerk, to

19   research means to address door-to-door solicitation issues.

20   The Town Council considered restrictions as to solicitors at

21   four subsequent Town meetings; but over the time period of

22   those four meetings, only three additional pieces of

23   information were presented to the Town Council.  The first was

24   in a report by the working group that said "A complaint about a

25   solicitor in a neighborhood at 9:45 p.m.," with no explanation

1    and no description beyond that brief ambiguous reference.

2         The second was an undated legal memorandum prepared by

3    two lawyers at the law firm of Hayes, Phillips, Hoffman and

4    Carberry, PC, for the Colorado Municipal League. Sometimes

5    this is referred to as a white paper; but for purposes of this

6    ruling, I'll simply call it a memorandum. It was a legal

7    memorandum that described the case law addressing various means

8    used to regulate door-to-door solicitation. They included

9    total bans; permitting; time restrictions -- also referred to

10   as curfews; opt-in and opt-out lists; identification; bonding;

11   fingerprinting; background checks; permit licensing fees; door

12   hangers and menus; and no solicitation signs. It also

13   contained a chart which categorized the type of regulation and

14   whether it was constitutional or not in a commercial or

15   non-commercial context.

16        Interestingly, although the curfew was listed as

17   constitutional in the chart if used in a commercial context,

18   the text describing curfews and time restrictions included only

19   decisions where the time restrictions and curfews were found

20   unconstitutional.

21        Based on the discussions within the working group --

22   which are unmemorialized and for which the Court has no

23   evidence other than the testimony presented -- the Town Clerk

24   recommended that the Town Council adopt most of the regulations

25   that the chart in the memo designated as constitutional.

1          With regard to a curfew, the recommendation states,

2     "Additionally, restrictions on the times during which

3     solicitation may occur have been provided and were written in

4     order to meet constitutional requirements for definiteness and

5     reasonableness.  It is our opinion that the times provided,

6     7:00 p.m. to 9:00 a.m., provide a reasonable balance for

7     residents and solicitors."  No further evidence or explanation

8     is provided.

9          Prior to the February 26 meeting, the Council received

10    a memo from the town attorneys, referring to the memo prepared

11    by the Colorado Municipal League and its chart, recommending

12    regulation of commercial solicitation, including

13    no-solicitation signs, a no-knock list, charge for sales tax

14    deposit, background check prior to permitting or licensing, and

15    the curfew.

16         Council members had a brief discussion as to the

17    cutoff time for a curfew for commercial solicitation, noting

18    that some courts overturned cutoffs at 6 o'clock p.m., but

19    others found cutoffs at 8 to 9 o'clock p.m. to be reasonable.

20    The minutes reflect that one Council member suggested 7:00 p.m.

21    as a compromise, because 8 o'clock was too late in the winter.

22    This became the subject of a motion directing staff to prepare

23    an ordinance restricting the commercial solicitation and

24    non-commercial solicitation as recommended, including a curfew

25    time period of 7:00 p.m.

1      The proposed ordinance was considered, then, at the

2  meeting on March 25 and April 8, 2008.  Its first reading and

3  second reading do not reflect any further discussion as to the

4  merits of the proposal.  The ordinance as adopted contains no

5  express justification for a curfew.  Several of the

6  justifications for the entire ordinance's repeal and

7  reenactment address crime.  But four out of five of those

8  paragraphs that reference justification of public safety have

9  no factual basis reflected in any of the pre-enactment history.

10      They are, "Whereas, a significant percentage of the

11  reported criminal activity of the Town of Castle Rock during

12  2006 and 2007 involved uninvited access to private property,

13  including theft, burglary, criminal mischief, and trespass."

14  There is no reference in the record before the Court as to

15  where that fact came from, and the evidence presented at trial

16  indicates an ambiguity as to its source.

17      "Whereas, some persons are known to pose as

18  door-to-door solicitors in an effort to engage in criminal

19  activity and illegal entry onto private property."  Again, no

20  source for that information in the pre-enactment history.

21      "Whereas, criminal activity on private property often

22  occurs during nighttime hours."  Again, no evidence to support

23  that statement in the pre-enactment record.

24      And, "Whereas, the Town Council finds and determines

25  that unregulated door-to-door solicitation within the town

1   would present a danger to town residents and their private

2   property, especially where residents are alone or absent when

3   persons gain or seek to gain entrance onto their property or

4   into their homes."  There is no evidence that this had occurred

5   in the town in the pre-enactment history.

6          In 2014, the ordinance was again amended at staff

7   suggestion.  The primary change in the ordinance was a

8   distinction between solicitors and canvassers.  Solicitors were

9   commercial solicitors, and canvassers were non-commercial

10   solicitors.  The ordinance expanded the nature of the

11   background check, the grounds for denial, and required

12   solicitors to wear identifying badges.  There was no change to

13   the curfew provisions and no record indication of any facts or

14   any evidence considered for that change.

15          In 2017, Aptive, a pest control services company,

16   sought to conduct door-to-door solicitation for its services in

17   the town.  Door-to-door solicitation is its only marketing

18   device, and it is the most successful pest control company in

19   the country.  In 2017, through door-to-door solicitation,

20   Aptive sold more than 200,000 customers annual pest service

21   agreements through door-to-door solicitation.

22          The time of day for the solicitation is critical.

23   Most successful sales occur in a period of time after 7 o'clock

24   p.m., when residents are home from work and both residents in a

25   household can confer with the salesperson and each other.

1        Aptive obtained permits for salespeople in the town

2   and abided by the curfew in August of 2017.  Aptive also

3   engaged in door-to-door solicitation in the Denver metro area,

4   where there was no 7:00 p.m. curfew.

5        Between August 5 and August 12, 2017, there were 49 to

6   55 sales in Castle Rock; but the rate of sale was twice as many

7   in the Denver metropolitan area as in the Town of Castle Rock.

8   Aptive attributes that to the fact that it could not engage in

9   door-to-door solicitation after 7 o'clock p.m.

10       The current evidence of justification for the curfew

11  portion of the ordinance adds little more.  As of 2017, the

12  ordinance had been in effect for nine years.  There was a

13  prominently displayed no-knock list or to participate on the

14  no-knock list, but most residents were not on the list.

15  Residents were provided with signs and stickers that they could

16  use to dissuade solicitors; and there was registration of all

17  commercial solicitors, as well as a requirement that they wear

18  an official badge designating them as such.

19       Each solicitor was required to fill out a solicitation

20  application with the Town.  Upon registration, when the

21  solicitor collected the permit, the solicitor was given a

22  physical copy of the checklist, which included an explanation

23  of the no-knock list; an advisement to look online for updates

24  to the list; and solicitors are also advised that even if

25  residents did not choose to display a no-knock sticker,

1    solicitors should not knock on the doors of those homes.  The

2    solicitor was also given a certificate of registration that

3    advised solicitors of the town that they were not authorized to

4    engage in solicitation between the hours of 9:00 a.m. and 7 --

5    they were authorized to engage in solicitation between the

6    hours of 9:00 a.m. and 7:00 p.m., but they were not authorized

7    to engage in solicitation after 7:00 p.m. and before 9:00 a.m.

8          Because the Town does not require canvassers to

9    register, it has no record of the number of canvassers that go

10   door to door; it has no record of the number of registered

11   solicitors, as compared to canvassers; and it does not know how

12   many canvassers are soliciting at any point in time.

13   Furthermore, it does not track the number or percentage of its

14   residents who are home prior to or after 7 o'clock p.m.  No

15   surveys have been conducted as to the residents' view of the

16   curfew ordinance or any other provision of the ordinance

17   affecting commercial solicitation.

18         The Town has no records of any crime being -- either

19   property or personal crime being committed by a solicitor since

20   2008.  In 2016 and 2017, there were a total number of 86

21   complaints made to Castle Rock's police dispatch center about

22   solicitation.  More than half of those, 44, had no

23   classification as to whether there was a solicitor or a

24   canvasser involved.  As to solicitors, there was only one

25   complaint about registered solicitors, twenty-two complaints

1    about unregistered solicitors, and no complaints about

2    solicitors soliciting after 7 o'clock p.m.  As to canvassers,

3    there were 16 complaints about canvassers and 11 complaints

4    about canvassers soliciting after 7 o'clock p.m.

5            According to the Town's current chief of police -- who

6    has an illustrative career of more than 32 years in law

7    enforcement -- door-to-door solicitation is not a law

8    enforcement issue for the Town.  The police track data in many

9    respects; but this is such a low priority issue, there is

10   little data maintained.

11           The chief is unaware of any data that correlates a

12   propensity of a solicitor to commit crimes or correlates the

13   likelihood of crime as occurring after 7:00 p.m., as compared

14   to an earlier time.  Indeed, his testimony was that if there is

15   a problem with solicitation, it is with unregistered

16   solicitors, which tracks the information from the dispatch

17   calls.

18           Contrary to the initial justification for the

19   ordinance, he testified that crimes are more likely to be

20   committed during daytime hours rather than at night because

21   more people are away from their homes during daytime hours.  To

22   the extent that there is an issue with regard to crime, it is

23   attributable to registration, or lack thereof.  There are no

24   incidents correlating violation of the curfew with any crime.

25   There are no studies as to the effect of the curfew on

1   residents' perceptions.  The lack of a curfew would not have

2   any material impact upon public safety or crime prevention.

3   Its primary impact is as to fears of the public as nighttime

4   hours progress.  In other words, as he says, people get more

5   anxious as it gets dark.  The primary benefit of the curfew

6   really is in its precise temporal delineation of 7:00 p.m.  And

7   that only is a benefit to enforcement of the curfew and to

8   public perception.  It does not tie to public safety or crime

9   prevention.

10          Lay witnesses have testified about public perception

11   of the need for a curfew.  The mayor, Mayor Green, recited two

12   instances of being frightened by solicitors during daytime

13   encounters.  She said she talked to neighbors and friends who

14   do not like solicitors and generally support regulation.  But

15   her testimony offered no specifics as to the content of any

16   conversations and whether the participant addressed the need

17   for benefit of a curfew.

18          We turn, then, to the law that applies to these facts.

19   As I noted, Aptive brings this action pursuant to 42 U.S.C.

20   Section 1983.  It seeks a declaratory judgment that the Town's

21   solicitation curfew ordinance is unconstitutional under the

22   First and Fourteenth Amendments to the United States

23   Constitution, both facially and as applied.  The distinction

24   between facial and as-applied challenges is not as well defined

25   as some might like.  And that's particularly true in First

1   Amendment challenges, such as this, where the transcendent

2   value to all society of constitutionally protected expression

3   is deemed to justify allowance of attacks on overly broad

4   statutes with no requirement that the person making the attack

5   demonstrate that his own conduct could not be regulated by a

6   statute drawn with the requisite narrow specificity.

7        The standard applied in both circumstances -- the

8   circumstances of facial attack and also as-applied -- are

9   reflected in two Supreme Court decisions, *Citizens United v.*

10  *FEC*, at 558 U.S. 310, a 2010 decision, and *Gooding v. Wilson*,

11  at 405 U.S. 518, a 1972 decision.

12       In this case, because the curfew is challenged on its

13  face as an unconstitutional restriction of commercial speech,

14  Aptive has the burden to establish that no set of circumstances

15  exist under which the curfew would be valid.  And that standard

16  is set out in *United States v. Salerno*, at 481 U.S. 739, a 1987

17  decision.

18       The first issue that the Court encounters on -- in its

19  legal analysis is whether the curfew regulates speech.  Before

20  addressing the merits of Aptive's arguments, the Court must

21  take a diversion to address this argument, which was late

22  brought by the Town.

23       The Town concedes that the curfew ordinance regulates

24  speech in a number of its filings, including the Proposed Final

25  Pretrial Orders and the Final Pretrial Order, No. 105, that the

1    Court adopted.  But nevertheless, the Town in closing argument

2    following the trial raised the question as to whether the

3    ordinance regulates conduct or speech.

4         It reads, "No solicitors shall enter upon private

5    property within the town after 7:00 p.m. and before 9 o'clock

6    a.m."  The Town contends that the ordinance merely limits the

7    solicitor from walking up to a resident's door -- which would

8    be conduct -- and it does not limit what the solicitor might

9    say -- which is speech.  The Town urges too narrow a reading of

10   the ordinance, I believe, both under its express language and

11   under established jurisprudence.

12        First, turning to the ordinance -- and, here, I refer

13   to the entire ordinance affecting solicitation -- the

14   purpose -- espoused purpose in its preamble is to "adopt a

15   regulatory program" in furtherance of the espoused goals and

16   purposes.  Among the goals and purposes espoused are the

17   interests of the Town and the public being accommodated by a

18   regulatory scheme that permits commercial solicitation during

19   reasonable daytime and evening hours.  Thus, the purpose of the

20   curfew, as articulated in the ordinance, is to regulate

21   commercial speech during particular hours.  Notwithstanding the

22   fact that it states in the curfew provision that the solicitor

23   may not enter upon private property, the espoused intention for

24   this provision is to regulate speech.

25        It is long established that commercial solicitation is

1    a form of speech subject to the First Amendment.  And like all

2    speech, it is circumscribed to oral utterances.  That was

3    recognized in *Edenfield v. Fane* by the Supreme Court in 1993,

4    found at 507 U.S. 761.  But speech also incorporates writings,

5    means of dispensing information, such as publication, and

6    dissemination of information.  And, thus, the right to speak is

7    implicated when the information that a person possesses is

8    subject to restraints on the way the information may be

9    disseminated.

10        This is reflected in a multitude of decisions,

11   including *Seattle Times Company v. Rhinehart*, 467 U.S. 20, a

12   1984 Supreme Court decision; *Bartnicki v. Vopper*, at 532 U.S.

13   514, a 2001 Supreme Court decision.  And as noted by the

14   Supreme Court in *Sorrell v. IMS Health, Inc*., found at 564 U.S.

15   552, a 2011 decision, a law prohibiting trade magazines from

16   purchasing or using ink was considered to be an infringement of

17   speech because the ink would have been used in the publication

18   of the speech.

19        Curfews have long been regarded as burdens on

20   commercial speech.  *Watseka v. Illinois Public Action Council*,

21   796 F.2d 1547, a Seventh Circuit 1985 decision; as well as *New

22   Jersey Environmental Federation v. Wayne Township*, at 310

23   F.Supp.2d 681, a District of New Jersey 2004 decision; as well

24   as *Ohio Citizen Action v. City of Mentor-On-The-Lake,* 272

25   F.Supp.2d 671, a Northern District of Ohio 2003 decision; as

1    well as *Alternatives for California Women, Inc. v. County of*

2    *Contra Costa* in a California Court of Appeals decision in 1983.

3            Likely, such treatment is rooted in the commonsense

4    notion that a door-to-door solicitor is barred from approaching

5    a resident's front door only if the implicit license has been

6    revoked.  The nature of that license is referred to in a

7    criminal decision of *Florida v. Jardines*, 569 U.S. 1, a 2013

8    Supreme Court decision.  And there, the Supreme Court wrote as

9    follows:  "A license may be implied from the habits of the

10   country, notwithstanding the strict rule of English common law

11   as to entry upon a close.  We have accordingly recognized that

12   the knocker on the front door is treated as an invitation or a

13   license to attempt an entry justifying ingress to the home by

14   solicitors, hawkers, and peddlers of all kinds.  This implicit

15   license typically permits the visitor to approach the home by

16   the front path, knock promptly, wait briefly to be received,

17   and then -- absent invitation to linger longer -- leave.

18           "Complying with the terms of that traditional

19   invitation does not require fine-grained legal knowledge.  It

20   is generally managed without incident by the nation's Girl

21   Scouts and trick or treaters.  Thus, a police officer not armed

22   with a warrant may approach a home and knock, precisely because

23   that is no more than what any private citizen might do."

24           Finding, then, that the curfew ordinance regulates

25   commercial speech, the Court turns to the legal standard for

1   assessing the permissibility of that regulation.  The parties

2   agree that the standard to be applied is set out in *Central*

3   *Hudson Gas & Electric Corporation v. Public Service Commission*,

4   in the Supreme Court decision found at 447 U.S. 557, issued in

5   1980.  That decision has a four-prong test.

6        The first prong is of no issue here.  The first prong

7   requires that the speech at issue be lawful and not misleading.

8   Here, the parties agree that Aptive's speech is such.  But then

9   there are three requirements that the Town bears the burden of

10  establishing.  First, that the Town is serving a substantial

11  interest; second, that the regulation directly and materially

12  achieves the Town's interest; and, third, that the regulation

13  is narrowly drawn and not more extensive than is necessary to

14  serve that interest.

15       Turning to the first of these three elements, the

16  substantial interest element.  The parties agree that Castle

17  Rock's two proffered interests are substantial.  They're

18  legitimate governmental interests.  The two interests that are

19  proffered are public safety and prevention of crime and

20  ensuring citizens can maintain undisturbed privacy in their

21  home.

22       The second element under *Central Hudson* examines the

23  degree to which the regulation advances these governmental

24  interests.  The Town must demonstrate that the harms it recites

25  are real and that its restriction will, in fact, alleviate them

1   to a material degree.  That's the teaching found in *Florida Bar*

2   *v. Went for It, Inc.*, 515 U.S. 618, a 1995 decision.  And this

3   element inherently has two components, although the Supreme

4   Court has noted that they're not entirely discrete.  The two

5   components are the existence of a harm and the effectiveness of

6   the regulatory solution to address it.

7          In applying these standards, the Court focuses solely

8   on the curfew ordinance -- not the panoply of other

9   restrictions that apply to solicitors, solely the curfew

10   ordinance -- and how well it addresses the harms that the Town

11   establishes.

12          Turning first to the interests of privacy.  The Court

13   finds that the Town has demonstrated that there is a privacy

14   interest in preventing doorbell rings at residences after

15   7:00 p.m., but it has not established that the solicitation

16   curfew alleviates intrusions into residents' privacy to any

17   material degree.

18          As an abstract matter, protection of the privacy of

19   the home is recognized in many cases and by the Supreme Court

20   as being of the highest order of importance for municipalities

21   to protect.  The privacy right at issue here is identified by

22   anecdotal evidence.  Lay witnesses have expressed their desire

23   to focus on family and recreational activities in the evening

24   hours without the intrusion of doorbell interruptions.  They

25   have testified that they do not want to be disturbed after

1    7:00 p.m., when they have returned from a working day, are

2    enjoying family time, or attending to children's activities.

3    And based on this showing, the Court finds that the privacy

4    interest associated with the curfew ordinance is freedom from

5    doorbell interruptions after 7 o'clock p.m.

6            Although the Court respects the preferences expressed

7    by these witnesses, it has some doubt as to whether this

8    privacy interest is real, in the sense that it is or was

9    significant or widespread.  The standard for showing a real

10   interest is best articulated in the Supreme Court decision of

11   *Lorillard Tobacco Company v. Reilly*.  *Lorillard* is found at 522

12   U.S. 525, a 2001 Supreme Court decision.  And it explains that

13   the burden of showing that the restriction advances the

14   government interest is not satisfied by mere speculation or

15   conjecture; rather, a governmental body seeking to sustain a

16   restriction on commercial speech must demonstrate that the

17   harms it recites are real and that its restriction will in fact

18   alleviate them to a material degree.

19           It goes on to state that "We do not, however, require

20   that empirical data come accompanied by a surfeit of background

21   information.  We have permitted litigants to justify speech

22   restrictions by references to studies and anecdotes pertaining

23   to different locales altogether, or even, in a case applying

24   scrutiny, to justify restrictions based solely on history,

25   consensus, and simple common sense."

1          The Tenth Circuit interprets the standard to mean that

2     a regulation must do more than provide ineffective or remote

3     support for a governmental purpose.  That's found in *Mainstream*

4     *Marketing*, at 358 F.3d 1228, a Tenth Circuit 2004 decision.

5          At trial, the Town argued that although there were not

6     wide-based studies, analytical data, or a long list of examples

7     in the legislative history behind this ordinance, that the

8     Court should find that the anecdotal evidence with regard to

9     the privacy interest is sufficient.  The Court has a problem

10    with that, because there is not much of anything in the record

11    at all with regard to this privacy interest.

12         Councilman Rausch's experience didn't occur during

13    evening hours.  There is only one incident that is referred to

14    in the material submitted to the Council, and that's an

15    ambiguous complaint about a solicitor being in a neighborhood

16    at 9:45 p.m.  There is no record of the Council's discussions

17    about the purpose of the curfew.  The only discussion about the

18    curfew appears in the records of February 22, 2008.  Indeed, it

19    appears that the curfew concept arose not from anecdotal or

20    other evidence, but, instead, from the Council of Governments'

21    memo listing regulations that it characterized as permitted.

22         Subsequent to the ordinance's enactment, there is

23    little evidence of a widespread or significant interest in

24    eliminating doorbell interruptions after 7:00 p.m.  There have

25    been only 11 complaints about doorbell contact after 7:00 p.m.;

1    and this was due to canvassers, not solicitors.  None of the

2    lay witnesses testified about incidents involving solicitors in

3    the evening.  And although lay witnesses testified that their

4    neighbors and friends shared their perspective that this would

5    be beneficial, there is no evidence that such incidental

6    conversations are representative of the 56,000 people in the

7    town.

8          Indeed, this showing is in direct contrast with the

9    showings that have been made in other cases.  The amount of

10   support that is relevant in defining the harm has been

11   addressed by a number of courts.  And it's important to note

12   that the sufficiency of that information is persuasive both as

13   to the existence of the harm and also in determining whether

14   the regulation materially alleviates the harm.

15         So, for example, one can look to the *Association of*

16   *Community Organizations for Reform Now v. the Town of East*

17   *Greenwich,* 239 Fed.Appx. 612.  This was a District of Rhode

18   Island decision in 2006.  And, there, the question about a

19   7:00 p.m. curfew was at issue.  The curfew applied both to

20   commercial solicitors and non-commercial canvassers.  But the

21   facts that were important to the Court included that there had

22   been a 9 o'clock curfew, and there had been many complaints by

23   residents that that curfew time was too late, and, instead, it

24   should be moved back to 7 o'clock.

25         In *New Jersey Citizen Action v. Edison Township*, 797

1   F.2d 1250, a Third Circuit 1986 case, the Court noted that many

2   residents did not object to solicitors and, indeed, some warmly

3   received solicitation in the evening hours.  Here, the record

4   is sparse as to evidence about the curfew.  Instead, it appears

5   to be the tail of the dog -- the dog being all of the

6   comprehensive restrictions that were adopted by the Town in

7   2008.

8            But given the presumption of privacy in one's own home

9   and the low standard for an adequate showing of the right to be

10  protected, I will assume that the Town's showing as a

11  protectable privacy interest is sufficient.  Whether the curfew

12  accomplishes this objective, however, leads to an entirely

13  different conclusion.

14           Under the ordinance, only solicitors -- not

15  canvassers -- are subject to curfew restrictions.  That means

16  that canvassers can ring doorbells after 7 o'clock p.m.

17  Indeed, the Town's own statistics indicate there have been

18  complaints about canvassers doing exactly that.  The Town has

19  presented no evidence, nor can it, as to the comparative

20  numbers of solicitors and canvassers or as to the times when

21  they are most active or would like to be most active.  Thus,

22  there can be no comparative measure of the effectiveness of the

23  curfew in protecting residential privacy after 7:00 p.m.

24  Although elimination of solicitor calls after 7:00 p.m. may

25  advance the purpose of protecting the residents' privacy

1    interest without quantification of how exposed they are to the

2    very same contact by canvassers, the Court cannot conclude that

3    the curfew has any material effect in advancing the protection

4    of the privacy rights.

5          This finding is consonant with that found by the

6    District Court, Court of Appeals, and Supreme Court in the *City*

7    *of Cincinnati v. Discovery Network*, found at 507 U.S. 410, a

8    1993 decision.  In *Cincinnati*, the courts addressed the

9    constitutionality of a ban on news racks containing commercial

10   handbills, but which did not apply to news racks that contained

11   newspapers.  The City offered a legitimate interest in safety

12   and aesthetics to justify the ban, but all three courts found

13   that the City did not establish a fit between the articulated

14   interest and its choice of selective prohibition of news racks.

15         The Supreme Court stated, "The benefit to be derived

16   from the removal of 62 news racks, while about 1,500 or 2,000

17   remain in place, was considered minute by the District Court

18   and paltry by the Court of Appeals.  We share their evolution

19   of a lack of fit between the City's goal and its means of

20   achieving it."

21         Here, the burden is on the Town to show how the curfew

22   that affects only solicitors materially protects residents'

23   privacy rights.  Because the privacy rights continue to be

24   infringed by canvassers, and there is no way of comparing the

25   number of canvassers or the number of solicitors that might

1    impact the doorbell, the Court cannot find that there is an

2    appropriate fit or a material benefit for that purpose.  Thus,

3    the curfew does not materially advance the Town's interest in

4    protecting residents' privacy after 7:00 p.m.

5         We turn to the second justification, public safety and

6    crime prevention.  Crime prevention and public safety are

7    legitimate governmental concerns in the abstract sense, as

8    well.  But there is even less evidence that there is a real

9    harm to be addressed, as compared to a hypothetical harm or a

10   feared harm.  Put another way, there is no evidence that

11   commercial solicitation after 7:00 p.m. would increase crime or

12   decrease public safety.  And due to the lack of a demonstrable

13   harm in the absence of a curfew, it follows that there is no

14   evidence that the curfew materially advances the purpose

15   espoused.

16        At the time of the adoption of the curfew ordinance,

17   the Town Council had no evidence before it to correlate any

18   crime arising from commercial solicitation, much less any crime

19   arising from commercial solicitation after 7:00 p.m.  As I

20   noted earlier, there was only one reference to an evening

21   incident with a solicitor, and that involved no crime.  The

22   initial memo from the police chief contains no information

23   about crime related to solicitation.

24        And with regard to the prefatory whereas clauses,

25   there was no factual basis to support them.  In particular, the

1  two that pertained to the curfew, that some persons are known

2  to pose as door-to-door solicitors in an effort to engage in

3  criminal activity and illegal entry onto private property, and

4  that the criminal activity on private property often occurs in

5  the nighttime hours.

6       In 2018, ten years later, despite modern policing and

7  data collection methods, there is still no evidence that

8  correlates commercial solicitation after 7:00 p.m. with an

9  increase in crime or a decrease in public safety.  The chief of

10  police testified that most crimes occur during the daytime

11  hours.  In his 32-year career, he has once heard of a criminal

12  posing as a solicitor, but he can't think of the specific

13  incident, and the Town has no data that demonstrates that it

14  has ever occurred.  The Town has no record of any commercial

15  solicitor having been charged or convicted of a crime related

16  to property or person, it has no records that commercial

17  solicitation occurs to any criminal activity whatsoever, and

18  there is no data suggesting that commercial solicitors tend to

19  commit crimes more frequently after 7:00 p.m. as compared to

20  any other time.

21       The Court therefore finds that the record is actually

22  devoid of evidence showing that commercial solicitation after

23  7:00 p.m. causes a real harm in the form of increased crime or

24  decreased public safety.

25       Turning to the effect of the curfew.  The Court notes

1     that the chief of police testified that solicitation has little

2     effect on crime in the town, that the utility of the curfew

3     ordinance from a law enforcement perspective is simply in its

4     simplicity of defining when the curfew goes into effect and

5     perhaps in making the population feel safer.

6            The inadequacy of this evidence is stark compared to a

7     case that the Town has relied on in its briefing, *Vivint*

8     *Louisiana, LLC v. The City of Shreveport.*  That is found at 213

9     F.Supp.3d 821.  It's a 2016 case.  And it concerned an

10    anti-solicitation ordinance that actually was found to be

11    constitutional, but it was found to be constitutional based on

12    an evidentiary showing of statements from Deputy Chief

13    Huddleston, who was the deputy chief of police in Shreveport.

14    And he explained that he had been the deputy chief since 2012,

15    but he had worked continuously for the Shreveport Police

16    Department since 1984; that he reviewed on a weekly basis

17    information regarding the types of criminal activity occurring

18    within the City of Shreveport; that he was familiar with the

19    ordinance; and he went on to detail at great length his

20    assessment that criminals approach residences and knock on the

21    door in order to determine whether the resident is at home, and

22    by doing so, they gather information about how to enter the

23    residence then or at some other time; that the Shreveport

24    Police Department maintains statistics on burglaries, and it is

25    a significant amount of the criminal activity in Shreveport;

1    that in 2014, there were 2,095 burglaries reported to the

2    department and that the department attributed a reduction from

3    the 6,400 burglaries in 1990 to this particular ordinance.

4         This is the kind of information that demonstrates the

5    correlation between the solicitation ordinance and public

6    safety.  As he says, "If the door-to-door solicitation

7    ordinance was not available, then I am certain it would have a

8    significant impact on the effectiveness of law enforcement in

9    preventing criminal activity, including burglaries and home

10   invasion crimes, and will make it more difficult to control

11   criminal activity."

12        In the town, the residents are surveyed as to whether

13   they consider themselves to live in a safe environment, and

14   they say they do.  And there is no evidence, such as in

15   *Shreveport*, that they are falling victim or have fallen victim

16   or might fall victim to a widespread risk of crime due to

17   solicitation.

18        Viewing the curfew as a singular restriction has its

19   limits, because it is likely the result of the other pieces of

20   the solicitation ordinance that help keep the citizens safe --

21   registration of solicitors, wearing of badges, no-knock list,

22   and posting of signs.  And that is why Chief Cauley can say

23   that doing away or changing the curfew would have very little

24   effect on crime in the town.

25        Now, that leads me to the conclusion that the Town has

 1   not established that the curfew materially impacts the

 2   legitimate objectives of reducing crime and promoting public

 3   safety.  But before I conclude, I want to address something

 4   that underlies this case from my review of the evidence; and

 5   that is that the primary justification for the extensive

 6   revision of the City's ordinances with regard to door-to-door

 7   solicitation was a generalized feeling of distrust of

 8   solicitors, and that this distrust has continued through the

 9   current day.  And with regard to evening solicitation, it is

10   coupled by natural anxiety of residents as darkness approaches.

11           Councilman Rausch's encounter with the solicitor in

12   his garage and Mayor Green's encounters with solicitors were

13   frightening, but they were daytime encounters.  They were not

14   nighttime encounters.  But they're understandable.  And when

15   you add them to Chief Cauley's observation that as it gets

16   later in the evening, people are a little bit more anxious, the

17   concerns about commercial solicitation are understandable.  But

18   they're also highly subjective, and they're not tethered to any

19   facts.  Put simply, these are emotionally driven perceptions

20   that do not neatly fit within the traditional governmental

21   interests of preserving privacy and fostering public safety.

22   Instead, they're a bit ephemeral.

23           And Chief Cauley characterized these as a perception

24   of safety or being related to a perception of safety.  That's

25   as good a description as I can think of.

1          I also note that although the curfew is viewed as a

2   discrete restriction on commercial speech for purposes of this

3   matter, it is just simply one of the laundry list of regulatory

4   tools that the Town adopted in 2008 to address this perception

5   of safety.  Indeed, the primary reason the curfew was enacted

6   was not because of its unique role in regulating door-to-door

7   solicitation, but because it was on the menu of permissible

8   restrictions that the Council of Governments' memo identified.

9   Essentially, it appears that the Town enacted the curfew

10  because it could, not because it needed to.  Under these

11  circumstances, the justification for the curfew becomes even

12  more ephemeral:  We fear and dislike commercial solicitors, and

13  a curfew is one way to regulate them.

14          The Court recognizes that the Town has not

15  characterized the justification of perception of safety as a

16  legitimate governmental interest and that Aptive has tried to

17  distinguish itself as a registered solicitor from the bad-actor

18  unregistered solicitors who flaunt the law.  But if the Court

19  were to assume that perception of safety, as ephemeral as it

20  is, is a permissible justification for regulation, then the

21  Court would have to ask the second question:  What is the fit

22  between the curfew and the perception of safety?

23          And in that regard, the Court finds the same problem

24  that it did with the privacy interest.  Perception of safety

25  necessarily is linked to a stranger coming to your door and

1    ringing the doorbell.  And to the extent it's related to a

2    nighttime anxiety, it's a stranger coming to the door ringing

3    the doorbell at night.  And it matters very little whether that

4    stranger is a solicitor or a canvasser, insofar as perceptions

5    of safety are concerned.  And so, absent adequate information

6    to measure the effect of excluding solicitors from ringing the

7    doorbell while you allow canvassers to do so, prevents the City

8    from establishing a materially beneficial impact of the curfew.

9           Because the Court finds that no legitimate

10   governmental interest is materially advanced by the Town's

11   solicitation curfew, it's not necessary to address the third

12   prong of the *Central Hudson* test, whether the solicitation

13   curfew is more extensive than necessary to serve such interest.

14          For these reasons, the Court declares the Town's

15   solicitation curfew set out in 5.04.080(A)(4) violates the

16   protections of the First and Fourteenth Amendments to the

17   United States Constitution.  The enforcement of same is

18   permanently enjoined.

19          Any need for clarification or further explanation?

20          *MR. FIELDING:*  Not from the plaintiff, Your Honor.

21          *MR. CONNOLLY:*  We do have one question, Your Honor.

22   The relief that was requested in Aptive's Second Amended

23   Complaint was to enjoin the daylight enforcement of the curfew.

24   So is that section you referenced enjoined at all times, or is

25   it just during the daylight hours, through dusk?

1          *THE COURT:*  The curfew is set out in that section.  If

2     what you're asking is, is the Court saying that this is going

3     to be a dawn-to-dusk curfew?  That's beyond my authority.  The

4     entire curfew is enjoined.

5          *MR. CONNOLLY:*  So we don't have a curfew at all?

6          *THE COURT:*  You -- right.

7          *MR. CONNOLLY:*  Okay.

8          *THE COURT:*  All right.  Judgment will enter

9     permanently enjoining the curfew provision.

10         Is there anything further that we need to address?

11         *MR. PERFREMENT:*  Not for plaintiff, Your Honor.

12         *MR. CONNOLLY:*  Nothing, Your Honor.

13         *THE COURT:*  Okay.

14         Thank you very much, counsel.  That will conclude this

15    matter.  As soon as the judgment is entered, the case will be

16    closed.  We'll stand in recess.

17         (Recess at 11:22 a.m.)

18

19                    REPORTER'S CERTIFICATE

20       I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.
21
              Dated at Denver, Colorado, this 4th day of April,
22    2018.

23                            _____
                              Therese Lindblom,CSR,RMR,CRR
24

25