FILED
CLERK
4:44 pm, Jul 16, 2019
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
APTIVE ENVIRONMENTAL, LLC,

                    Plaintiff,

   -against-

VILLAGE OF EAST ROCKAWAY, NEW YORK,

                   Defendant.
----------------------------------------------------------------X

**OPINION AND ORDER**
19-cv-3365 (SJF)(SIL)

FEUERSTEIN, United States District Judge

      On June 6, 2019, plaintiff Aptive Environmental, LLC ("plaintiff" or "Aptive") commenced this action against defendant Village of East Rockaway, New York ("defendant" or the "Village"), pursuant to 42 U.S.C. § 1983, alleging, *inter alia*, that two (2) provisions of the East Rockaway Village Code (the "Village Code") infringe upon their commercial speech rights in violation of the First and Fourteenth Amendments. On June 12, 2019, plaintiff filed an amended complaint, *inter alia*, challenging a third provision of the Village Code. Presently before the Court is plaintiff's application for a preliminary injunction enjoining and restraining defendant from enforcing Sections 171-14, 171-16 and 171-18 of the Village Code. For the reasons set forth herein, plaintiff's application is granted.

I.    BACKGROUND

      Plaintiff is a residential pest control services company with offices throughout the United States. (Amended Complaint ["Am. Compl."], ¶ 9 and Ex. B, ¶ 3). Plaintiff's sales are made almost exclusively through door-to-door solicitation. (*Id.*). According to Pierson Baldwin ("Baldwin"), the branch manager of plaintiff's Long Island office, plaintiff's "unique business

1

model is predicated upon establishing a personal and trusting relationship with its customers, getting to know their homes and their individual needs so [it] can customize its services[;] . . . [and] [y]ears of business experience have confirmed to [it] that other forms of less personal marketing, including phone solicitation, email campaigns, and web advertisements, are ineffective for establishing or maintaining this necessary personal relationship with its customers." (*Id.*, Ex. B, ¶ 3).

During its annual summer selling season, plaintiff typically solicits door-to-door between the daylight hours of 10:00 a.m. and dusk, (Am. Compl., ¶ 10), but most of its sales occur after 5 p.m. "because most residents have work, school, or other activities that keep them away from their homes during typical working hours." (*Id.*). Accordingly, municipal ordinances that impose solicitation curfews affecting evening hours, such as Section 171-18 of the Village Code, have a direct and substantial impact on plaintiff's business, its employees, and its sales representatives. (*Id.*).

Plaintiff has received both positive and negative reviews on-line, and has had some complaints lodged against it with the Better Business Bureau ("BBB").[1] (*See* Declaration of John E. Ryan, Esq. ["Ryan Decl."], ¶ 6 and Exs. C and D).

In April 2019, plaintiff entered into an "Assurance of Voluntary Compliance" with the Commonwealth of Pennsylvania, Office of Attorney General (the "Commonwealth"), to settle an enforcement action alleging, *inter alia*, that while plaintiff was engaging in door-to-door

---

[1] The third-party online reviews and complaints are considered only for the fact that the online comments were made; not for the truth of the matters stated therein. *See GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D. P.C.*, 769 F. Supp. 2d 630, 647 (S.D.N.Y. 2011); *e.g. Williams v. Arctic Cat, Inc.*, No. 3:11-cv-445, 2014 WL 1028476, at * 17 (N.D.N.Y. Mar. 13, 2014) (third-party reviews taken from websites or other sources excluded as hearsay). The Court also notes that plaintiff has been an accredited business with the BBB since June 30, 2016, has an "A-" BBB rating and has a four and a half out of five (4.5/5.0) star average rating based upon three thousand four hundred and fifty (3,450) customer reviews. *See* https://www.bbb.org/us/ut/sandy/profile/pest-control/aptive-environmental-llc-1166-90014084 (last visited 7/15/2019).

solicitation of Pennsylvania consumers, it violated Pennsylvania's Consumer Protection Law by: (i) failing to provide consumers with a completed copy of their contracts at the time of the sale or contract, and with the required statutory notifications of their right of rescission; (ii) continuing to service, on at least three (3) occasions, consumers who notified it that they were cancelling their contracts; and (iii) engaging in door-to-door solicitation, on more than one (1) occasion, without complying with the requirements of local peddling and solicitation ordinances. https://www.attorneygeneral.gov/wp-content/uploads/2019/04/2019-04-16-Aptive-filed-AVC.pdf (last visited 7/15/19). While plaintiff denied the allegations, it, *inter alia*, agreed to ensure compliance with all provisions of the Pennsylvania Consumer Protection Law and paid restitution, civil penalties and costs.[2] (*Id.*).

The Village adopted chapter 171 of Article III of the Village Code, which regulates "Solicitors and Canvassers," on July 27, 1959. (Am. Compl., ¶ 11). Plaintiff challenges the following provisions of chapter 171 of Article III of the Village Code: (i) Section 171-14 (the "License Requirement"), which provides, "No person shall engage in business as a solicitor or canvasser in the village without first obtaining a license thereof;"[3] (ii) Section 171-16 (the "Bond

---

[2] The Court considers the Assurance of Voluntary Compliance only to establish the fact of the enforcement action; not for the truth of allegations set forth therein. Similarly, the Court has not considered the news articles, (*see* Ryan Decl., Exs. E and F), for the truth of the matters asserted therein, because they constitute inadmissible hearsay. *See, e.g. C.G. ex rel. B.G. v. N.Y.C. Dep't of Educ.*, 752 F. Supp. 2d 355, 360-61 (S.D.N.Y. 2010); *Ladner v. City of New York*, 20 F. Supp. 2d 509, 519 (E.D.N.Y. 1998), *aff'd*, 181 F.3d 83 (2d Cir. 1999). The Court also does not consider the letter, dated May 28, 2019, that Ryan sent to plaintiff's counsel regarding a prior case commenced by plaintiff against the Village of Floral Park, *Aptive Environmental, LLC v. Village of Floral Park*, No. 18-cv-4690 (Bianco, J.) (the "Floral Park Case"), (*see* Ryan Decl., Ex. G), but which was not actually filed in that case, (*see* docket in 18-cv-4690), for the truth of the matters asserted therein, particularly since there is no basis from which to infer that Ryan had any personal knowledge of the activities challenged therein.

[3] The Village Code defines the terms "solicitor or canvasser" as "Any natural person traveling either by foot or by conveyance from place to place, from house to house, from street to street, soliciting and taking orders for the sale of goods, wares, merchandise, including books and periodicals, for future delivery, or for services to be performed later, whether he collects advance payments on such sales or services or not." Village Code § 171-15. Thus, it is clear that the overall purpose of Chapter 171 of the Village Code is to regulate only commercial solicitors; non-commercial solicitors are not regulated thereunder. As set forth below, plaintiff challenges Section 171-14 of the Village Code "only because the Village has imposed a moratorium on the issuance of solicitation licenses

Requirement"), which provides, in relevant part, "Every applicant, not a resident of the village . . . shall file with the Village Clerk a surety bond, running to the village in the amount of $2,500 with surety given by a recognized insurance carrier conditioned that the applicant shall comply fully with the provisions of the ordinances of the village and the laws of the State of New York regulating the business of solicitor and canvasser and guaranteeing to any resident of the village that all money paid as a down payment will be accounted for and applied according to the representations of the solicitor and that any property purchased will be delivered in compliance with the representations made by the solicitor. Such bond shall provide that action thereon may be brought by any person to whom a judgment has been awarded because of loss caused by such licensee's fault or default[;]" and (iii) Section 171-18 (the "Solicitation Curfew"), which provides, "It shall be unlawful for any person to enter upon private property for the purpose of peddling or soliciting before the hour of 9:00 a.m. of any day or after the hour of 5:00 p.m. of any day, except upon the invitation of the householder or occupant." (*See* Am. Compl., Ex. A). Except as can be inferred from the Bond Requirement, the Village Code offers no justification and identifies no state interests ostensibly advanced by the challenged provisions. (*See Id.*, ¶ 11 and Ex. A).

Plaintiff claims, *inter alia*, that during its active selling season in the late spring and summer months of March through September, the Solicitation Curfew prohibits between three (3) to four (4) hours of daylight solicitation after 5:00 p.m. each day, and all during the most productive time of day when most people have returned home from work. (Am. Compl., ¶ 13). According to Baldwin, the Solicitation Curfew prohibits plaintiff from soliciting in the Village during the time that more than half of its sales take place, *i.e.* between 5:00 p.m. and 9:00 p.m.,

---

[there]under," (Plaintiff's Reply Memorandum of Law at 9, n. 36), thus imposing a *de facto* ban on all commercial solicitations in the Village.

and plaintiff "loses thousands of dollars in revenue" for each day it is prohibited from soliciting in the Village during that time period. (*Id.*, Ex. B, ¶ 11).

By letter to the Village's counsel, John Ryan, Esq. ("Ryan"), dated May 20, 2019, plaintiff's counsel, Jeremy A. Fielding, Esq. ("Fielding"), *inter alia*, identified the Solicitation Curfew and Bond Requirement as constitutionally infirm and demanded, under threat of litigation, that the Village: (i) cease and desist enforcement of, and repeal or amend, those provisions; and (ii) provide written assurances, within one (1) week of the date of the letter, "that the Village has complied, or is taking immediate steps to fully comply, with [plaintiff's] request." (Am. Compl., ¶ 15 and Ex. C).

On June 4, 2019, after the Village failed to "agree[] to amend its ordinance or suspend its enforcement through an interim agreement," Jon Kelley, Esq. ("Kelley"), co-counsel for plaintiff, sent Ryan, among others, an email indicating, *inter alia*, that plaintiff intended to file a lawsuit and application for a temporary restraining order ("TRO") and preliminary injunction against the Village on June 6, 2019 unless it received written confirmation by noon the next day that the Village would immediately suspend enforcement of the Solicitation Curfew, the Bond Requirement and "its unconstitutional licensing process." (Am. Comp., Ex. F). Later that same date, Fielding also sent an email to Ryan emphasizing that plaintiff wanted to avoid litigation but needs "the ability to solicit in the town [sic] free from the[] unconstitutional provisions" of the Village Code; and indicating that "a stand down/suspension agreement accomplishes this goal and ensures the parties won't waste attorneys [sic] fees on litigation." (*Id.*, Ex. G).

Ryan responded by email sent the following day, June 5, 2019 at 7:24 a.m., indicating, *inter alia*, "If such an ill-advised lawsuit is filed, the Village will seek sanctions." (Am. Compl., Ex. H). Several more emails were exchanged between plaintiff's counsel and the Village's

counsel over the next couple of days, with plaintiff's counsel, *inter alia*, seeking "a compromise solution" and a resolution "through collaboration and settlement," and urging plaintiff to choose collaboration over conflict, (Docket Entry ["DE"] 7, Ex. A at 3, 5 and 7); and the Village's counsel, *inter alia*, accusing plaintiff's counsel of "continu[ing] to engage in [a] civil extortion scheme" in order to get attorney's fees and of engaging in shameful and sanctionable conduct. (*Id.* at 4, 6-7).

On June 6, 2019, plaintiff commenced this action against the Village pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging, *inter alia*, that the Solicitation Curfew and Bond Requirement infringe upon its First Amendment commercial speech rights. That same date, plaintiff made an application to this Court for a TRO and preliminary injunction enjoining the Village's enforcement of those provisions. On June 6, 2019, at 3:45 p.m., the Court issued an order to show cause, *inter alia*, granting plaintiff's application for a TRO enjoining the Village's enforcement of the Solicitation Curfew and Bond Requirement pending the hearing and determination of plaintiff's application for a preliminary injunction.[4]

On or about June 10, 2019, the Village Board of Trustees adopted a resolution, as a result of this lawsuit, establishing a moratorium "with respect to the issuance of any permits under chapter 171 of the [Village] Code," effective immediately and until December 31, 2019, "unless further extended by Resolution if [sic] the Board of Trustees." (Am. Compl., Ex. L).

---

[4] Plaintiff's counsel notified Ryan that he would be filing a lawsuit and seeking a TRO on June 6, 2019. (DE 7, Ex. A at 3). Although Ryan indicated that he was not available to attend a hearing on the TRO that day, but would be available the following day, (*id.*), plaintiff's counsel responded that they were not available the following day and would inform the Court of Ryan's unavailability and request that the TRO be granted *ex parte*. (*Id.* at 2). Ryan requested that plaintiff's counsel advise the Court that he opposed an *ex parte* application and asserted his client's "right to be heard on this application," (*Id.* at 2), but he did not appear, or have someone else appear, on behalf of the Village when the TRO application was made. On June 7, 2019, Ryan filed a letter motion requesting a conference "to address the *ex parte* relief granted to [plaintiff]," and to bring to the Court's attention the previous "dealings" between himself and plaintiff's counsel in the Floral Park Case. (*Id.*). By order dated June 10, 2019, Ryan's motion was granted and a conference was held on June 12, 2019.

On June 12, 2019, plaintiff filed an amended complaint, *inter alia*, to add a claim challenging the License Requirement in light of the moratorium imposed by the aforementioned resolution. Baldwin avers, *inter alia*, (i) that twenty-eight (28) Aptive representatives intend to solicit in the Village, (Am. Compl., Ex. J, ¶ 3); (ii) that he brought a check for payment of the Village's licensing fee for each of those representatives to the Village Clerk, Connie Petrucci, on June 11, 2019, (*id.*, Ex. J, ¶ 4); (iii) that Petrucci informed him that the Village would not accept plaintiff's license fee payment, (*id.*, ¶ 5); and (iv) that when he asked how plaintiff could receive required solicitation licenses from the Village, he "was informed that no licensing process existed[,] . . . [and] was told to contact the Village's counsel, Mr. John Ryan." (*Id.*, ¶¶ 6-7). Plaintiff contends that since the Village does not maintain any process by which a prospective solicitor can obtain a license, the Village's enforcement of the License Requirement is a *de facto* ban on solicitation. (Am. Compl., ¶ 12). On that same date, plaintiff filed an application for an amended TRO to enjoin enforcement of the Licensing Requirement pending the hearing and determination of its application for a preliminary injunction, which was granted, without opposition, by order to show cause dated June 14, 2019.

Presently before the Court is plaintiff's application for a preliminary injunction enjoining and restraining defendant from enforcing the Solicitation Curfew, the Bond Requirement and the License Requirement (collectively, the "Ordinances").

II.  DISCUSSION

   A.  Standard of Review

"A district court may enter a prohibitory preliminary injunction staying 'government action taken in the public interest pursuant to a statutory or regulatory scheme' only when the

moving party has demonstrated that (1) absent injunctive relief, he will suffer 'irreparable injury,' . . . (2) there is 'a likelihood that he will succeed on the merits of his claim[,]'"[5] *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006) (quoting *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989)); *accord Dexter 3345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011); and (3) "the public's interest weighs in favor of granting an injunction." *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011); *accord Friends of the E. Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133, 143 (2d Cir. 2016). "[A] preliminary injunction is 'an extraordinary remedy never awarded as of right[,]'" *Benisek v. Lamone*, --- U.S. ---, 138 S. Ct. 1942, 1943, 201 L. Ed. 2d 398 (2018) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)), and "is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. 7, 32, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). Accordingly, a court must also consider whether the movant has shown "that the balance of equities tips in his favor." *Benisek*, --- U.S. ---, 138 S. Ct. at 1944; *see also American Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) ("A preliminary injunction is an equitable remedy and an act of discretion by the court. A party seeking a preliminary injunction must generally show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary

---

[5] Although a party who satisfies the irreparable harm and public interest elements may usually demonstrate either a likelihood of success on the merits or "sufficiently serious questions going to the merits and a balance of hardships tipping decidedly" in its favor, *Able v. United States*, 44 F.3d 128, 130-31 (2d Cir. 1995) (quoting *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir. 1991), the latter, less rigorous standard is not applicable "'[w]here the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme' . . . [because] governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Id.* (quoting *Plaza Health*, 878 F.2d at 580) (internal quotation marks added); *accord Otoe-Missouria Tribe of Indians v. N.Y.S. Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014).

relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest.").

B.  Likelihood of Success on the Merits

It is beyond cavil that door-to-door solicitation is a form of expression that is entitled to First Amendment protection. *See Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632, 100 S. Ct. 826, 63 L. Ed. 2d 73 (1980). Since the Ordinances restrict plaintiff's commercial speech, the Court must assess whether they "pass muster under the First Amendment commercial speech framework of *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980)." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 112 (2d Cir. 2017). "[T]he *Central Hudson* test for commercial speech restrictions is a form of intermediate scrutiny[,]" *Centro de la Comunidad Hispana*, 868 F.3d at 113, that requires courts "to ask: (i) if the Ordinance restricts speech that concerns lawful activity; (ii) if the Town's asserted interest is substantial; (iii) if the Ordinance directly advances that interest; and (iv) if the Ordinance is more extensive than necessary to serve that interest[.]" *Id.* (citing *Central Hudson*, 447 U.S. at 566, 100 S. Ct. 2343); *see also Edenfield v. Fane*, 507 U.S. 761, 767, 113 S. Ct. 1792, 123 L. Ed. 2d 543 (1993) (holding that "laws restricting commercial speech, unlike laws burdening other forms of protected expression," are subject to an "intermediate standard of review" pursuant to which they "need only be tailored in a reasonable manner to serve a substantial state interest in order to survive First Amendment scrutiny."); *Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 367, 122 S. Ct. 1497, 152 L. Ed. 2d 563 (2002) ("Under [the *Central Hudson*] test we ask as a threshold matter whether the commercial speech concerns unlawful activity or is misleading. If

so, then the speech is not protected by the First Amendment. If the speech concerns lawful activity and is not misleading, however, we next ask whether the asserted governmental interest is substantial. . . . If it is, then we determine whether the regulation directly advances the governmental interest asserted, and, finally, whether it is not more extensive than is necessary to serve that interest. . . . Each of these latter three inquiries must be answered in the affirmative for the regulation to be found constitutional." (quotations and citations omitted)).

"The government bears the burden of justifying the restriction." *Centro de la Comunidad Hispana*, 868 F.3d at 113; *see also Edenfield*, 507 U.S. at 770, 113 S. Ct. 1792 (holding that the burden of justifying a restriction on commercial speech is on the party seeking to uphold it). "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770-71, 113 S. Ct. 1792.

Since truthful and non-deceptive expression "will be snared along with fraudulent or deceptive commercial speech," *Edenfield*, 507 U.S. at 768-9, 113 S. Ct. 1792, the Ordinances restrict First Amendment protected speech that "concerns lawful activity." *See generally Centro de la Comunidad Hispana*, 868 F.3d at 113-15 ("[I]f . . . there are plausible ways to complete a proposed transaction lawfully, speech proposing that transaction 'concerns lawful activity' and is therefore protected commercial speech"). The Village's asserted interest in protecting the privacy of its residents, (*see* Defendant's Memorandum of Law in Opposition to Application for a Preliminary Injunction ["Def. Opp."] at 4), is a substantial interest under *Central Hudson*, *see, e.g. Ward v. Rock Against Racism*, 491 U.S. 781, 796, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989) (recognizing that the government has a substantial interest in seeking "to protect the well-being,

tranquility, and privacy of the home" (quotations and citation omitted)); as is the Village's interest in protecting the safety of its residents, (Def. Opp. at 5 [asserting an interest in protecting the Village's residents "from door-to-door hucksters, whether selling snake oil or pest control services."]). *See, e.g. Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 162-63, 122 S. Ct. 2080, 153 L. Ed. 2d 205 (2002) (recognizing that crime prevention is a legitimate governmental interest).

"That the [government's] asserted interests are substantial in the abstract does not mean, however, that its blanket prohibition on commercial solicitations, *i.e.*, solicitations for the sale of goods and services, *see* Village Code § 171-15, serves them. The penultimate prong of the *Central Hudson* test requires that a regulation impinging upon commercial expression 'directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose.'" *Edenfield*, 507 U.S. at 770, 113 S. Ct. 1792 (quoting *Central Hudson*, 447 U,S, at 564, 100 S. Ct. 2343). Accordingly, the government must show "not merely that its regulation will advance its interest, but also that it will do so 'to a material degree.'" *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505, 116 S. Ct. 1495, 134 L. Ed. 2d 711 (1996) (quoting *Edenfield*, 507 U.S. at 771, 113 S. Ct. 1792).

Numerous courts have found that permitting requirements for canvassing and soliciting, and curfews imposed upon canvassing and soliciting prior to 9:00 p.m., are not sufficiently connected to a municipality's interest in crime prevention. *U.S. Mission Corp. v. City of Mercer Island*, No. C14-1844, 2015 WL 540182, at * 7 (W.D. Wash. Feb. 10, 2015) (collecting cases regarding curfew); *see also Watchtower*, 536 U.S. at 169, 122 S. Ct. 2080 ("[I]t seems unlikely that the absence of a permit would preclude criminals from knocking on doors and engaging in conversations not covered by the ordinance. They might, for example, ask for directions or

permission to use the telephone, or pose as surveyers [sic] or census takers."); *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 574 (6th Cir. 2012) ("There is reason to doubt the effectiveness of a soliciting curfew in reducing crime. . . . What seemed 'unlikely' with regard to a permitting requirement is equally so in the case of a curfew. . . . There is no reason to believe . . . that a curfew on soliciting activities deters criminals from posing as canvassers, or from approaching private residences under different pretenses altogether. . . ."); *City of Watseka v. Illinois Pub. Action Counsel*, 796 F.2d 1547, 1555-56 (7th Cir. 1986), *aff'd*, 479 U.S. 1048, 107 S. Ct. 919, 93 L. Ed. 2d 972 (1987) (finding that a 9:00 p.m. curfew on solicitation was not sufficiently connected to the municipality's interest in preventing crime). Nor are solicitation curfews, or permitting or licensing requirements, sufficiently connected to the privacy interests of a municipality's residents. *See Ohio Citizen Action*, 671 F.3d at 572 (finding that the municipality's interest in protecting the privacy rights of its residents did not support the 6:00 p.m. curfew because the residents appear "generally averse to door-to-door advocacy, at any time of the day." (quotations and citation omitted)); *Watchtower*, 536 U.S. at 168-69, 122 S. Ct. 2080 ("The annoyance caused by an uninvited knock on the front door is the same whether or not the visitor is armed with a permit."); *Working America, Inc. v. City of Bloomington*, 142 F. Supp. 3d 823, 832 (D. Minn. 2015) ("With respect to privacy, the licensing requirement does not eliminate the 'evil,' intrusive knocking at the front door, it merely requires the precursor step of requiring some speakers to obtain a license before their knocking is legal. Furthermore, many sources of privacy interruptions—individuals seeking signatures for a legislative initiative, volunteers promoting a neighborhood block party, Girl Scouts, Boy Scouts, or other youth fundraisers—do not need to be licensed.")

With respect to the Bond Requirement, the Village has not shown why state criminal or tort laws are inadequate to deter fraud or criminal conduct, or to provide relief to its residents for tortious conduct, and, thus, failed to show that the Bond Requirement advances its interests to a material degree. *See Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1232-33 (10th Cir. 2005).

The fact that the Ordinances do not apply to all forms of door-to-door solicitations, only to commercial solicitations, *i.e.*, solicitations for the sale of goods and services, *see* Village Code §171-15, "strongly suggest[s]" that door-to-door solicitation, itself, "creates no inherent safety issue[,]" *Centro de la Comunidad Hispana*, 868 F.3d at 117; *i.e.*, that the Village's stated interests are not advanced by the Ordinances, since non-commercial solicitations, *e.g.* for religious, charitable or political purposes, remain unrestricted. "Entirely prohibiting one speech-based subset of an activity that is not inherently disruptive raises the question whether the [municipality's] actual motivation was to prevent speech having a particular content, rather than address an actual [safety or welfare] issue." *Id.*; *see also Village of Schaumburg*, 444 U.S. at 638-39, 100 S. Ct. 826 ("The 75-percent requirement is related to the protection of privacy only in the most indirect of ways. As the Village concedes, householders are equally disturbed by solicitation on behalf of organizations satisfying the 75-percent requirement as they are by solicitation on behalf of other organizations. The 75-percent requirement protects privacy only by reducing the total number of solicitors, as would any prohibition on solicitation. The ordinance is not directed to the unique privacy interests of persons residing in their homes because it applies not only to door-to-door solicitation, but also to solicitation on 'public streets and public ways.'"); *Wisconsin Action Coal. v. City of Kenosha*, 767 F.2d 1248, 1257 (7th Cir. 1985) (finding that the municipality's legitimate interests in protecting privacy and peaceful

13

enjoyment of the home were not advanced by its ordinance prohibiting only solicitation of contributions at certain hours since it did not "in any way prohibit door-to-door canvassing or distribution of literature," and there was no "evidence that solicitation constitutes some exacerbated threat to privacy not posed by the door-to-door activities which are permitted.")

Moreover, the Village has not established that the Ordinances are "narrowly drawn to further the interests served." *Centro de la Comunidad Hispana*, 868 F.3d at 115 (quotations and citation omitted). "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988). Although the Village does not "have to show that it chose the least restrictive means of advancing its asserted interests, nor that there was no conceivable alternative[,]" it must "establish that the regulation not burden substantially more speech than necessary to further its legitimate interests." *Centro de la Comunidad Hispana*, 868 F.3d at 115.

"[I]t is an 'important consideration' to the 'narrowly drawn' requirement if there existed 'numerous and obvious less-burdensome alternatives to the restriction on commercial speech[.]'" *Centro de la Comunidad Hispana*, 868 F.3d at 117 (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 632, 115 S. Ct. 2371, 132 L. Ed. 2d 541 (1995)); *see also Thompson*, 535 U.S. at 371, 122 S. Ct. 1497 ("[I]f the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so. . . . The fact that . . . [multiple] alternatives could advance the Government's asserted interest in a manner less intrusive to [] First Amendment rights indicated that the law was more extensive than necessary. (quotations, alterations and citations omitted)).

There are less-burdensome alternatives available to protect the safety and privacy of the Village's residents. For example, the Village may enforce its trespassing laws against anyone

who enters or remains on private property after the owner has indicated that he or she is not welcome; residents can refuse to answer the door for, or close the door upon, any solicitor or canvasser whose speech they do not want to hear; and residents can post a sign indicating that they do not want to receive messages from solicitors or peddlers pursuant to Section 171-19 of the Village Code. *See, e.g. Watchtower*, 536 U.S. at 168, 122 S. Ct. 2080 (invalidating an ordinance provision requiring solicitors to obtain a permit where another provision provided "for the posting of 'No Solicitation' signs, . . . [which] coupled with the resident's unquestioned right to refuse to engage in conversation with unwelcome visitors, provides ample protection for the unwilling listener."); *Village of Schaumburg*, 444 U.S. at 639, 100 S. Ct. 826 ("Other provisions of the ordinance, which are not challenged here, such as the provision permitting homeowners to bar solicitors from their property by posting signs reading 'No Solicitors or Peddlers Invited,' . . . suggest the availability of less intrusive and more effective measures to protect privacy." (citation omitted)); *City of Watseka*, 796 F.2d at 1556-57 (holding that the municipality failed "to prove a significant relationship between protecting the quiet enjoyment and peace of its residents and the 5 p.m. to 9 p.m. ban[,]" because "[a]nother provision of the ordinance allows [its] residents to protect themselves from all solicitors at all times simply by posting signs. . . . [The municipality] has already provided unwilling listeners with a mechanism to ban all solicitors from their property at any time the listeners desire. A resident who does not want to be disturbed during dinner but is willing to talk to canvassers thereafter can post the sign during dinner and take it down once the table is cleared. [The municipality] can prosecute any solicitor who disturbs a resident posting a no solicitation sign. The only additional effect of the citywide 5 p.m. to 9 p.m. ban is to deprive willing listeners of the canvassers' message."); *Wisconsin Action Coal.*, 767 F.2d at 1257 (holding that the municipality's enforcement of its trespass laws "against

solicitors who enter or remain on private property after the owner has indicated the solicitor is not welcome[,]" and the ability of its residents to post a no-solicitation sign, are less restrictive alternatives to an 8:00 p.m. curfew). Since the Ordinances broadly impact protected commercial speech and only narrowly address the Village's stated interest in the safety and privacy of its residents, plaintiff has demonstrated a likelihood of success on the merits of its claims that the Ordinances are unconstitutional restrictions of commercial speech in violation of the First Amendment.

### C. Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976). Where, as here, "a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 246 (2d Cir. 2014) (quoting *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003)).

### D. Public Interest

"The constitutional guarantee of free speech serves significant societal interests wholly apart from the speaker's interest in self-expression." *Pacific Gas and Elec. Co. v. Public Utilities Comm'n of California*, 475 U.S. 1, 8, 106 S. Ct. 903, 89 L. Ed. 2d 1 (1986) (quotations and citation omitted). "By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information."

*Id.*; *see also N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("[S]ecuring First Amendment rights is in the public interest.")

In *Edenfield*, the Supreme Court held, in pertinent part:

> "In the commercial context, solicitation may have considerable value. Unlike many other forms of commercial expression, solicitation allows direct and spontaneous communication between buyer and seller. A seller has a strong financial incentive to educate the market and stimulate demand for his product or service, so solicitation produces more personal interchange between buyer and seller than would occur if only buyers were permitted to initiate contact. Personal interchange enables a potential buyer to meet and evaluate the person offering the product or service and allows both parties to discuss and negotiate the desired form for the transaction or professional relation. Solicitation also enables the seller to direct his proposals toward those consumers who he has a reason to believe would be most interested in what he has to sell. For the buyer, it provides an opportunity to explore in detail the way in which a particular product or service compares to its alternatives in the market."

*Edenfield*, 507 U.S. at 766, 113 S. Ct. 1792. Thus, the Ordinances, by restricting commercial speech, "threaten[] societal interests in broad access to complete and accurate commercial information that First Amendment coverage of commercial speech is designed to safeguard." *Id.* "[T]he general rule is that the speaker and the audience, not the government, assess the value of the information presented[]" in the commercial marketplace. *Id.* at 767, 113 S. Ct. 1792. Accordingly, the public's interest weighs in favor of granting plaintiff's application for a preliminary injunction.

### E. Balance of Equities

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, --- U.S. ---, 137 S. Ct. 2080, 2087, 198 L. Ed. 2d 643 (2017). "The purpose of such interim equitable relief is not to conclusively determine

the rights of the parties, . . . but to balance the equities as the litigation moves forward." *Id.* (citation omitted).

Considering, *inter alia*, that irreparable harm to plaintiff may be presumed by the deprivation of its First Amendment right to free speech; that securing First Amendment rights is in the public interest; and that the Village has not demonstrated any potential harm that might befall it or its residents if enforcement of the Ordinances is enjoined pending a final resolution of this action, particularly since it has not established that the Ordinances directly advance its asserted interests in protecting the safety and privacy of its residents, the balance of equities weighs in favor of granting a preliminary injunction in this case. Accordingly, plaintiff's application for a preliminary injunction is granted and the Village, its agents, servants, employees, attorneys, and all others in active concert or participation with it, is preliminarily enjoined and restrained from enforcing Sections 171-14, 171-16 and 171-18 of the Village Code pending the final determination of this action or further order of this Court, except that it may restrict all door-to-door solicitations in the Village "before the hour of 9:00 a.m. of any day or after dusk of any day, except upon the invitation of the householder or occupant."

III. CONCLUSION

For the reasons set forth above, plaintiff's application for a preliminary injunction is granted and the Village, its agents, servants, employees, attorneys, and all others in active concert or participation with it, is preliminarily enjoined and restrained from enforcing Sections 171-14, 171-16 and 171-18 of the Village Code pending the final determination of this action or further order of this Court, except that it may restrict all door-to-door solicitations in the Village "before the hour of 9:00 a.m. of any day or after dusk of any day, except upon the invitation of

the householder or occupant." Since plaintiff alleges infringement of fundamental constitutional rights, and the Village has not identified any harm it would suffer as a result of the preliminary injunction, the Court exercises its discretion to waive the security required by Fed. R. Civ. P. 65(c).

SO ORDERED.

                                                 _____/s/_____
                                                 Sandra J. Feuerstein
                                               United States District Judge

Dated: July 16, 2019 at 4:43 p.m.
        Central Islip, New York