IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
CENTRAL ISLIP DIVISION
-------------------------------------------------------------X
APTIVE ENVIRONMENTAL, LLC,

                             **REPLY**
                             **AFFIDAVIT**

               Plaintiff,

                           **Index No. 19-CV-03365**
                           **(SJF-SIL)**

      -against-

VILLAGE OF EAST ROCKAWAY,
NEW YORK,

               Defendants.

-------------------------------------------------------------X

      JOHN E. RYAN, ESQ., being duly sworn, deposes and says:

      1.     I am admitted to practice before this Court. I am a member of the firm RYAN, BRENNAN & DONNELLY LLP, attorneys for the Defendant, VILLAGE OF EAST ROCKAWAY ("VILLAGE"), in the above-captioned action.

      2.     This Affidavit, and the accompanying Reply Memorandum of Law, are submitted in support of the VILLAGE's motion for an order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting the VILLAGE summary judgment dismissing Plaintiff's Second Amended Verified Complaint. These papers also are submitted in opposition to Plaintiff's motion for summary judgment.

      3.     In its Notice of Cross-Motion for Summary Judgment, Plaintiff correctly posits the sole remaining issue before this Court in this case, to wit:

> Whether "as a matter of law . . . the $200 solicitation
> fee of the Village . . . violates the First Amendment
> . . . .

Plaintiff's Notice of Cross-Motion for Summary Judgment, dated March 31, 2020, at p.1.

4.      By filing its cross-motion for summary judgment, Plaintiff also has conceded that there exists no genuine issues of material fact preventing this Court from deciding this issue of law.  See Plaintiff's Memorandum of Law, at p. 2 ("Simply put, no genuine issue of material fact exists.").

5.      Section 171.3 of the Village Code, which imposes the $200 fee, expressly recites what "[t]his fee will be applied to:

        a) processing costs;
        b) criminal background checks;
        c) maintenance of the "No Knock" list; and
        d) enforcement of the provisions of the Code.

6.      In its Responses to Plaintiff's First Set of Discovery Requests, a copy of which is annexed as Exhibit "C" to the Declaration of Clint Cowan, executed March 21, 2020 in Dallas, Texas, the VILLAGE confirmed that I, as Village Attorney, was the only individual involved in determining the $200 fee amount.  See Response to Interrogatory 2.

7.      In addition, the VILLAGE confirmed that the Code provisions were substantively identical to those contained in Chapter 47 of the Village Code of Floral Park, New York, both of which "were based upon the `model code´ provided by plaintiff's former counsel, Jeremy Fielding, Esq.".  Interrogatory Response No. 7.  The Floral Park Code, including the provision regarding the $200 license fee, were the subject of a stipulation of settlement, which was so-ordered by Judge Bianco in Aptive v. Floral Park, 18-cv-4690, Document No. 27.

8.      With respect to the projected expenses the VILLAGE expects to incur in connection with commercial solicitation licenses, the following were specified in the Village's Response to Interrogatory No. 5:

     (a)      Criminal background check ($100);

     (b)      Initial review of application, etc. ($50 to $75);

     (c)      Maintenance of No-Knock List ($50 to $75);

     (d)      Enforcement ($50 to $75).

9.     Notwithstanding Plaintiff's protestations, based on my forty years of practice, I do have personal knowledge that the cost of a criminal background check conducted by a licensed private investigator in this area of the country is at least $100. Also, Plaintiff has conceded that these costs range from $100 to $125 on Long Island. See Declaration of Pierson "Pierse" Baldwin, Docket 40 – 1 at Para. 19, p. 870. As of two months ago, the New York State Office of Court Administration ("OCA") was charging a $95.00 fee just for a New York Statewide Criminal History record search. See Exhibit "B" to Affidavit of John E. Ryan, sworn to February 20, 2020.

10.     Similarly, there is not question of fact regarding the annual salaries of Village Clerk ($123,000.00) and Superintendent of Buildings ($121,000.00). If they each spend only one-half hour to one hour with respect to the application process, no-knock list and enforcement of the Village Code provisions regarding solicitation, their pro-rated salaries would be at least another $130 in additional costs incurred by the VILLAGE.

11.     With respect to such processing and enforcement expenses, these are clearly based on reasonable projections. In this regard, attached hereto as Exhibit "A" are additional pages of testimony from the deposition of the Village Clerk which was not included by the Plaintiff.

12.     Among other things, the Village Clerk confirmed that no commercial solicitation licenses have been sought or issued in the Village for many years. Exhibit "A", at p. 18-26. With the exception of one company, only one such application has been received by the VILLAGE for a commercial solicitation license under the amended Code provisions. Id.

13.     There will be multiple steps in the licensing process, including intake, review by staff, counsel and the Board of Trustees, as well as time spent on generating and continually updating the "No-Knock list." Id. at pp. 26-28; 85; 121-124.

14.     Because no commercial solicitation license has been issued under the new Code provisions, exact costs are not available.  Id. at pp. 22; 42-43; 82-85.  However, these costs are reasonable projections.  The likely costs, including the criminal background check, will be at least $200.  Id. at p. 63; 113.

15.     The $200 fee is reasonably related to the VILLAGE's actual anticipated expenses and certainly is not unconstitutional.  In Plaintiff's view, the only "constitutional" fee that the VILLAGE could impose would be between $25-$50.  This contention apparently is based upon the fact that the fee established by the VILLAGE in 1945 for such licenses was $25.00.  Perhaps needless to say, and the rate of inflation aside, the VILLAGE's operational costs have increased dramatically over the least seven and one-half decades.

WHEREFORE, it is respectfully requested that: (a) the VILLAGE's motion be granted; (b)  Plaintiff's motion be denied; and (c) that the Second Amended Complaint be dismissed, together with such other and further relief as this Court deems proper.


_John E. Ryan_

Sworn to before me this
1st day of May, 2020


_Mary Forgione_
Notary Public

MARY FORGIONE
NOTARY PUBLIC STATE OF NEW YORK
QUEENS COUNTY
LIC. #01FO6219236
COMM. EXP 03-22-2022

4

# EXHIBIT A

1
2  UNITED STATES DISTRICT COURT
   FOR THE EASTERN DISTRICT OF NEW YORK
3  CENTRAL ISLIP DIVISION
   --------------------------------------X
4
   APTIVE ENVIRONMENTAL, LLC,
5
                    Plaintiff,
6
             - against -
7
   VILLAGE OF EAST ROCKAWAY, NEW YORK,
8
                    Defendants.
9
10  NO.:  2:19-cv-03365-SJF-SIL
11  --------------------------------------X
12
                         131 Tulip Avenue
13                       Floral Park, New York
14                       February 6, 2020
                         10:02 A.M.
15
16
17
18          DEPOSITION OF PATRICIA RENNER,
19  a witness on behalf of the Defendant, taken by
20  the attorney for the Plaintiff, pursuant to Rule
21  30(b)(6), and held before Deborah Thier, a Notary
22  Public of the State of New York at the above-stated
23  time and place.
24
                    *    *    *    *
25

Patricia Renner - February 6, 2020

1    give my presentation and then they decide, the board

2    decides what the budget will be, whether it's less or

3    more.

4        Q      So you would come to the board on an annual

5    basis and say, here are the expenses we have, here is

6    what I recommend you ought to appropriate?

7        A      Correct.

8        Q      So you are familiar with the various expenses

9    of the village clerk's office?

10       A      Correct.

11       Q      I take it the villager clerk's office

12   performs at least a few tasks, I might be understating

13   it, for the village?

14       A      Correct.

15       Q      What are those tasks that are performed by

16   the village clerk's office?

17       A      We collect taxes, property taxes, we collect

18   permit fees for parking, for landscapers, for

19   hairdressers, beauty salons in the village.  We have

20   FOIA requests that we process.

21       Q      Is that Freedom of Information Act?

22       A      Correct.

23              Yes, we have several applications.  We used

24   to do those and now we're not doing that anymore.  We

25   have the solicitors, we have scavengers, we have --

1      Q      Are scavengers secondhand dealers?

2      A      Yes.

3             I believe that's -- I'm not sure what the

4      other ones are.

5      Q      As village clerk, you would be familiar with

6      the time and materials involved in issuing the licenses

7      that you described earlier; is that right?

8      A      I don't actually issue all of them.  I may

9      approve them, but I don't do the issuing.  I oversee the

10     people who do the issuing.

11     Q      But you are personally familiar with how much

12     time it generally takes for them to do the issuance; is

13     that correct?

14     A      I could approximate, I guess.

15     Q      And you've done that issuance yourself

16     probably as deputy clerk as well?

17     A      No, not really.

18     Q      Have you ever personally ever issued a

19     solicitor's license to someone?

20     A      No, not as of yet.  It's a new process, so we

21     haven't actually -- well, no.

22            Let me -- we have received one as a result of

23     a complaint, we sent out one of the applications.

24     Q      The office sent out an application to

25     someone.

1          Did that person return that application
2    filled out?
3          A      No.   It was just done recently, about a week
4    to two weeks ago.
5          Q      With respect to the other business licenses
6    that you described, have you personally issued any of
7    those business licenses to an applicant before?
8          A      Parking permits I've issued.
9          Q      What about a landscape license?
10         A      No.
11         Q      Secondhand dealer license?
12         A      No.
13         Q      But you supervise the people who do issue
14   those licenses?
15         A      Yes.
16         Q      So you know the time and materials and
17   expense involved?
18         A      Yes.
19         Q      Are there any businesses that do not require
20   a license to operate in the village?
21         A      I suppose so.   I'm not really sure.   Like a
22   CVS, I can't think of any license that the village
23   issued.
24         Q      Are there any business licenses besides
25   solicitors in East Rockaway that require a criminal

Patricia Renner - February 6, 2020

1  background check?

2      A    I don't -- I'm not sure.  I don't think

3  so, but I'm not sure.

4      Q    We were talking earlier about the other

5  business licensing that the clerk's office does.

6           Are you aware in your capacity of formulating

7  the budget of the village losing money on issuing any of

8  those licenses?

9      A    I'm sorry, can you just repeat that?

10     Q    Sure.

11          For example, let's take a landscaping

12  license, I believe the last -- I don't know what the fee

13  was, but are you aware that the village is spending a

14  higher amount to issue the license than it is collecting

15  as a fee from the applicant?

16     A    No.

17     Q    I realize this is personal, so I apologize in

18  advance for the awkwardness, what was your total annual

19  compensation in 2020, or what is your expected total

20  compensation in 2020?

21     A    A hundred and six thousand.

22     Q    Does that include bonus, retirement, health

23  and disability benefits?

24     A    I don't receive a bonus.  I have a longevity

25  check that I receive which is included in that.

Patricia Renner - February 6, 2020

1   Benefits are additional.

2              And what was the other item?

3      Q    Any type of health, disability, life

4   insurance, if you were to add up all of your forms of

5   compensation, what --

6      A    Well, we do get a -- if I should die, there's

7   a life insurance.  But that would be extra that I'm not

8   including in that.

9      Q    If you were to try to estimate your total

10  annual compensation, including all of those benefits for

11  2020, what do you think it would be?

12     A    The only extra one would be the medical

13  benefit and the dental and eye glass, and that probably

14  is in the -- 'cause I have single, I don't have a family

15  plan, so that is probably an additional seventeen

16  thousand.

17     Q    So, approximately, a hundred and twenty-three

18  thousand total annual compensation for this year?

19     A    Yes.

20     Q    What do you think it was in the years 2017

21  through 2019, could you give me an approximation?

22              MR. RYAN:  As to what years, I'm sorry,

23        Counselor?

24              MR. COWAN:  2017 through 2019.

25     A    Ninety-five thousand -- oh, with medical,

1   then it would be another additional, maybe, fifteen
2   thousand.
3       Q     So, approximately, in 2017 a hundred and ten
4   thousand?
5       A     Correct.
6       Q     Then 2018, approximately, a hundred and
7   fifteen?
8       A     Correct.
9       Q     Then 2019, perhaps about a hundred and twenty
10  thousand?
11      A     Correct.
12      Q     I won't hold you to that.  I know these are
13  approximate.
14            Besides you, who are the other current
15  employees in the clerk's office?
16      A     Cindy Lark is the deputy clerk, L-A-R-K,
17  Theresa Gaffney is the deputy treasurer, G-A-F-F-N-E-Y.
18  Then there's Robert Vito, he's the tax person, and Donna
19  Pagliero, P-A-G-L-I-E-R-O, she's the accountants
20  payable, and Cheryl Conklin, C-O-N-K-L-I-N, she is the
21  secretary to the board of trustees.
22      Q     Total of six employees including
23  yourself?
24      A     Yes.
25      Q     What are Cindy Lark's main job

1  responsibilities?

2      A     Cindy does the minutes.  She also spearheads

3  a lot of our village events.  She also does awards that

4  the board likes to give out at the board meetings, and

5  she keeps a calendar for myself and her as far as the

6  meetings go.

7      Q     How many of her yearly hours involved tasks

8  related to solicitation?

9          MR. RYAN:  Talking about commercial

10     solicitation?

11         MR. COWAN:  Correct.

12     A     Yes, she worked on finding addresses for me

13  for the one solicitation application that we did get.

14  So about an hour.

15     Q     About an hour in the past three years?

16     A     Well, we've only had one application in the

17  past three years, so yes.

18     Q     Does she have any other job responsibilities

19  that might involve tasks related to solicitation?

20     A     No.

21     Q     I know you might need to give an

22  approximation, but what is her total yearly

23  compensation?

24     A     Eighty-five thousand plus the family plan,

25  which I think is about twenty-five thousand, and that's

1   approximate.  I'm not sure.

2          MR. COWAN:  The health insurance is so

3      expensive.

4          MR. RYAN:  Is that a question or just a

5      comment?

6          MR. COWAN:  Just a comment.

7          MR. RYAN:  I agree with that.

8          MR. COWAN:  You can move to strike,

9      Counsel.

10         MR. RYAN:  No, I agree with that.  The only

11     thing you've said so far that I agree with.

12     Q      You mentioned Ms. Gaffney is deputy

13  treasurer.

14         Does she perform any job tasks related to

15  solicitation?

16     A      No.

17     Q      What about Mr. Vito, any job tasks for him

18  related to solicitation?

19     A      Future, possibly.  Has he done any so far

20  with one application, no.

21     Q      What about Ms. Pagliero?

22     A      No.

23     Q      No job tasks related to solicitation?

24     A      No -- wait now, let me go back, 'cause the

25  solicitation -- if someone would -- if someone would be

1    handing in an application, Mr. Vito, Cheryl Conklin or

2    Donna Pagliero would probably go up to the counter and

3    receive the application.

4         Q       What would they do with that after they

5    received it?

6         A       They would give it to me.

7         Q       So you would be doing most of the processing

8    of the application for a solicitor license?

9         A       Correct.

10        Q       Besides what you described about receiving

11   the applications, would Ms. Conklin have any job duties

12   related to solicitation?

13        A       No.

14        Q       Does the village have any independent

15   contractors who perform any tasks related to

16   solicitation?

17        A       I'm not sure I understand the question.

18        Q       All the people at the village who deal with

19   regulating solicitation, are they all village employees?

20        A       Yes.

21        Q       So you're not aware of outsourcing any tasks

22   related to solicitation in the village?

23        A       Well, a background check is not done within

24   the village.

25        Q       Has the village submitted any applications

Patricia Renner - February 6, 2020

1  for a background check to date?

2       A    Well, we do background checks only in

3  recreation for contractors, but not for solicitation

4  yet.  We've only received one application so far.

5       Q    So there were no background checks done from

6  the years 2017 through 2019?

7       A    No.

8       Q    There hasn't yet been any background check

9  done in 2020?

10      A    No.

11      Q    Are there any other people in other village

12  departments who might have any job tasks related to

13  solicitation?

14      A    No.

15      Q    It's only the village clerk's office

16  that regulates solicitation?

17      A    Correct.

18      Q    How many hours did the village spend in tasks

19  in relating to licensing solicitors in 2017?

20      A    Zero.

21      Q    What about in 2018?

22      A    Zero.

23      Q    2019?

24      A    I'm not sure in 2019.

25      Q    Can you give me a range of hours?

1     A     I may have spent some hours developing

2  the new form.  Several hours actually developing

3  the forms that would be used, but I'm not sure if

4  it was December or January of this year that I've

5  been doing that.

6     Q     Would you say two to three hours developing

7  the form?

8     A     No, longer.

9           Well, there was the -- the e-mails from

10 residents to be placed on a do not knock list and the

11 forms to be used for the applications.

12    Q     Would you say between three and five hours?

13    A     Between December and January I would say at

14 least seven hours.

15    Q     Between December of 2019 and January of 2020?

16    A     Yes.

17    Q     What about from January through November of

18 2019, how many hours did the village clerk spend on --

19    A     None.

20    Q     How many hours under the new ordinance does

21 it take the village clerk's office to create a solicitor

22 license?

23    A     To create the license?  I'm not sure I

24 understand.

25          To create the application or to generate the

1   low of a fee?

2       A       We recently changed our fees, took the

3   fees out of the code because the entire code --

4   because they were outdated.

5       Q       Up until June of 2019 had anyone come

6   to you and said twenty dollars is too low of a fee

7   for a solicitor's license?

8       A       No.

9       Q       Up until June of 2019 had anyone from the

10  village expressed concern that the village clerk's

11  office was losing money because it was charging too

12  little for a solicitor license?

13      A       No.

14      Q       I want to look now at or talk about the past

15  few years under this ordinance.

16              MR. RYAN:  Which ordinance?

17              MR. COWAN:  The ordinance in this

18      Exhibit 2.

19      Q       In 2019 how much did it cost the village to

20  process and issue a single solicitor license under this

21  ordinance?

22      A       I don't have a figure off the top of my head.

23  I don't know.

24      Q       But it had to have been less than twenty,

25  otherwise you would have been losing money?

```
 1              MR. RYAN:  Object to the form of the
 2      question.
 3      A       There were no commercial solicitation
 4   licenses issued ever since I've been there that
 5   I'm aware of.
 6      Q       So there's no way to know --
 7      A       Correct.
 8      Q       -- what the cost would be --
 9      A       Correct.
10      Q       -- because no commercial solicitation
11   licenses were issued by the village?
12      A       Correct.
13      Q       There are certain exemptions in the
14   ordinance.
15              Do you recall that?
16      A       No.
17      Q       Certain groups don't have to pay, 'cause I'm
18   looking at Section C of 171-17.
19      A       Yes.
20      Q       Do you know how much it cost the village in
21   2019 to issue a single solicitor license for a member of
22   a recognized village association of war veterans,
23   police, firemen, or religious or charitable
24   organization?
25      A       No license fee shall be charged.
```

Patricia Renner - February 6, 2020

1          You answered.

2      Q     You're the person who would be most

3  knowledgeable about the expenses that the village incurr

4  related to solicitation; isn't that right?

5      A     Yes, I would be.  I suppose I could be the

6  person that would be able to figure out how much, yes.

7      Q     You know what these licenses cost to produce,

8  don't you?

9          MR. RYAN:  Which licenses, Counselor?

10          MR. COWAN:  The licenses that are referred to

11      in this draft amended Local Law at Exhibit 4.

12      A     If asked to give an approximation, then I

13  could.

14      Q     I want to turn with you in this draft law to

15  Section 171-2.

16          Do you see the reference in Section 171-2 to

17  another village?

18      A     Yes.

19      Q     If you look down with me at subsection

20  H, do you see in the last sentence of subsection H

21  that it refers to another village?

22      A     Yes.

23      Q     What village is that?

24      A     Village of Floral Park.

25      Q     Not the Village of East Rockaway;

1              As I stated before, we've never issued any

2    prior -- have not issued one yet since I'm in the

3    village other than the non-for-profit, which just was a

4    letter.

5         Q      Was there a reason why the village never

6    previously gave licenses to for-profit solicitors?

7              MR. RYAN:  Objection.

8              You can answer.

9         A      There were never any requests for it.  We've

10   never received a request for it.

11        Q      Was there a policy against allowing it?

12        A      No, just never received any solicitors

13   requesting it other than the non-for-profits or

14   canvassing.

15        Q      In Section 171-2, the information that's

16   listed here in A through J, is all that information

17   requested on the current application that's been

18   recently developed?

19        A      I believe, I believe we have everything but

20   the vehicles that would be used in solicitation on the

21   application.  I missed that.

22        Q      Is the application still in draft form or can

23   an applicant get it right now?

24        A      They can get it.  We've sent one out to an

25   applicant.  As a result of a complaint, I sent one out

1   to Altice.

2        Q      Who is Altice?

3        A      Cablevision.

4        Q      So they were a company going door to door in

5   the village?

6        A      Correct.

7        Q      As you look through here at Section 171-2, do

8   you see any additional information that's included in

9   the new application that is not present here in the

10  ordinance?

11       A      No.

12       Q      So the village is not requesting any

13  information beyond what is here in the ordinance?

14       A      Correct.

15       Q      Currently if someone wanted to apply for a

16  solicitor license in the village, what would that person

17  have to do?

18       A      They'd have to request an application and

19  they would be sent a cover letter with the application,

20  and then once it's sent back into the village, then it

21  would be reviewed by the board.

22              Then we'd have to go through the procedures,

23  background check and review, and then have to send them

24  either a permit or -- which we haven't even made up the

25  permit yet, because this is brand new, and then -- oh,

1   and they would have to show us too whether they're, you

2   know, the corporation or a -- if they're there as the

3   non-for-profit, and then they would get the permit.

4        Q     Will the permit --

5        A     And I'm sorry I'm stuttering a little, it's

6   because we haven't done it yet, so I'm kind of just

7   muddling through.

8        Q     Understood.

9              Thank you for answering my questions, by the

10  way.

11             Do you think that the license itself, the

12  hard copy license, will be available by the fall of this

13  year?

14       A     Yes.  I see no reason why it wouldn't be.

15       Q     I want you to turn with me to subsection J in

16  that same section, and it says here such other

17  information as the board of trustees may require.

18             What do you take that section to mean?

19       A     That the board might require some additional

20  information and we would request it in writing.  After

21  reviewing, if they have any questions regarding what's

22  maybe not clear what goods they're going to be

23  soliciting, et cetera.

24       Q     Anything else?

25       A     I can't think of anything.

Patricia Renner - February 6, 2020

1      Q      So the process is that the applicant first
2  submits the application; correct?
3      A      Yes.
4      Q      After that the village clerk's office takes
5  the application to the board of trustees; is that
6  correct?
7      A      Yes.
8      Q      Then the board of trustees reviews the
9  application; is that correct?
10     A      Yes.
11     Q      What would happen then if the board
12 determines that it needs other information as stated
13 here in subsection J?
14     A      I would send something in writing to the
15 applicant requesting that information.
16     Q      Is there any guidance in the ordinance about
17 what types of other information that the board could
18 request?
19            MR. RYAN:  Objection.
20            You could answer.
21     A      I'm not sure.
22     Q      Just looking at subsection J --
23     A      And, I'm sorry, --
24     Q      Go ahead.
25     A      -- the other aspect would be that I would

Patricia Renner - February 6, 2020

```
 1   one hundred dollars, at least.  My time, the board's
 2   time, the denial letter, those all are costs that we
 3   incur.
 4              So, no, twenty-five dollars is not the total
 5   cost of that.
 6        Q     What do you think the total cost is?
 7        A     Approximately?
 8        Q     Yes.
 9        A     Two hundred dollars.
10        Q     Has the village ever licensed a solicitor
11   before?
12        A     No.
13        Q     So what basis --
14        A     I'm using approximate in all my answers
15   because we have not done it.  So we're approximating the
16   costs.  We don't know for sure what the costs are until
17   we have one that we can process fully through the
18   application, and I don't know what the failure to pass
19   and be disapproved is because we haven't done that.
20              I'm approximating, I'm guessing.  I'm not --
21   I don't know for sure because we haven't done it.
22        Q     The two hundred dollar fee is a guess?
23              MR. RYAN:  Object to the form of the
24        question.
25              You can answer.
```

1 fifty to seventy-five dollars per solicitor to do intake
2 and review of applications?
3     A    Yes.
4     Q    Is it true that the village has not yet
5 drafted its application for solicitor license
6 applicants?
7          MR. RYAN:  Object to the form of the
8     question.
9          You can answer.
10     A    No, we have drafted an application for
11 solicitors.
12     Q    Has it been finalized?
13     A    I sent one out.  I'm not so sure, I may have
14 to amend it though to include the last -- during the --
15 during one of the questions there was a part that was
16 missing and I have to add that now.
17     Q    So the application has been drafted but it
18 might be amended later on?
19     A    Yes.
20     Q    How can the village know that processing an
21 intake of each application will take fifty to
22 seventy-five dollars?
23     A    Someone has to receive the application, stamp
24 it in, pass it onto me.  It has to go on the agenda.  It
25 has to be reviewed by the board, it has to be reviewed

Patricia Renner - February 6, 2020

1  -- our attorney is at the board meetings, so he will

2  also be inputting.

3           Then we have to then review all of the

4  background check, the application itself, what type of

5  business, make sure there's no additional information

6  that we're missing.  So that's all time, and time is

7  money.

8      Q     But all of those tasks are at this point

9  speculative because the village hasn't yet done this;

10 right?

11          MR. RYAN:  Object to the form of the

12     question.

13          You can answer.

14     A     We have not gone past sending the application

15 along with a letter.

16     Q     That was done on one occasion?

17     A     Correct.

18     Q     What evidence or documents does the village

19 have to support its view that intake and review will

20 cost fifty to seventy-five dollars?

21          MR. RYAN:  Object to the form of the

22     question.  Object, the question's been asked

23     and answered.

24          Go ahead.

25     A     Okay.  So someone will have to take in the

Patricia Renner - February 6, 2020

1    application.

2              MR. RYAN:  I think his question was --

3        Q    I'm asking specifically about documents.  I

4    was unclear as well.

5        A    I'm sorry, can you just repeat that?

6        Q    What documents or other evidence does the

7    village have to support its view that intake and review

8    of applications will take fifty to seventy-five dollars

9    per applicant?

10             MR. RYAN:  Same objection as before.

11       A    It's an approximation.  I am not -- it's

12   nothing definitive.  There's no paperwork definitively.

13       Q    I'm looking now at the section of

14   interrogatory number five where it talks about

15   enforcement.

16             Are you with me on that?

17       A    Yeah.

18       Q    It says fifty to seventy-five dollars per

19   solicitor; right?

20       A    Yes.

21       Q    What basis does the village have for its view

22   that each solicitor will impose a fifty to seventy-five

23   dollar enforcement burden on the village?

24             MR. RYAN:  Object to the form of the

25        question.  Object that the question has been

1          asked and answered.

2                    You may answer.

3          A      The enforcement personnel for each

4    application, which we only had one, so it's an

5    approximate, it's not a definitive, and you have to keep

6    -- for every application that we -- well, the one

7    application that we've had so far has been as a result

8    of a complaint from a resident which then generated code

9    enforcement.

10                   So I'm not going through the phonebook

11   looking for solicitors.  I'm going based on complaints

12   from residents.  So that generates a code enforcement

13   response.  So that's a salary for the code enforcement

14   person, and Tom Smith, the supervisor of the code

15   enforcement, they're being utilized.

16         Q      So Mr. Smith supervises and then there's a

17   full-time individual; correct?

18                   MR. RYAN:  Objection.  Asked and answered.

19                   You can answer.

20         A      Yes.

21         Q      And then four part-time, is that also

22   correct?

23         A      Yes.

24         Q      What research did the village do about

25   the cost of enforcement of its solicitation code